IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| **GUARANTEE COMPANY OF NORTH** | ) | |
| **AMERICA, USA** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **CIVIL ACTION NO.** |
| | ) | **2:09-CV-1003-MEF** |
| **vs.** | ) | |
| | ) | |
| **SHERYL B. WAINWRIGHT,** | ) | |
| **et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**BRIEF OF DEFENDANT FIRST COMMUNITY BANK OF CENTRAL
ALABAMA, INC. IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Defendant First Community Bank of Central Alabama, Inc. hereby submits the following

Brief and Statement of Uncontested Material Facts in support of its Motion for Summary

Judgment filed this date:

## I.   INTRODUCTION AND SUMMARY OF ARGUMENT

This case presents claims by Guarantee Company of North America ("CGNA") to

recover indemnity from W.D. Wainwright & Sons, Inc. ("WDWS"), the Principal under

performance and payment bonds issued by GCNA in 2007 and 2008 on eight bonded projects.

CGNA also named as Defendants the individual owners of WDWS, and their spouses, all of

whom purportedly signed an indemnity agreement in favor of GCNA.  GCNA asserts that it has

a contractual right to full indemnity and exoneration from all of the indemnitors who signed or

assented to the indemnity agreement.

Two of the indemnitors whose names appear on the indemnity agreement, William J.

("Jeff") Wainwright and his wife, Tracye Wainwright, deny that they signed the indemnity

agreement and maintain that their purported signatures are forgeries.  Accordingly, GCNA seeks (Count IV) a declaration as to whether those two indemnitors are bound under the indemnity agreement.[1]

The sole Count asserted against First Community Bank of Central Alabama ("First Community") is a claim of "breach of notary obligations" by its employee, Denise Poole, based upon the allegation that she falsely notarized the signatures of Jeff and Tracye Wainwright on the indemnity agreement, and that they therefore are not bound under the agreement. This is a contingent, fallback claim which exists only if and to the extent that GCNA fails to recover from Jeff and Trayce Wainwright.  If GCNA is made whole by them, or any of the other indemnitors, who are jointly and severally liable, then GCNA's claims are satisfied and there is no viable claim against First Community.

As the facts will demonstrate, Poole notarized the document in question as a courtesy and the Indemnity Agreement was not First Community's bank business. GCNA claims that it detrimentally "relied" upon the notary acknowledgement and would not have agreed to act as surety for WDWS or issue any bonds "but for" the notary acknowledgement.  Through this wholly contrived claim, WDWS is attempting to shift the entire potential loss under the bonds to First Community, which had nothing to do with the relationship between GCNA and WDWS, merely because the bank's employee happened to be the notary who performed the clerical function of notarizing the indemnity agreement.

---

[1] Jeff and Tracye Wainwright have filed a motion for summary judgment asserting that their alleged signatures are forgeries.  GCNA filed an opposition asserting that a notary acknowledgement attached to the indemnity agreement provides proof that the signatures in question are authentic, and that Jeff and Tracye Wainwright accepted the benefit of the bonds and thereby ratified the indemnity agreement or are estopped from contesting it.  The summary judgment motion has not been ruled upon.

As GCNA says in its Complaint, WDWS has "encountered financial difficulties" which prevented it from completing the bonded projects, and based upon investigation, GCNA "justifiably fears that the assets of the Defendants may be insufficient to provide for the reimbursement, exoneration and indemnity of GCNA as surety."  In fact, both WDWS and its President, Stephen Wainwright, have filed bankruptcy actions.  The reality is that GCNA is attempting to compensate for the financial failure of its Principal, WDWS, and its own underwriting decisions, by blaming an entity in First Community which is not guilty of any culpable conduct whatsoever.

GCNA's breach of notary duty Count is recognized under the common law as a fraudulent notarization or "constructive fraud" claim.  To prevail, if First Community were liable for the notarial acts of its employee (which it is not), GCNA would still be required to produce substantial evidence to establish the traditional fraud elements of reasonable reliance in fact, proximate cause, and provable damages.  The only conceivable damages would be the loss of Jeff and Tracye Wainwright's potential indemnity contributions.

As an initial matter, fraud must be pleaded with particularity. GCNA's Complaint expressly alleges  that the "fraud" in notarizing the Indemnity Agreement occurred on *June 22, 2007.*  In reality, the only notarization relevant to this dispute took place on May 30, 2007, and there is no evidence of any act by Defendant Denise Poole on June 22, 2007.  Whether this is simply an error in pleading by GCNA is not known to this Defendant.  However, First Community raised the issue in its Answer, and GCNA did not amend its fraud pleading within the assigned deadlines.  As shown below, the fraud allegation as it stands is due to be summarily dismissed.  If GCNA seeks to amend its allegations now, as shown below, it should be precluded from doing so.

Even if GCNA is allowed to amend, for the reasons shown herein, First Community is not liable under the theory of *respondeat superior* based upon Poole's notarization of  the Indemnity Agreement. Alabama cases directly on point have specifically held, in cases dealing with a notary employed by a bank, that the bank is not liable for improper notarization, even where the employee was asked to perform the notarization by her employer, because the notary is in effect an officer of the state, performing a function in his or her official capacity, and not for any business purpose of the bank. In such situations, damages for improper notary acknowledgment are limited to the penal sum of the notary bond.

Even if GCNA were permitted to amend, and First Community was liable for Poole's notarial acts, GCNA simply cannot establish any of the elements on this self-serving, manufactured fraud claim.  Specifically, GCNA did not rely in fact upon the alleged fraud (the notary acknowledgement), even if it was false, as it had clearly decided to act as surety for WDWS *before* the notary acknowledgement was created, and it had in fact issued, executed, and delivered bonds on the first two bonded projects *before* the acknowledgement was signed.

Second, even if GCNA had in fact relied upon the notarization, such reliance would be patently unreasonable as a matter of law because its authorized agent, who had a power of attorney to act for GCNA, and was himself a licensed Notary Public, *knew* the notarization was faulty because he knew that signatures on the indemnity agreement, including his own, were not affixed in the presence of Poole or any qualified Notary Public. GCNA's agent Bo Evans knew the document was improperly notarized, and proceeded to sign and assent to the document.  In addition, GCNA's own underwriting guidelines say that notarization is not a complete guarantee of authenticity of signatures, or sufficiently reliable to ensure the signatures are valid.  Therefore, as a matter of law, GCNA could not have reasonably relied on the notary acknowledgement.

Third, GCNA's losses (assuming it fails to recover from the indemnitors), were not proximately caused by the false notarization, because it decided to write bonds before it occurred.  The real cause of GCNA's losses, if any, would be the lack of assent by Jeff and Tracye Wainwright to the indemnity agreement (which the notarization could not have cured) and/or the poor financial condition of the indemnitors.  In addition, GCNA failed to follow several of its own underwriting guidelines— such as a rule that GCNA have the appropriate officer witness signatures on the indemnity agreement and a rule that GCNA send copies to each of the indemnitors— which, if followed, would have prevented this entire predicament.

Fourth, GCNA can prove no present damages, because it is unknown if and to what extent it may recover from Jeff and Tracye Wainwright and/or the other indemnitors.  If GCNA were to recover indemnity from any of the indemnitors, who are jointly and severally liable, then the contingent, fallback claim against First Community will cease to exist.  In addition, if Jeff and Trayce Wainwright are deemed to be bound under the indemnity agreement, then no damage to GCNA would flow from the false notarization.

Fifth, if any viable constructive fraud claim existed, it would be time-barred because GCNA knew, or should have known, that the notary acknowledgement was faulty in May of 2007, yet it waited more than two years – until October of 2009 – to file suit against First Community and Poole.

## II.       STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Fed. R. Civ. Pr. 56 (a) and (c), First Community submits the following statement of undisputed material facts in support of its motion for summary judgment.

1.       Bo Evans ("Evans") is employed by the J. Smith Lanier (hereinafter "JSL") insurance agency in Birmingham as a Senior Account Executive. (Ex. 1, Bo Evans depo, p. 9, l. 3-18).  He specializes in selling insurance and bonds to contractors, and has worked in that field since 2004. (Id., at p. 10, l. 5-19).   One of the companies Evans was licensed to sell or issue bonds through was Plaintiff, Guaranty Company of North America, USA (hereinafter "GCNA"). (Id., at p. 10, l. 23- p. 11, l. 1-4).

2.       In early 2007, Evans made a "cold call" to Stephen ("Steve") Wainwright of W.D. Wainwright & Sons, Inc. (hereinafter "WDWS") in attempt to obtain WDWS' business. (Id, p. 12, l. 16-23- p. 13, l. 1-18).  After Steve Wainwright responded positively, Evans began to gather financial information on WDWS such as financial statements and credit reports to pass on to bond underwriters, as well as bank statements and a questionnaire. (Id., at p. 13, l. 19-23, p. 14, l. 1-15, p. 21, l. 1- p.23).  Evans also attended a meeting at JSL's offices with Steve Wainwright, Jeff Cutshall (JSL's Bond Manager), and Jim Befort ("Befort"),  GCNA's local underwriter on the Wainwright account.   (Id.).

3.       Jeff Cutshall ("Cutshall") was employed by  JSL in 2007 as a Bond Manager. (Ex. 2, Jeff Cutshall depo, p. 16, l. 9-14).  His duties as Bond Manager include gathering financial information after a producer gets a lead on a new account, then marketing the new account to various surety companies, and later managing the day to day needs of the surety bond client. (Id., at p. 16 (l.17-23) - p. 17 (l. 1)).  On April 16, 2007, Cutshall sent an email to Befort which

6

attached financial documents gathered from the Wainwrights for Befort to consider in underwriting the account.  (Ex. 2, pp. 48-51, l. 3; Ex. 3, email dated 4/16/07).

4.      On new accounts, JSL has no authority to issue bonds until the account is "fully underwritten by the local bond underwriter and such authority is granted. (Ex. 2., at p. 19, l. 12 - p. 20, l. 18).    Once a "line of authority" is established on an account, the local underwriter is authorized to approve and issue bonds on the account. (Id., at p. 20-21, l. 23).

5.      JSL has a fixed, contractual relationship with GCNA to be its agent, under a written agency contract, and to handle the Wainwright account. (Ex. 2., p. 62, l. 22, p. 63, l. 5; Ex 4, GCNA response to interrogatory # 10(b)).  Cutshall holds a power of attorney for GCNA and was authorized to, and did, "issue" bonds for GCNA on the Wainwright account. (Ex. 2., at p. 23, l. 13-22; Ex 5, Power of Attorney form)  Bo Evans is also listed on the Power of Attorney giving him authority to act for and bind GCNA.  (Ex. 5).

6.      Prior to any bonds being issued,  GCNA requested that WDWS and its owners, and their spouses, sign a General Agreement of Indemnity (hereinafter "Indemnity Agreement"), in favor of GCNA, in which they promised to indemnify and exonerate GCNA for any losses sustained by GCNA on any WDWS projects on which GCNA might issue bonds. (Complaint, ¶¶ 9-10, and Exhibit "A" to the Complaint ).   A copy of the fully executed Indemnity Agreement is submitted herewith and made a part of the record as Exhibit 6.  The indemnitors listed on the Indemnity Agreement include WDWS (signed for by Stephen R. Wainwright as President), Stephen R. Wainwright, individually, Sheryl B. Wainwright (Steve's spouse), William J. ("Jeff") Wainwright, and Tracye Wainwright (Jeff's spouse) (Id.).

7.     Evans testified that normally the agent will speak to all of the indemnitors at some point, but in this case he did not speak to Jeff or Trayce Wainwright about the indemnity obligation. (Ex. 1, p. 25 (l. 9) - p. 26 (l.1)).

8.     Attached to the Indemnity Agreement is a notary acknowledgment signed by Defendant Denise Poole and dated **May 30, 2007.**  (Ex. 6, p. 8). The Indemnity Agreement is also dated May 30, 2007 on the signature page. (Ex. 6, p. 6).

9.     JSL sent the original of the Indemnity Agreement to GCNA during the underwriting process. (Ex. 2, pp. 13 (l. 8)-14(l. 16).  Cutshall was involved in reviewing the Indemnity Agreement which was transmitted. (Id.).  Based upon entries in a memo referred to as a "Write Up," generated by Jim Befort, GCNA's underwriter, Cutshall testified that his office submitted the Indemnity Agreement to GCNA on or before **May 22, 2007.** (Ex. 2, pp. 51 (l.20)-57(l.16); Ex. 7, Write Up).  Cutshall had no explanation for the discrepancy as to how the completed Indemnity Agreement could have been mailed to GCNA 8 days before it was dated and notarized. (Id.). Cutshall is not even positive that the notary acknowledgment was attached to Indemnity Agreement when JSL sent it to GCNA. (Ex. 2, p. 56, l. 4-12).

10.     The underwriting guidelines published by GCNA, which were authenticated by Befort, state that notary acknowledgements "provide *some level* of assurance as to the authenticity of the signatures of indemnitors or their representatives.  They are *not necessary* to the creation of a binding agreement but are desirable and should be obtained as a matter of standard operating procedure." (Ex. 8, GCNA Underwriting Guidelines, p. GCNA 00023) (emphasis added).  Thus, notarization is not even a GCNA requirement, and the guidelines state that even if a notary acknowledgement is attached, it is *some* assurance as to the signatures, but

not a complete assurance which can or should be relied upon. Mr. Befort admitted the substance of this guideline and does not refute it. (Ex. 9, Jim Befort depo, pp. 56(l.17)-58(l.14)).

11.     The CCNA guidelines further state, with regard to proper execution of indemnity agreements, that all signatures *should* be notarized. (Ex. 8, p. GCNA 00024).  In stark contrast, with regard to other guidelines for proper execution, the document states that certain things *must* be done. As examples, item 4, which indicates that a general partner *must* sign for a partnership, and item 12, which specifies that any modifications of the standard indemnity form *must* be approved by the head office.   (Ex. 8, p. GCNA 00024).   GCNA clearly does not consider notarization a mandatory item for proper execution of an indemnity agreement.   Befort himself admits that notarization is *not* necessary to create a binding agreement, but is only "desirable," and that he is not aware of any legal requirement to have an indemnity contract notarized to be enforceable.   (Ex. 9, pp. 60 (l.13)-63 (l.17)).

12.     GCNA's underwriting guidelines require that "a signature of a corporate officer should be attested to by a Corporate Secretary or Assistant Secretary and sealed with the corporate seal." (Ex. 8, p. GCNA 00024).  It is undisputed in this case that the signature of Steve Wainwright, as President of WDWS, was attested to by Bo Evans of JSL, *not* by the corporate Secretary or Assistant Secretary.  (Ex. 6, pp. 6-7).  At the time of the execution of the indemnity agreement, Jeff Wainwright was the secretary of the corporation. (Ex. 10, Jeff Wainwright depo, p. 23, l. 22- p.24, l. 1).  In addition, the corporate seal is not affixed to the signature page.  (Ex. 6, pp. 6-7).

13.     GCNA's underwriting guidelines state that indemnity agreements should be executed in at least triplicate, *with one copy going to each indemnitor*.  (Ex. 8, p. 00025).   Jeff Wainwright testified that he did not receive a copy and in fact did not see the indemnity

agreement until April of 2009, when he discovered it while reviewing some of his father's papers.  (Ex. 10, pp. 27(l. 12)-28(l.9); 30(l.12)-31(l.15)).  Neither Cutshall, nor Evans recall the indemnity agreement being signed in triplicate or sent to all the indemnitors.  (Ex. 1, p. 43 (l.6-13); Ex. 2, p. 71(l.14-21)).  Befort does not know if the document was executed in triplicate. (Ex. 9, pp. 75(l.16)-76(l.19)).

14.    GCNA's underwriting guidelines also specify that, where indemnity is being taken, the indemnity agreement *must* be received prior to the release of any non-cancellable final bond. (Ex. 8, p. GCNA 00025).  They also state elsewhere that prior to issuing any final bonds, "a properly executed General Agreement of Indemnity needs to be obtained" (Ex. 8, p. GCNA 00002). Mr. Befort testified that "properly executed" in that context includes having signatures notarized, based upon his understanding of common practice in the industry. (Ex. 9, pp. 51(l.16)-54(l.16)).  Befort explained that there is an absolute requirement that GCNA must have the signed Indemnity Agreement before final bonds[2] can be "released," which means the bonds are actually signed and delivered to the owner or contractor on the project, as opposed to being merely "issued," which means being prepared by the agent and ready to be signed and released. (Ex. 9, pp. 97(l.2)- 99(l.21)).  Once the bonds are signed and presented to the owner, they are effective and the surety is bound to the risk and subject to claims on the bonds.  (Ex. 9, pp. 102(l.3)-104(l.2)).

15.    In Befort's "Write Up" memo, he writes that he had "the GIA" (referring to the indemnity agreement) as of *May 22, 2007,* and that the final bonds had been issued a week prior to 5/22/07.  (Ex. 7, p. GCNA 00198 and GCNA 00204, which contains the date of the entry). However, in deposition he testified that this entry was a "grammatical error" and that he did *not*

---

[2] "Final bonds" are the payment and performance bonds issued after the job is awarded, as opposed to preliminary bid bonds, and they are non-cancellable once issued. (Ex. 1, p. 54, 82; Ex. 3, p. 58; Ex. 6, pp. 41; 97-99).

have the indemnity agreement on 5/22/07. (Ex. 9, pp. 109(l.14)-121(l.5)).  Mr. Befort testified

under oath that he meant to say that he *would have* the indemnity agreement at some later date,

and that the first final bonds were *issued* by the agents at JSL before Befort had the indemnity

agreement, but not released or delivered, according to his recollection  (Id).

16.     The first final  bonds issued on the Wainwright account related to the "Town of

Gordo" project, which was designated bond number 40008021. (Ex. 1, pp. 54(l.2)-56(l.8)).  The

bonds were "issued" or physically produced on *May 16, 2007*. (Id.).  This date is memorialized

in a document generated by JSL called "Bond Details" which shows the "effective" or issue date

of "5/16/07" on the front page. (Id; Ex. 11, Bond Details and attachments for bond # 40008021;

Ex. 9, pp. 123(l.11)-125(l.20)).  Both Evans and Befort testified they have no reason to question

the dates shown on the document, which was created contemporaneously with the entry of the

bond into JSL's system. (Id.; Ex. 1, pp. 54(l.2)-56(l.8)).

17.     The second payment and performance bonds issued on the Wainwright account

related to the "Interstate Business Park" project for the Autauga County Commission. (Ex. 1, pp.

54(l.2)-57(l.20); Ex. 12, Bond Details and attachments for bond # 40008020).   The bond was

issued or physically produced on *May 17, 2007*.  The "Bond Details" document shows the

effective date as "5/17/07."  Both Evans and Befort testified that they have no reason to question

the dates shown on the document, which was created contemporaneously with the entry of the

bond into JSL's system. (Id.).

18.     A formal line of authority was created for the Wainwright account as of *May 24,

2007.*   when it was approved by Dick Miller, the head office underwriter at GCNA, at limits of

$1,000,000 single (per project) and $2,500,000 (aggregate). (Ex. 7,p. GCNA 204; Ex. 9, pp.

84(l.14)-86(l.16)).  A line of authority is a grant of authority to the underwriter to approve the

execution of bid bonds and final bonds up to the approved limits. (Ex. 9, pp. 34(l.1)-35(l.5)) Establishment of the line of authority occurs when underwriting of the new account is complete—it is the culmination of that process. (Ex. 9, pp. 35(l19)-36(l.8); Ex. 2, pp. 19(l.12)-21(l.23)). A line of authority cannot be established until underwriting of the new account is completed to the point that a decision has been reached to enter into a surety relationship with the Principal and to issue and release bonds up to the per project and aggregate bond limits. (Id.).

19.     The payment and performance bonds on the Town of Gordo project (bond # 40008021) were executed and dated *May 24, 2007*, and delivered to Sentell Engineering, Inc,, the project engineer and designated representative of the Owner. (Ex. 13, Affidavit of Gilbert Sentell and executed bonds attached thereto).

20.     Denise Poole is employed as a financial services representative at First Community's branch location in Prattville, and she is also a notary.  (Ex. 14, Denise Poole deposition, pp. 7(l.2-20); p. 12(l.22)). Although she does not have any independent recollection of signing the notary acknowledgment on the indemnity agreement, she admits that her signature and notary seal appear on the indemnity agreement with the date of *May 30, 2007.*  (Ex. 14,  pp. 27(l.16)-32(l.21)).  She maintains that she either saw all of the indemnitors sign the indemnity agreement, or the document was presented to her by a superior at the bank to sign, but she cannot recall which happened in this case.  (Ex. 14, pp. 36(l.18)-37(l.10)).

21.     Tracy Alexander is employed as the City President of the First Community branch location in Prattville and is Poole's immediate superior.  (Ex. 15, Tracy Alexander deposition, pp. 7(l.1)-8(l.22); 12).  He has no recollection of the indemnity agreement, or what happened with regard to Poole notarizing it.  (Ex. 15, pp. 22(l.12)-24(l.21)).  There is no affirmative

evidence anywhere in the entire record of this case that Poole was actually directed by Alexander or any other superior to notarize the Indemnity Agreement.

22.     Bo Evans attested the signature of Steve Wainwright on the Indemnity Agreement where Steve signed in his individual capacity.  (Ex. 6, p. 6; Ex. 1, pp. 36(l.9)-38(.l20)).  Evans actually witnessed Steve sign the agreement in JSL's offices in Birmingham. (Ex. 1, p. 43(l.14-19)).  He has never been to the First Community bank in Prattville and has never spoken to anyone affiliated with First Community about the indemnity agreement.  (Ex. 1, p. 44(l.15-22)).  He has never met Denise Poole. (Ex. 1, p. 61(l.13-14)).  He does not know if her notary acknowledgement was on the agreement when he signed it or not.  (Ex. 1, p. 64(l.4-9)).  Evans *knew* that Poole did not actually witness his signature, or Steve Wainwright's signature in his individual capacity, and he therefore knew at the time that the notary acknowledgement was false, but he didn't notify GCNA of the false notarization.  (Ex. 1, pp. 65(l.7)-69(l.22); 71(l.7-17)).  Evans himself had a notary license at the time of these events. (Ex. 1, p. 80(l.2-15)).  If he could do it over again, he would tell GCNA that he knew the notary acknowledgment was false. (Ex. 1, p. 73 (l12-21)).

23.     Jim Befort testified that, had Bo Evans informed him of what he knew—that the notary acknowledgement was false and therefore a constructive fraud—then he would have rejected the indemnity agreement and not gone forward with the relationship.  (Ex. 9, pp. 153(l.12)-154(l.17)).

24.     Jeff Wainwright testified that he first saw the Indemnity Agreement in April of 2009 and did not know it existed until that time.  (Ex. 10, J Wainwright depo, pp. 27(l.12)-28(l.9)).  He was very upset when he saw the Indemnity Agreement because, he claims, he did not sign it, nor did his wife Trayce. (Id., pp. 8(l.3-19), 32(l.9-22)).  He immediately consulted

with an attorney—within 30 minutes of discovering the Indemnity Agreement—and he immediately notified GCNA by phone call and letter of the discrepancy regarding his signature. (Ex. 10, pp. 30(l.12)-33(l.23); 58(l.4)-60(l.16); Ex. 16, Jeff Wainwright  correspondence from counsel, attached as Exhibit "A" to his Answer).

## III.    LEGAL ARGUMENT

### A.    STANDARD OF REVIEW

Summary judgment is appropriate when there exists no genuine issue of material fact, and the evidence compels judgment as a matter of law in favor of the moving party.  *Fed. R. Civ. P.* 56(c). Under *Fed .R. Civ .P.* 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." See <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). The 11th Circuit has employed the exact same standard on numerous occasions.  <u>See</u>, <u>e.g.</u>, <u>Greenberg v. BellSouth Telecomms., Inc</u>., 498 F.3d 1258, 1263 (11th Cir. 2007) (per curiam) (internal quotations and citations omitted).

As the 11th Circuit has articulated, the party asking for summary judgment bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. <u>Celotex</u>, 477 U.S. at 323; <u>McCaslin v. Birmingham Museum of Art</u>, 384 Fed. Appx. 871, 873 (11th Cir. 2010) (Applying Alabama law). Once the moving party has met its burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by its own affidavits, or by depositions, answers to interrogatories, and admissions of file, designate specific facts showing that there is a genuine issue for trial. <u>Celotex</u>, 477 U.S. at 324.

The substantive law will identify which facts are material and which are irrelevant. <u>Anderson v. Liberty Lobby, Inc</u>., 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson</u>, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. <u>Id</u>. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial. <u>Wade v. Chase Manhattan Mortg. Corp</u>., 994 F. Supp. 1369, 1375-76 (N.D. Ala. 1997). If the moving party does not bear the burden of proof at trial— as First Community does not— it can satisfy its initial burden on summary judgment by producing affirmative evidence which negates a required element of the plaintiff's claim, thus demonstrating that non-moving party, herein plaintiff GCNA, will be unable to prove its case against defendant First Community at trial.  <u>Id</u>.

## B.   ELEMENTS OF CONSTRUCTIVE FRAUD/BREACH OF NOTARY DUTY CLAIM

GCNA's sole claim against First Community is that its employee, Denise Poole, breached her notary duty, and that First Community is legally responsible for her breach of her notary duty. Under Alabama law, breach of a notary duty is a common law claim that shares the same elements as a constructive fraud claim.  <u>See</u> <u>Butler v. Olshan</u>, 280 Ala. 181, 190-91 (Ala. 1966) (applying constructive fraud concept to a claim at common law for breach of a notary public's duty); <u>First Bank of Childersburg v. Florey</u>, 676 So. 2d 324, 332-333 (Ala. Civ. App. 1996). In <u>Florey</u>, a recent Alabama case addressing the issue of a breach of notary duty, the Hon. John Crawley (a judge who has authored several opinions on notary law) wrote for the Court:

> The liability of a notary public is founded on the common law and predates any statutory duty. <u>Independence Leasing Corp. v. Aquino</u>, 111 Misc. 2d 1039, 445 N.Y.S.2d 893, 894 (Buffalo City Ct. 1981). A notary has the duty to use ordinary reasonable care in the performance of his

functions. <u>Immerman v. Ostertag</u>, 83 N.J. Super. 364, 370, 199 A.2d 869, 873 (1964). As the Alabama Supreme Court observed in <u>Butler v. Olshan</u>, 280 Ala. 181, 190-91, 191 So. 2d 7, 16 (1966), "A notary public is not an insurer, but he is under a duty to his clients to act honestly, skillfully, and with reasonable diligence." "In the absence of statute, a notary is held to the care and diligence of a reasonably prudent man to ascertain the acknowledger's identity, but is not an insurer of the truth of the recitals." <u>Manufacturers Acceptance Corp. v. Vaughn</u>, 43 Tenn. App. 9, 29-30, 305 S.W. 2d 513, 522 (1957) (quoting <u>Figuers v. Fly</u>, 137 Tenn. 358, 369, 193 S.W. 117, 120 (1917)). ...

It is true that fraudulent intent does not have to be proven to establish a constructive fraud. <u>See Ex parte Cheriogotis</u>, 553 So. 2d 558 (Ala. 1989); <u>Hornaday v. First Nat'l Bank of Birmingham</u>, 259 Ala. 26, 65 So. 2d 678 (1952). The Alabama Supreme Court has explained the distinction between actual and constructive fraud as follows:

"Actual fraud denotes the actual mental operation of intending to defeat or delay the rights of the creditor. On the other hand, constructive fraud is based on facts and circumstances which courts have said constitute legal fraud, regardless of actual intent."

<u>Hope Developers, Inc. v. Vandiver</u>, 665 So. 2d 910, 913 (Ala. 1995).

<u>First Bank of Childersburg v. Florey</u>, 676 So. 2d 324, 332-33 (Ala. Civ. App. 1996).  The <u>Florey</u> court concluded that <u>Olshan</u>, "**a decision that applied the concept of constructive fraud to the conduct of a notary**," correctly identified the elements of the claim.  <u>Florey</u> at 333 (emphasis added).

Judge Steele, in a case pending in the Southern District of Alabama, recently granted defendant's motion for summary judgment on a constructive fraud claim, writing as follows:

The common-law tort of constructive fraud is recognized under Alabama law; however, it remains something of an enigma, inasmuch as it is rarely invoked by litigants and has garnered scant mention in published Alabama authorities. That said, the Alabama Supreme Court explained more than a half century ago that "[c]onstructive fraud at common law is the breach of a legal or equitable duty which, irrespective of the moral guilt, the law declares fraudulent because of its tendency to deceive others, to violate public or private confidence, or to inspire public interest." <u>Hornaday v. First Nat'l Bank of Birmingham</u>, 259 Ala. 26, 65 So. 2d 678, 687 (1953); <u>see</u> <u>also</u> <u>Frost v. Latham & Co.</u>, 181 F. 866, 868 (S.D. Ala. 1910) (constructive fraud is "an act which the law declares to be fraudulent without inquiring into its motive") (citation omitted). A critical

distinction between constructive fraud and other species of fraud is that "fraudulent intent does not have to be proven to establish a constructive fraud." First Bank of Childersburg v. Florey, 676 So. 2d 324, 332 (Ala. Civ. App. 1996); see also Hornaday, 65 So. 2d at 687 ("Neither actual dishonesty nor intent to deceive is an essential element of constructive fraud.").

**Consistent with the foregoing, it has been routinely held in jurisdictions throughout the country that the elements of proof for a common-law constructive fraud claim bear marked similarity to those for an ordinary fraud claim, except that the intent element is generally replaced by an element of some special circumstance or relationship requiring disclosure**. See, e.g., E*TRADE Financial Corp. v. Deutsche Bank AG, 631 F. Supp. 2d 313, 387 (S.D.N.Y. 2009) ("Constructive fraud requires establishing the same elements as actual fraud, except that the element of scienter is replaced by a fiduciary or confidential relationship between the parties.") (citations and internal quotation marks omitted); 3D Global Solutions, Inc. v. MVM, Inc., 552 F. Supp. 2d 1, 9 (D.D.C. 2008) ("Constructive fraud differs from actual fraud in that constructive fraud need not be intentional."). **Given the parallels between constructive fraud and ordinary fraud, it is hardly surprising that the elements of false representations and detrimental reliance are cornerstones of a common-law constructive fraud cause of action.** Plaintiffs do not contest these principles, and do not quarrel with Ciba's contention that they bear the burden of establishing detrimental reliance in order to recover on a constructive fraud theory.

Abrams v. Ciba Specialty Chemicals Corp., 663 F. Supp. 2d 1220, 1227-28 (S.D. Ala. 2009) (emphasis added).

Under Alabama law, the well-established elements of fraud are (1) a misrepresentation, (2) of a material existing fact, (3) on which the plaintiff reasonably and detrimentally relied, and (4) which proximately caused injury or damage to the plaintiff.   Wright v. AmSouth Bancorporation, 320 F.3d 1198, 1204 (11th Cir. 2003); Austin v. Global Connection, 303 Fed. Appx. 750 (11th Cir. 2008); Foremost Ins. Co. v. Parham, 693 So. 2d 409, 422-23 (Ala. 1997) (Returning to the "reasonable reliance" standard in fraud cases); Booker v. United American Ins. Co., 700 So. 2d 1333, 1339-40 (Ala. 1997).

**C.      COUNT VI OF THE COMPLAINT STATES NO ACTIONABLE CLAIM.**

The Complaint (Count VI) alleges that a fraudulent notarization occurred on **June 22, 2007**, when GCNA claims that Denise Poole notarized the signatures of Jeff and Tracye Wainwright.   However, the Indemnity Agreement clearly reflects that Poole notarized the signatures on **May 30, 2007.**   In fact, the Indemnity Agreement (which has a readily-apparent date of May 30, 2007) is attached to GCNA's Complaint.

The evidence gathered in discovery all comports with the May 30, 2007, date of Poole affixing her notary seal to the Indemnity Agreement.   Poole testified that she placed her notary seal on the indemnity agreement on the date indicated, May 30, 2007.   (Ex. 14, pp 27-32)

No evidence suggests any notarization made by Poole took place on June 22, 2007. Moreover, in its own Answer, First Community informed GCNA that no such notarization occurred on June 22, 2007 (Doc. 24).   The answer states at paragraph 37, "The allegations of Paragraph No. 37 of said Verified Complaint are denied as written.   Specifically, the signatures notarized by Denise Poole were notarized on May 30, 2007, not June 22, 2007 as alleged.   As such, the allegations of Paragraph No. 37 of said Verified Complaint are denied and strict proof thereof is demanded."   This Answer was filed on November 9, 2009.   Because this is a fraud claim in a case with a Scheduling Order, GCNA is limited to what they have plead, and  the case should be decided against GCNA on summary judgment.

In Alabama, parties may only recover damages for claims actually plead in the complaint. "It is a general rule of pleading that the complaint shall state the material issuable facts indicating plaintiff's right to recover."   James v. Handley, 267 Ala. 241, 243 (Ala. 1958) (denying plaintiff the right to recover on a fraud claim that was not plead in the complaint).   This is a fundamental tenet of civil practice, without which Defendants would have no knowledge of the claims against them, and due process would be abrogated.

Pleading fraud requires a heightened duty to plead specific facts under Alabama law.  *See Ala. R. Civ. P.* 9(b), stating, "**Fraud, Mistake, Condition of the Mind.** In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.") The commentary to the Alabama Code states, "The pleading must show **time, place and the contents or substance of the false representations**, the fact misrepresented, and an identification of what has been obtained.  Trussell v. United Underwriters, Ltd., 228 F. Supp. 757, 774 (D.C. Col. 1964); United States v. Hartmann, 2 F.R.D. 477 (E.D. Penn. 1942); Rubens v. Ellis, 202 F.2d 415 (5th Cir. 1953)."  See Committee Comments on 1973 Adoption, *Ala. R. Civ. P.* 9(b) (emphasis added).

 In Alabama, if a complaint does not state when a fraud occurred, it is due to be dismissed under Rule 12(b).  Robinson v. Allstate Ins. Co., 399 So .2d 288, 289-90 (Ala. 1981) (A fraud claim **must state when** the fraud occurred); Sims v. Lewis, 374 So. 2d 298 (Ala. 1979) (Home-owners' complaint for fraud against builders were dismissed under Rule 9(b) because **they did not state when** the fraud occurred); Thomas v. Baptist Medical Center-DeKalb, 614 So. 2d 997 (Ala. 1993) (Med-mal claim dismissed because fraud claim **did not plead when fraud occurred**). The 11th Circuit has reached the same conclusion, as Federal Rule 9(b) and the Alabama rule are the same.  See U.S. ex rel. Clausen v. Laboratory Corp. of America, Inc., 290 F.3d 1301 (11th Cir. 2002) (In qui tam action, the 11th Circuit upheld the district court's order dismissing the complaint because the plaintiff failed to plead his fraud claim with required specificity, as he failed to state when the fraud occurred.).

GCNA did state with specificity what date the fraud allegedly occurred.  If GCNA is allowed to now seek to recover at trial damages for a fraud that happened on a different date than they have plead, then the purpose of Rule 9(b) is completely negated.  If this were allowed,

defendants in this case would have to prepare for a moving or unknown target of a fraud claim. Surely, this is not the purpose of Rule 9(b), which increases the requirement to plead fraud with specificity, because misrepresentation is more difficult to disprove than other torts. First Community could not prepare arguments addressing the elements of a fraud claim— which includes issues of reliance on the notarization— if GCNA is not held to its specification allegation of when the fraud occurred, nor could it establish a chronology of events in defense of the reliance claim.  In this case, dates are very important to show lack of reliance: when GCNA issued and delivered bonds is evidence of assent to the indemnity agreement and critical to First Community's defense.

The obvious conclusion to this dilemma is that CGNA should have amended its complaint, or should attempt to amend now to state the date of the alleged fraudulent notarization.  Unfortunately for GCNA, when a Scheduling Order has been entered by a federal district court in the 11th Circuit that states a date by which pleadings must be amended, this date is not an aspirational guideline; rather it is an order, and leave to amend pleadings after the deadline requires GCNA to show "good cause," and that they were diligent and not careless in seeking to timely amend their complaint.  This Court's Scheduling Order was entered on April 30, 2010.  Section 4 clearly sets July 12, 2010, as the deadline to amend pleadings, seven months and one week ago.  GCNA did not timely amend even though First Community informed it over a year ago of the apparently erroneous allegations in their complaint.

As Judge Steele cogently expresses in Abrams v. Ciba Specialty Chemicals Corp., 2009 WL 1658525, at *2-3 (S.D. Ala. June 12, 2009), in the 11th Circuit, a party may not amend a pleading after the deadline set by the scheduling order without showing good cause; lack of diligence and carelessness are not an excuses. Judge Steele denied Plaintiff's request to amend

its complaint 105 days after the Scheduling Order deadline (CGNA is over 230 days tardy),

holding:

> The applicable Rule 16(b) Scheduling Order entered by Magistrate Judge Bivins in this case in October 2008 expressly provided that "[a]ny motion for leave to amend the pleadings or join other parties must be filed by January 30, 2009." Plaintiffs' Motion overshot that deadline by some 105 days. The law of this Circuit is clear that a motion to amend pleadings filed after the applicable scheduling order deadline is governed in the first instance by the more stringent Rule 16(b) test, rather than the liberal Rule 15(a) standard. See Smith v. School Bd. of Orange County, 487 F.3d 1361, 1367 (11th Cir. 2007) ("despite Smith's argument on appeal that the district court should have granted his motion to amend his complaint in accordance with ... Rule 15(a), Smith still had to comply with Rule 16(b)'s good cause requirement because he filed his motion to amend" after the deadline prescribed in the scheduling order); Sosa v. Airprint Systems, Inc., 133 F.3d 1417, 1419 (11th Cir. 1998) ("[B]ecause Sosa's motion to amend was filed after the scheduling order's deadline, she must first demonstrate good cause under Rule 16(b) before we will consider whether amendment is proper under Rule 15(a)."). The Court therefore declines plaintiffs' implicit invitation to hopscotch over Rule 16(b) and decide the Motion to Amend exclusively by reference to Rule 15(a). See Millenium Partners, L.P. v. Colmar Storage, LLC, 494 F.3d 1293, 1299 (11th Cir. 2007) ("If we considered only Rule 15(a) without regard to Rule 16(b), we would render scheduling orders meaningless and effectively would read Rule 16(b) and its good cause requirement out of the Federal Rules of Civil Procedure.") (citation omitted). **Because plaintiffs requested leave to amend the Complaint more than three months after the deadline established by the operative Scheduling Order, their untimely Motion to Amend may be granted, and the after-the-fact revision to the Scheduling Order approved, "only for good cause and with the judge's consent."** Rule 16(b)(4), *Fed.R .Civ.P.* Indeed, "where a party's motion to amend is filed after the deadline for such motions, as delineated in the court's scheduling order, the party must show good cause why leave to amend the complaint should be granted." Smith, 487 F.3d at 1366; see also Sosa, 133 F.3d at 1419 (similar). **The Rule 16(b) "good cause" standard "precludes modification unless the schedule cannot be met despite the diligence of the party seeking the extension."** Sosa, 133 F.3d at 1418; see also Romero v. Drummond Co., 552 F.3d 1303, 1319 (11th Cir. 2008) ("**To establish good cause, the party seeking the extension must have been diligent**."). **"[T]he focus of the inquiry is upon the moving party's reasons for seeking modification.... If that party was not diligent, the inquiry should end.**" Johnson v. Mammoth Recreations, Inc., 975 F.2d 604, 609 (9th Cir. 1992); see also O'Connell v. Hyatt Hotels of Puerto Rico, 357 F.3d 152, 155 (1st Cir. 2004) ("Rule

16(b)'s 'good cause' standard emphasizes the diligence of the party seeking the amendment."). **In assessing the presence or absence of good cause, the Court recognizes that "carelessness is not compatible with a finding of diligence and offers no reason for a grant of relief**." Johnson, 975 F.2d at 609; see also O'Connell, 357 F.3d at 155 (indifference by movant precludes Rule 16(b) relief "because such conduct is incompatible with the showing of diligence necessary to establish good cause"). In short, then, Magistrate Judge Bivins entered a Scheduling Order setting a firm deadline for motions to amend the pleadings or join additional parties. **This deadline was not aspirational. Despite knowledge of that deadline (and prior knowledge of most or perhaps even all of the facts on which the proposed amendment rested), plaintiffs' counsel waited for more than 100 days after that deadline before seeking leave to amend their pleadings.** They have not shown good cause, nor have they otherwise satisfied the Rule 16(b)(4) standard for modification of scheduling orders, as required by Sosa and its progeny, antecedent to application of Rule 15(a). … Plaintiffs' Motion for Leave to File Second Amended Complaint (doc. 174) is denied.

Abrams v. Ciba Specialty Chemicals Corp., 2009 WL 1658525, at *2-3 (S.D. Ala. June 12, 2009) (emphasis added).

Summary Judgment is appropriate when a plaintiff has incorrectly alleged *when* a fraud occurred, and therefore cannot muster any evidence that the fraud happened on the date the complaint alleges. GCNA had an opportunity to amend its complaint, and was put on notice of the apparent need to by First Community's Answer, but instead chose not to amend. The existing fraud allegation cannot be sustained and is due to be dismissed by summary judgment as no evidence whatsoever – including GCNA's employee's own statements in deposition - supports a claim of any fraudulent act on June 22, 2007.

## D. FIRST COMMUNITY IS NOT VICARIOUSLY LIABLE FOR POOLE'S NOTARIZATION.

GCNA's attempt to saddle First Community with its potential losses resulting from the Indemnity Agreement with the Wainwrights is wholly without merit. GCNA offers two theories for imposing liability upon First Community for Denise Poole's notarization of the Indemnity

Agreement.  The first is that First Community breached its duty of notary obligation, as alleged in Count VI and in ¶ 40, where it asserts First Community and Poole "should be held liable to GCNA by virtue of their breach of duties and representations as notary public." The second is vicarious liability, as stated in the Complaint at ¶ 41: "FCB, the employer of Denise Poole, is vicariously liable for her action and conduct, all which incurred [sic] an [sic] employee of FCB and in the line and scope of her employment duties."  Despite the garbled sentence, First Community assumes GCNA's allegation to be that, because Denise Poole was an employee of First Community performing a duty within the line and scope of her employment when she notarized the Indemnity Agreement, the bank is vicariously liable under *respondeat superior* and agency principles.  Both arguments are specious.

As to the first argument, First Community has no duty to GCNA.  First Community is not in privity of contract with GCNA, and does not do business with GCNA.  There is no allegation or suggestion in this case that the notarization related in any way to the business of the bank. First Community is not, itself, a Notary Public, and is not vested by the State of Alabama with the authority to notarize documents.  If and when any employee of First Community notarizes a document which is not the business of the bank, they do so as independent Officers of the State in their individual capacity.  Finally, there is no evidence in the record to establish that anyone at the bank instructed Poole to notarize the document.  No witness testified definitively as to how the document was notarized.  Without such evidence, GCNA has no possible avenue to assert that First Community committed any act or omission which could give rise to a breach of duty.

There is no vicarious liability in Alabama for a bank whose employee fraudulently notarizes a document.  Constantine v. United States Fidelity & Guar. Co., 545 So. 2d 750 (Ala. 1989).  The basic facts in Constantine were that a notary employed by First Alabama Bank of

Birmingham improperly notarized a mortgage which was not signed in her presence by one of the joint owners of the property (Mr. and Mrs. Constantine).  A dispute later arose as to the validity of the mortgage, the bank's right to foreclose on the mortgage.  The bank sued the Constantines over these issues, asserting that if there were no valid mortgage, then the Constantines owed them the amount of the loan back, but in the alternative, the mortgage was good in equity. The bank prevailed and a final judgment was entered. The notary, along with her surety, was subsequently sued by Rita Constantine for allegedly breaching her duty as notary. The trial court ruled against Constantine and in favor of the notary and surety on the basis that the notary was the "agent" of the bank, and because the bank, as the "principal," had already prevailed in the litigation, Constantine was estopped from proceeding further with these claims against the notary and surety.  The significant point about the ruling, as it relates to this case, is the finding that the notary and the bank she worked for were in an agent/principal relationship.

On appeal, the notary and surety argued again that Constantine's claims were barred by collateral estoppel because the bank had already prevailed on claims against it in the litigation, and the notary and surety, as "agents" of the bank, were not subject to any further claims by Constantine.  The Alabama Court of Civil Appeals affirmed the trial court's judgment. The Alabama Supreme Court disagreed, however, and found, on that factual record, that neither the notary nor her surety were agents of the bank, and the bank was not her principal, so the claims by Constantine were not barred on that basis. Again, the facts are somewhat complex, but the salient holding is that a notary employed by a bank is not the bank's "agent" when he or she notarizes a document, even where the notarized document was signed for the benefit of the bank/employer (i.e., it was signed and notarized for bank business).

In so holding, the Court wrote: "Unlike the trial court, we can not agree with the

defendants' contention that a principal/agent relationship existed between the bank and the notary public or her surety, thus providing a defense to the instant defendants as "agents" of the bank, which, as "principal," had been "absolved" of liability in the earlier case."  <u>Constantine</u> at 755. In his dissent, Justice Hornsby pointed out lucidly that the majority opinion would, in application, preclude liability on the part of any bank/employer for any actions by its notary/employee in performing notary duties— an outcome he did not favor, but which is exactly what the majority opinion stands for.  As he wrote: "Where is the privity of parties between the Bank and the notary? The majority opinion holds that there is not a principal/agent relationship in this context by which a finding for the principal would absolve the purported agent of liability. If there was no such relationship, then none of the acts of the notary would serve as a basis for holding the bank liable or not liable."  <u>Id</u>. at 756.  Precisely.

In <u>Higgins v. Pacesetter Corp.</u>, 694 So. 2d 1265 (Ala. Civ. App. 1996), the Alabama appellate court applied the <u>Constantine</u> holding as follows:

> Higgins argues that the circuit court erred by entering the summary judgment against him because, he claims, there was a jury question presented on the issue whether Pacesetter had probable cause to sue him for improper acknowledgment of the mortgage. Higgins concedes that the Houstons did not sign the mortgage in his presence and that he acknowledged their signatures after the fact. He maintains, however, that a jury question was presented on the issue whether Pacesetter had probable cause to believe that he had breached his duty as a notary public because, he says, a Pacesetter employee brought him the Houston mortgage after the Houstons had signed it and requested that he notarize the signatures. Higgins argues that, by participating in the alleged improper acknowledgment of the mortgage, Pacesetter was *in pari delicto* with him in the alleged wrongful act and thus, Higgins insists, Pacesetter could not have reasonably believed it would prevail against him in an action alleging breach of his duty as a notary.
>
> Our supreme court rejected a similar argument in <u>Constantine v. United States Fidelity & Guar. Co.</u>, 545 So. 2d 750 (Ala. 1989). **There, a husband and wife were to execute a mortgage in favor of First Alabama Bank. The signatures of the husband and wife were to be acknowledged by a notary public who was the secretary to a vice-**

> **president of the Bank. The husband signed the mortgage in the presence of the notary public. The wife, however, could not leave her place of employment to sign the instrument, so the Bank vice-president asked the husband to take the mortgage to the wife, have her sign it, and return it to the Bank. When the husband returned with the instrument, the Bank vice-president instructed his secretary to notarize the wife's signature. The Alabama Supreme Court held that no principal-agent relationship existed between the bank and the notary public so as to provide the notary with a defense in a false acknowledgment suit against her.**
>
> "When a notary is called on to perform an act which he is authorized by law to perform, and he does so carelessly or fraudulently, he and his surety are liable for any loss proximately resulting therefrom." Butler v. Olshan, 280 Ala. 181, 190, 191 So. 2d 7, 16 (1966). See also Central Bank of the South v. Dinsmore, 475 So. 2d 842, 845 (Ala. 1985); First Bank of Childersburg v. Florey, 676 So. 2d 324, 331-32 (Ala. Civ. App. 1996).
>
> Based on the foregoing authorities, it is clear that Pacesetter had probable cause to bring its district court action against Higgins. Accordingly, the circuit court properly entered the summary judgment for Pacesetter in the malicious prosecution action.

See Higgins at 1266-7. (Mr. Higgins' Petition for Writ of Certiorari was denied despite his *in pari delicto* argument by the Alabama Supreme Court in Ex parte Higgins, 694 So. 2d 1267 (Ala. 1997)).

Neither the Higgins or Constantine decisions has never been overturned or modified. The conclusion of these holdings is that notaries, as state officers, are not in a principal-agent relationship with their employer/bank, and thus the bank/employer is not liable for any alleged breach of notary duty merely because the bank employs a notary. As the Alabama Supreme Court stated in Ware v. Timmons, 954 So. 2d 545, 552-53 (Ala. 2006), where there in no agent/principal relationship there is no vicarious liability or *respondeat superior* liability:

> Because a master-servant relationship must be consensual, to qualify as a master, one must have the power to select the alleged servant. ... This requirement of consent derives not from the direct test for imposing vicarious liability, but from the elements necessary to form the agency relationship upon which the application of the doctrine of *respondeat superior* is founded. "As a reminder to the bench and bar of the analytical underpinnings involved in this analysis, we

note that a master-servant relationship   is a subgroup of principal-agent relationships; a master is a subspecies of principal and a servant is a subspecies of agent." Terry v. Phillips 66 Co., 591 So. 2d 33, 36 n. 1 (Ala. 1991). Thus, "[t]he rules applicable generally to principal and agent as to the creation of the relation, delegability and capacity of the parties apply to master and servant." *Restatement (Second) of Agency § 25* (1958).

The Restatement (Second) of Agency explains the formation of the relationship between principal and agent as follows: "The relation of agency is created as a result of conduct by two parties manifesting that one of them is willing for the other to act for him subject to his control, and that the other consents so to act. The principal must in some manner indicate that the agent is to act for him, and the agent must act or agree to act on the principal's behalf and subject to his control." *Restatement (Second) of Agency* § 1 cmt. a (1958).

The Court's ruling in Higgins and in Constantine state that a notary, and his or her surety, stand alone as to the notary's exercise of the Public Office, and an employer does not have a principal-agent relationship with that notary as to exercise of his or her enumerated, state-vested powers.  This makes sense, because no employer could lawfully instruct a Notary Public to fraudulently notarize a document.  In this sense, there is no master-servant relationship.

Moreover, Alabama Courts have stated repeatedly that a notary is *not an insurer*.  See, e.g., Butler v. Olshan, 280 Ala. 181, 190, 191 So. 2d 7, 16 (1966).  But if a notary is not an insurer, why and how could her bank-employer become so?  If one of  a notary's normal tasks at work is to notarize documents for free as an act of public good by the bank she works for, and any time a notary falsely or negligently notarizes a document, her employer-bank became liable for whatever damage that employee's blunder could cause, such an interpretation would make all banks who employ independent notaries in effect insurers of the notarized document's validity without any limits of liability.   In the case at hand, there is no dispute that the Indemnity Agreement notarized by Denise Poole was performed for no consideration, and the Indemnity Agreement was not bank business or a bank contract.

27

Other states have approached the issue the same way.  See Commercial Union Ins. Co. of New York v. Burt Thomas-Aitken, 49 N.J. 389, 230 A.2d 498, 499 (N.J. 1967).  This New Jersey Supreme Court opinion is absolutely on all fours with the facts before this Court.   In Commercial Union, the Plaintiff, a surety company, sued on an indemnity agreement to recoup a loss on a  performance bond.  Plaintiff sued the notary public who took the acknowledgment on that agreement and sued also the bank by whom the notary was employed.  As in this case, one of the indemnitors asserted that his signature on the indemnity agreement was forged.  The bank denied the notary acted as its employee in the capacity in which she acted in notarizing the document, and on that basis the court granted the bank's motion for summary judgment.   The Appellate Court reversed, and the Supreme Court of New Jersey heard the case.  The notary in this case was a bank cashier, and notarized documents for customers of the bank at no charge. The bank paid for his annual notary fees.  Based on those facts, the Court found that there is *no principal agency relationship*, and therefore no vicarious liability against the bank:

> [A] notary public is a public officer and as such exercises an authority the bank itself could not receive and does an act the bank itself could not do… [P]laintiff did not know of and hence did not rely upon a connection between the notary and the bank, plaintiff having sought only an acknowledgment by Some notary.  That the bank itself could not exercise the functions of a notary public is clear.  The notary holds a public office which the bank itself could not hold … Thus the notary public exercises a power he receives from government rather that from someone who happens to be his private employer. The bank could not itself take an official acknowledgment or empower an employee to do so. … [O]ne who seeks the services of a notary public does not ordinarily rely upon the credit of some third-party employer of the notary; he asks only for A notary, and Any notary will do. So, here, plaintiff conceded before us that it was wholly unaware of the identity of the notary and did not know the notary was connected with a bank. In short, plaintiff never sought the responsibility of someone other than A notary, and if the bank is held, plaintiff will have a windfall. … Here, plaintiff seeks to hold the bank, not on the thesis that the bank was a party in interest in a contract with plaintiff, but solely because the bank sought to improve its relations with its own customers by providing for the convenient presence of a notary public. … We are not persuaded that justice would be served by imposing liability in these circumstances. Surely neither party anticipated that prospect, and hence

to deny liability cannot surprise or disappoint anyone. No doubt a private employer, here a bank, may gather goodwill through the presence of a notary public and may have that advantage in mind when it encourages its employee to seek the office, but it is also true the public convenience is furthered when the services of a notary public are thus made available." Id. at 499-501 (citations omitted).

An Illinois court has also addressed the issue of vicarious liability when an employee-notary commits a faulty notarization, in Vancura v. Katris, 391 Ill. App. 3d 350, 907 N.E. 2d 814 (Ill. App. 1 Dist. 2008).  In this case, the employer against whom plaintiff sought vicarious liability, Kinko's, was not a party in interest to the notarized contract, and Kinko's did not participate in the transaction of the contract.  The Illinois Court found Kinko's therefore could not be vicariously liable.  Likewise, courts in Arizona and Nevada have concluded that Notaries Public are Officers of the state vested with and exercising state power separate from their powers and duties as employees.  Torrealba v. Kesmetis, 178 P.3d 716 (Nev. 2008); Transamerica Ins. Co. v. Valley Nat. Bank, 11 Ariz. App. 121 (Ariz. App. 1969).

Finally, the Third Circuit has held, "We note that a private employer of a notary public is not vicariously liable for the notary's negligence or breach of duty unless the private employer participated in the breach or negligence or unless the private employer led another to believe that the notary was acting for it and on its behalf."  Villanueva v. Brown, 103 F.3d 1128 (3rd Cir. 1997).  Even under the Third Circuit's articulation of its standard, which is more liberal in favor of allowing vicarious liability against a notary's bank than Alabama's,  GCNA could not prevail, because it carries the burden of proving the bank actively participated in the breach.

GCNA may argue, incorrectly, that the holding in First Bank of Childersburg v. Florey, 676 So. 2d 324, 331-32 (Ala. Civ. App. 1996) is to the contrary.  In Florey, a bank was held liable for the fraudulent notarization committed by its clerk.  Plaintiff may contend that Florey means there is a legal basis for vicarious liability based on the actions of bank-employees, and

thereby distinguishes or undermines <u>Higgins</u>.  This is incorrect.  First, <u>Florey</u> was decided in February of 1996, while <u>Higgins</u> was decided in October 1996, thus giving <u>Higgins,</u> as the latest authority, precedential value.  Second, in <u>Florey</u>, the issue of whether the bank was vicariously liable was *not* part of the appeal, and therefore the case is not binding authority on that issue. Third and most pertinent, the <u>Florey</u> and <u>Higgins</u> decision were authored by the same judge, Hon. John B. Crawley, who would have certainly noted in the subsequent opinion, <u>Higgins,</u> if it was inconsistent or in conflict with <u>Florey</u>.  Without doubt, <u>Higgins</u> and <u>Constantine</u> constitute the prevailing Alabama authority on the issue and are not diminished in any way by <u>Florey</u>. Under those cases, as well as the persuasive authority of other jurisdictions with similar notary laws to Alabama's, First Community is simply not legally responsible for improper notorial acts of Poole.

**E.    GCNA CANNOT ESTABLISH THE ELEMENTS OF A FRAUD CLAIM.**.

Under the particular facts and circumstances of this case, GCNA simply cannot prove reliance in fact, reasonable reliance, proximate cause, or damages, and, in any event, the claim is time-barred.

**No Reliance In Fact**

It is fundamental to an action for fraud that the plaintiff must actually have relied to his detriment on the alleged fraud.  <u>Wilson v. Southern Medical Ass'n</u>, 547 So.2d 510, 514 (Ala. 1989). In the absence of proof of reliance in fact, a plaintiff's fraud claim must fail as a matter of law. <u>Taylor v. Moorman Mfg. Co</u>., 475 So .2d 1187 (Ala. 1985); <u>Webb v. Renfrow</u>, 453 So .2d 724 (Ala. 1984); <u>Davis Bluff Land & Timber Co. v. Cooper</u>, 223 Ala. 137, 134 So. 639 (1931). "In the instant case, the undisputed facts establish that the action allegedly taken by Sanders in reliance upon the representations- becoming a partner in Kirkland- took place before the

representations ever occurred." <u>Sanders v. Kirkland & Co.</u>, 510 So. 2d 138 (Ala. 1987) (holding that plaintiff's fraud claim failed for lack of actual reliance.)

Opinions from other jurisdictions dealing specifically with fraudulent notarization have reached the same conclusion.  A New York federal court addressed a similar situation in a claim of fraudulent notarization where the alleged detrimental reliance occurred before the notarization and held: "[I]f there was a material misrepresentation or omission by these defendants there was no reliance upon it by plaintiff as she had invested in Artrageous prior to seeing the business plan and before her signature was falsely notarized."  <u>See Richardson v. Artrageous, Inc.</u>, 1993 WL 453858, at *2 (S.D.N.Y. November 4,1993) (citing  <u>Fortes v. Estate of Magoon</u>, 553 N.Y.S.2d 475 (2d Dept. 1990)).  Another New York Court recently held that plaintiff must show actual injury and reliance on the fraudulent notarization in order to recover.  <u>See Edwards v. Rockaway Storage, Inc.</u>, 2008 WL 8214039 (N.Y.Supp. 2008) (citing two other New York cases). Similarly, in a Louisiana case the appellate Court reversed and remanded a summary judgment ruling holding that, where a plaintiff alleged damages based upon a fraudulently notarized mortgage, and sued the notary public who notarized that mortgage,  the plaintiff was required to prove that he in fact relied on the notarization in taking subsequent actions that caused him damage in order to recover for fraudulent notarization.  <u>Caruso v. Fidelity & Deposit Co. of Maryland</u>, 199 So. 532, 534-35 (La. App. 1941); <u>Ellis v. Hale</u>, 58 Mont. 181, 194 P. 155 (Mont. 1920) (same); <u>Nahrgang v. American Emp. Ins. Co</u>., 198 Pa.Super. 20, 26 (Pa. Super 1962)(same).

In <u>Torres v. State Farm Fire & Casualty Co</u>., 438 So. 2d 757, 759 (Ala. 1983), the Alabama Supreme Court stated: "[T]he right of reliance comes with a concomitant duty on the part of the plaintiffs to exercise some measure of precaution to safeguard their interests. In order to recover

for misrepresentation, the plaintiffs' reliance must, therefore, have been reasonable under the circumstances."  See also Concrete Metal Forms, Inc. v. Cole-Farley & Associates, Inc., 2000 WL 1848162, at *6-7 (S.D. Ala. 2000) (in applying Alabama's "reasonable reliance" standard and positively citing Torres the district Court found that a company's president could not have reasonably relied on terms of an insurance policy that she did read, despite the company's policy designating her as the employee responsible to review insurance policies to affirm that terms were acceptable to company.)

GCNA claims that it "relied" on Poole's notary acknowledgement to such an extent that, but for its receipt, and its affirmation that the signatures on the indemnity agreement were valid, GCNA would not have agreed to act as surety for WDWS or issue any bonds. However, as shown above in the statement of facts, this claim is demonstrably false based upon the actual chronology of events.

GCNA's producing agent, Bo Evans, testified that the bonds on the first project (#40008021) were "issued" (i.e. drafted in blank form) with an effective date of May 16, 2007, and for the second project (#40008020) with a date of May 17, 2007.[3]  The "Bond Details" document created by J. Smith Lanier confirms those dates, which are 14 and 15 days, respectively, *before* the notary acknowledgement of Poole was signed on May 30, 2007.  Jim Befort's memo also confirms that bonds were "issued" during the week *prior to* May 22, 2007.[4] Thus, the uncontroverted testimony and evidence was that GCNA had already made its decision to enter into the surety relationship and issue bonds *before* May 30, 2007, and therefore could not have relied on the acknowledgement as the basis for issuing the bonds.

---

[3] See, Statement of Fact #s 16 and 17.
[4] See, Statement of  Fact # 15.

Jim Befort's underwriting memo also clearly indicates that, as of *May 22, 2007*, he had completed the underwriting of the WDWS account to the point that he recommended approval of a line of authority to issue final bonds for up to $1 million per project, and $2.5 million aggregate.[5]  Befort also testified (contrary to what he wrote in his memo) that he *did not* have an indemnity agreement in his possession on May 22, 2007 when he made the decision to accept the WDWS account and issue bonds.[6]  Obviously, he could not have been relying on signatures on an indemnity agreement he did not have, or a notary acknowledgement which *did not exist*, when he made his decision.  In summary, the undisputed evidence is that the first line underwriter had approved writing bonds for the account 8 days before the notary acknowledgement existed. While Befort's testimony and written documents are inconsistent, and his backtracking injects some uncertainty into exactly what happened, the discrepancies are not material to this motion. Either he had some form of the Indemnity Agreement on "5/22/07" in which case he could not have relied upon a notary acknowledgment dated 5/30/07; or he did not have the Indemnity Agreement on 5/22/07 and recommended approval of the line of authority before the notary acknowledgement was even created.  In either event, there was no reliance in fact upon the acknowledgement.

Moreover, GCNA's home office underwriter, Dick Miller, approved Befort's recommendation to handle WDWS' surety needs "for the coming year," and approved the $1 million/$2.5 million line of authority, effective *May 24, 2007*[7].  Thus, Miller gave the final underwriting approval, which established the surety/principal relationship, 6 days before the notary acknowledgement came into existence.  Without question, the decision to approve the

---

[5] See, Statement of Fact # 18.
[6] See Statement of Fact # 15.
[7] See Statement of Fact # 18.

new account and establish bond writing limits was *not* in reliance upon Poole's notary acknowledgement.

Even more importantly, the "final" bonds (performance and payment bonds) were executed and delivered on the first bonded WDWS project (Town of Gordo) on *May 24, 2007.*[8] Thus, GCNA was bound and obligated under non-cancellable bonds issued in favor of WDWS 6 days *prior* to Denise Poole signing the notary acknowledgement on May 30, 2007, in Prattville, Alabama.[9] .

In holding there could be no reliance to support a fraud claim where a contract was entered into before the alleged misrepresentation, the Alabama Supreme Court stated, "[T]he representations, if any, made by [Defendant's] secretary did not occur until after the parties had entered into the contract. Commander could not have relied on these purported representations in entering into the agreement." ERA Commander Realty, Inc. v. Harrigan, 514 So. 2d 1329, 1336 (Ala. 1987). "In order to be actionable, a misrepresentation must be material in the sense that the plaintiff relied upon it and acted or refrained from acting based upon such reliance. Deupree v. Ruffino, 505 So. 2d 1218 (Ala. 1987). Where there is no reliance, there can be no fraud." First Union Nat. Bank of Florida v. Perdido Motel Group, Inc., 142 B.R. 460, 464 (N.D. Ala. 1992). Applying the well-established principles of law set forth in those cases, GCNA did not rely on the notarization, as a matter of law.

Second, GCNA did not rely on the acknowledgment based upon the knowledge of its agent, Bo Evans, which is imputed to it.  It is undisputed that J. Smith Lanier and Bo Evans acted

---

[8] See Statement of Fact # 19.
[9] As Mr. Befort testified, the surety is bound under the bonds and is responsible for claims after the bonds are released and presented to the owner/obligee (Befort depo., pp. 99; 102-103).  The effective date here, as relected on the face of the executed and delivered bonds, was May 24, 2007.

as authorized agents of GCNA in their dealings with WDWS.[10]   It is also undisputed that Bo

Evans signed the indemnity agreement as a witness to indemnitor Stephen Wainwright's

signature as an individual indemnitor.[11]   However, Evans signed the document at his office in

Birmingham, not at First Community in Prattville where Denise Poole executed the notary

acknowledgement.[12]   Evans has admitted that Poole was not present when he and Stephen

Wainwright signed, so Evans *knew* the indemnity agreement was not properly notarized and was

not to be relied upon.[13]   Simply stated, Evans had direct, personal knowledge of the "constructive

fraud" in the form of improper notarization.   This is fatal to GCNA's fraud claim because Mr.

Befort testified that had Bo Evans told him that Stephen Wainwright did not sign the indemnity

agreement before the notary, he would have known the notarization was improper and would not

have accepted the indemnity agreement.[14]

Under established law, the knowledge of GCNA's contractually appointed agent, Bo

Evans, must be imputed to GCNA as its own knowledge.   As a general rule, a corporation, and

particularly an insurance or bonding entity, is held responsible for the knowledge acquired by its

agents while acting within the scope of their unemployment; Alabama Farm Bureau Mut. Cas.

Ins. Co. v. Moore, 435 So. 2d 712 (Ala. 1983) (party has a legal right to presume facts made

known to the agent are known to the principal, the insurer); In re Newriter v. Life & Cas. Ins. Co.

of Tennessee, 157 So. 73, 229 Ala. 359 (Ala. 1934) (notice to agent while acting within scope of

authority is imputed to insurer); Aetna Ins. Co. v. Kennedy, 50 So. 73, 161 Ala. 600 (Ala. 1909)

(notice to agent is notice to the insurance company); Birmingham Boys Club, Inc. v.

---

[10] See, Statement of Fact # 5.
[11] See, Statement of Fact # 22.
[12] See, Statement of Fact # 22.
[13] See, Statement of Fact # 22.
[14] See, Statement of Fact # 23.

Transamerica Ins. Co., 325 So. 2d 167 (Ala. 1976). GCNA is responsible for *all* knowledge of Evans, relating to the indemnity agreement, because he was its agent for purposes of obtaining the signed document. As a general principle of agency law, an agent's knowledge concerning the subject matter of the agency is *imputed to the principal.* Wilma Corporation v. Fleming Foods of Alabama, Inc., 613 So. 2d 359 (Ala. 1993). For purposes of the transaction at issue, Evans' knowledge of the improper notarization is legally imputed to GCNA and precludes it from prevailing on any claim that it relied upon the notary acknowledgement being accurate in all respects.

Based upon Evans' knowledge, GCNA cannot establish the element of detrimental reliance on any claim against First Community. Again, it is undisputed that GCNA knew of facts which made the notary acknowledgement false and defective. Given those facts, GCNA cannot conceivably argue that it was "relying" on the complete truthfulness and accuracy of the notary acknowledgement. Evans, who was himself a notary, *knew exactly* what had occurred.

### No Reasonable Reliance

Even if GCNA could prove actual reliance in fact, it still cannot establish reasonable reliance under the standards set forth in multiple cases explaining and applying the "reasonable" reliance standard.[15] See also AmerUs Life Ins. Co. v. Smith, 5 So. 2d 3d 1200 (Ala. 2008); In Torres v. State Farm Fire & Casualty Co., 438 So. 2d 757, 759 (Ala. 1983), the Alabama Supreme Court stated: "Because it is the policy of courts not only to discourage fraud but also to discourage negligence and inattention to one's own interests, the right of reliance comes with a concomitant duty on the part of the plaintiffs to exercise some measure of precaution to safeguard their interests. In order to recover for misrepresentation, the plaintiffs' reliance must,

---

[15] As this Court is well aware, in Foremost Insurance Co. v. Parham, 693 So.2d 409 (Ala. 1997), the Alabama Supreme Court adopted the "reasonable reliance" standard. Baker, supra, at 420-421.

therefore, have been reasonable under the circumstances." See also Concrete Metal Forms, Inc. v. Cole-Farley & Associates, Inc., 2000 WL 1848162, at *6-7 (S.D. Ala. 2000) (in applying Alabama's "reasonable reliance" standard and positively citing Torres, the district Court found that a company's president could not have reasonably relied on terms of an insurance policy that she did read, despite the company's policy designating her as the employee responsible to review insurance policies to affirm that terms were acceptable to company.).

The governing rule of reliance established in Foremost is simple, straightforward, and plainly applicable here – if the claimant deliberately chooses to ignore the true facts, or fails to exercise diligence to inquire or take reasonable action to discover the true facts, then as a matter of law, that party cannot claim any fraud relating to matters which were known or should have been known.  Foremost, 693 So. 2d at 421; See also Waddell v. Reed, Inc. v. United Investors Life Ins. Co., 975 So. 2d 1143, 1160 (Ala. 2003) (holding that plaintiff cannot recover on a fraud claim if the circumstances are such that a reasonably prudent person exercising ordinary care would have discovered the true facts).

As a matter of law, Plaintiffs may not blindly rely upon alleged fraud where they have information which would put them on notice of the alleged fraud.  The reliance must be reasonable in the circumstances, and the mental capacity, educational background, and sophistication of the claimant may be taken into consideration.  Liberty National Life Insurance Co. v. Ingram, 887 So. 2d 222, 228 (Ala. 2004).  As stated in Alfa Life Insurance Corp. v. Green, 881 So. 2d 991-992 (Ala. 2003), "if the [plaintiff] blindly trusts, where he should not, and closes his eyes where ordinary diligence requires him to see, he is willingly deceived…;"  See also Waddell & Reed, Inc. v. United Investors Life Ins. Co., 875 So. 2d 1143 (Ala. 2003) (finding no reasonable reliance applying the reasonably prudent person standard).

As shown above, GCNA could not have reasonable relied upon the notary acknowledgement when its agent knew it was false. In addition, GCNA's underwriting guidelines expressly state that a notarization provides "some assurance" that signatures are valid, but not a complete assurance or guarantee, and that the notary is not necessary in order to establish a binding agreement.[16] The text of the guideline is an admission of GCNA's understanding that a notary acknowledgement is not to be completely relied upon without some amount of investigation or inquiry.  The same underwriting guidelines indicate that having an indemnity agreement notarized is not mandatory, even if it is a custom.[17]  It is also the normal custom for agents to speak to each of the indemnitors about the indemnity obligation, but for whatever reason that was not done in the case of the Wainwrights.[18]

In light of its own guidelines, GCNA cannot reasonably and credibly claim to have placed complete reliance upon a notary authorization.  If GCNA has made even a minimal effort to inquire into the validity of the signatures by speaking with the purported signing indemnitors it would have immediately discovered the discrepancy with regard to the signatures of Jeff and Tracye Wainwright. GCNA is a highly sophisticated party with extensive experience with issuance of bonds and indemnity agreements.  It knew that a notary acknowledgment was not a complete assurance and it failed to exercise the degree of care required in the circumstances to discover the true facts.

### No Damages Proximately Caused By The Alleged Fraud.

For purpose of a fraud claim, proximate cause is defined as an act or omission that in the natural and continuous sequence, *unbroken by new and independent causes*, produces injury and

---

[16] See, Statement of Fact # 10.
[17] See, Statement of Fact # 11.
[18] See, Statement of Fact # 7.

without which injury would not have occurred.  Crowne Investments, Inc. v. Bryant, 638 So. 2d 873 (Ala. 1994) (emphasis added).

As shown above, GCNA's underwriting guidelines also require that indemnity agreements signed on behalf of a corporation by an officer must be witnessed by the Secretary or Assistant Secretary and be marked with the corporate seal.[19]   This is obviously a safeguard designed to protect GCNA from a forged signature of an alleged corporate officer and protect the validity and enforceability of the indemnity agreement.  GCNA failed to require the signature of the Secretary of WDWS, who, at the time, *was Jeff Wainwright*.[20]  Without question, if GCNA had required Jeff to witness the signature of his brother Steve, as its guidelines require, then the problem of the alleged forgery would have been avoided from the outset.  As such, GCNA's failure to protect itself by following its own guidelines was the proximate cause of any loss it may suffer, not the notary acknowledgement.

GCNA's underwriting guidelines expressly state that a notary signature is not required to establish a legally binding indemnity agreement.  Of course, this statement is correct and there is no legal requirement to have an indemnity contract notarized.  If Jeff and Trayce Wainwright have in fact signed the agreement, or have ratified it by accepting the benefit of the bonds as GCNA alleges, then they are bound regardless of whether the agreement was notarized or not.  Likewise, if they did not sign or  assent to the agreement, then they are not bound regardless of whether there was a notary acknowledgement.   Thus, there is simply no loss which was proximately caused by the act of falsely notarizing the document.

---

[19] See, Statement of Fact # 12.
[20] See, Statement of Fact # 12.

GCNA's underwriting guidelines also require indemnity agreements to be signed in at least triplicate, and a copy to be provided to each indemnitor.[21]  That obviously did not happen in this case because Jeff Wainwright's testimony, which was not refuted, was that he did not receive a copy of the Indemnity Agreement until April of 2009 when he found one with his father's papers.[22]  Immediately upon discovering the Indemnity Agreement, Jeff Wainwright went to see an attorney (Mr. Elam, who represents him in this action) and notified GCNA in writing that he did not sign the agreement.[23]  Again, GCNA's failure to follow its procedures was the proximate cause of the loss, or at the very least was an intervening cause which occurred after the notarization, and bars it claim of constructive fraud.

Evans admits that he should have brought the issue of the false notarization of his signature, and Steve Wainwright's as President of WDWS, to GCNA's attention; and GCNA claims it would not have gone forward if told about the defects with the notary acknowledgement.[24]

## No Proof of Present Damages

What is more, GCNA has not suffered any recoverable damages at this point in time.  As stated above, this is a contingent claim which depends for its viability and existence upon GCNA's inability to recover indemnity from Jeff and Trayce Wainwright and the other indemnitors.  It is simply not known at this point if any such recovery will occur.  GCNA cannot recover the same damages from the indemnitors and from First Community.  Any ruling issued now finding First Community liable would be an advisory opinion. Accordingly, the claims against First Community are not ripe, and the Court should either dismiss or stay the claims

[21] See Statement of Fact # 13.
[22] See, Statements of Fact #s 13 and 24.
[23] See, Statement of Fact # 24.
[24] See, Statement of Fact #s 22 and 23.

against First Community until the claims of GCNA against the indemnitors, including any claims in bankruptcy actions, are fully adjudicated and complete.

### GCNA's Purported Fraud Claim is Time-Barred.

GCNA's claims are subject to a two-year statute of limitations.  ALA. CODE §6-2-38(1). The statute of limitations bars fraud claims as a *matter of law* when a plaintiff receives information, more than two years prior to commencement of the action, that would place a reasonable person on notice of the fraud.  See Foremost, 693 So. 2d at 422; Jackson v. Secor Bank, 646 So. 2d 1377, 1379 (Ala. 1994) (statute of limitations barred fraud claim against bank for placing retirement funds in a taxable account, instead of a tax-deferred IRA; statute of limitations began to run at the time the plaintiff received a Form 1099 from the bank showing that the interest income from the account was being reported to the IRS). The rule in Foremost and its progeny squarely applies here. GCNA, through its agent, was aware in May of 2007 that the Indemnity Agreement was not properly notarized and was therefore not reliable.  Thus, GCNA was indisputably on written notice, more than two years prior to filing suit in October of 2009, of the alleged constructive fraud for which it now complains.


### IV.    CONCLUSION

Based upon the undisputed facts and law set forth herein, summary judgment is due to be granted as to Count VI as it purports to impose liability upon First Community Bank of Central Alabama, Inc., and this Defendant respectfully requests that the Court enter a summary judgment in its favor.

Respectfully submitted,

\s\ *Barry A. Brock*
Barry A. Brock

41

Attorney for First Community Bank of Central Alabama

**OF COUNSEL:**

JONES, WALKER, WAECHTER, POITEVENT,
  CARRERE & DENEGRE, LLP
1819 5th Avenue North
Suite 1100
Birmingham, Alabama 35203
Telephone:  (205) 244-5261
Telecopier: (205) 244-5400

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing Brief has been served by the Court's electronic filing system to all counsel as follows:

| | |
|---|---|
| George Matthew Keenan | Freeman Milton Elam |
| Starnes David Florie LLP | The Law Office of Freeman M. Elam, CPA |
| P O Box 598512 | 969 E. Main Street |
| Birmingham, AL 35259-8512 | Prattville, AL 36066 |
| | |
| Luther Graves Stiff , III | Joseph Michael Saloom |
| Starnes David Florie, LLP | Rountree & Associates, LLC |
| 100 Brookwood Place | 448 Saint Lukes Drive |
| P O Box 598512 | Montgomery, AL 36117-0474 |
| Birmingham, AL 35209 | |
| | |
| Robert Bailey Reneau | Nancy Marie Kirby |
| Reneau & Thornton, Attorneys at Law | 141 W. Main Street |
| 114 S. Main Street | Prattville, AL 36067 |
| Wetumpka, AL 36092 | |
| | |
| RLI Insurance Company | Ahrian Tyler Dudley |
| c/o John Norman | Chirayu Madhu Shah |
| 415 Commerce Street | Christian & Small, LLP |
| Greenville, AL 36037 | 505 20th Street North, Suite 1800 |
| | Birmingham, AL 35203 |

This the 18th day of  February, 2011.

\s\ Barry A. Brock
OF COUNSEL