IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| GUARANTEE COMPANY OF NORTH AMERICA, USA | ) ) ) | |
| Plaintiffs, | ) ) | CIVIL ACTION NO. 2:09-CV-1003-MEF |
| vs. | ) ) | |
| SHERYL B. WAINWRIGHT, et al., | ) ) ) | |
| Defendants. | ) | |

**BRIEF OF DEFENDANT FIRST COMMUNITY BANK OF CENTRAL ALABAMA, INC. IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

# EXHIBIT 8

**UNDERWRITING
GUIDELINE**

<u>1 2004</u>

---

<u>Subject:</u>   **Underwriting New Contract Surety Accounts**

<u>Background</u>

We must continue to develop and maintain strong distribution partners. This
requires us to be responsive, dependable, and consistent in our underwriting
approach. Quick concise answers to submissions and a willingness to listen and work
on difficult cases is a key to our success. The purpose of this guideline is to outline
the information normally needed to make an underwriting decision and to establish
response times

While we are willing to work on difficult cases, surety support should only be
extended when the information received and analyzed demonstrates the principal's
ability to fully respond during the term of the obligation. Simply recognizing the
shortcomings in a case is not enough; those shortcomings must be overcome. As
partners, our producers must understand and accept this approach.

The amount of information required from the Principal and Indemnitors must be
commensurate with the need to evaluate the Principal and the risk. This may create
a natural conflict, because the Principal frequently wants to expend as little effort as
possible to gain reliable surety support.  As Surety, however, we often need a lot of
information to evaluate our exposure as premium rates provide limited ability to
absorb a loss. Thus developing a cost-effective way to gather information is another
key to our success. The manner which information is developed may vary but a
successful surety needs information that provides a complete understanding of the
Principal and the risk.

There are four areas of risk that we need to fully understand before approving
bonds:
- the Principal,
- the Obligee,
- the bond form,
- the underlying agreement

All new accounts require the approval of both the Local Underwriter and Head Office. We
realize that this can slow the acceptance process and may cost us an opportunity. We,
however, are willing to sacrifice these opportunities to maintain underwriting discipline. We
also believe that in today's world of electronic communications, the delay should be minimal
and that through team work we can respond in a very timely manner, if complete
documentation is provided.



DEFENDANT'S
EXHIBIT
7

PENGAD 800-631-6989

GCNA 00001

**Procedure**

Submissions the file should contain the following information:

**New Contract Account Submissions**
1.  A meeting memorandum outlining why we are being provided with this opportunity and what underwriting issues or challenges must be resolved.
2.  Annual Write-up.
3.  Completed Contractor's Surety Survey (questionnaire).
4.  Current Dun & Bradstreet report.
5.  Bank letter or agreement.
6.  CPA prepared financial statements for last three fiscal years.
7.  Most current interim financial statement.
8.  Comparative financial analysis.
9.  Personal financial statements on owners and indemnitors.
10.  Aging reports of receivables and payables reconciled to financial statement.
11. Fiscal year end and current Status of Contract Reports and with Profit Trend Analysis, reconciled with financial statements.
12.  Concurrently dated financial statements on any affiliated entities.
13.  Organizational chart
14.  Details on insurance coverage.
15.  Details on whom we can expect as obligees and their qualifications.
16.  Details on the types of contracts the principal enters into and any unusual risk factors.
17.  Details on the bond forms the aforementioned obligees require and any unusual risk factors.

Prior to issuing any final bonds, a properly executed General Agreement of Indemnity needs to be obtained.


**Responsibility and Authority**

Local Underwriter
- Prepare a complete submission to Head Office for new accounts so that our service standards may be maintained
- Obtain further information as may be requested by Head Office.
- Respond to the agent with respect to our underwriting decision

Head Office
- Evaluate all submissions from Local Underwriters
- Provide the Local Underwriter the underwriting decision within 48 hours.
- If appropriate, issue Line of Authority.

GCNA 00002

*UNDERWRITING*                                    No. 2  2004
*GUIDELINE*

Subject:       Lines of Authority

### Background

This guideline outlines who is responsible for authorizing and issuing Lines of Authority.

All authority is granted on a Line of Authority basis or on a Special Acceptance basis. Lines of Authority provided single and aggregate dollar limits and specific exclusions as to the type and conditions of the contract that may be bonded. We require that at least two underwriters be involved in the issuance of authority. This concept is referred to as "two sets of eyes". Usually one underwriter will be a Local Underwriter and the second underwriter will be a Head Office Underwriter.

Authority will be given to the Head Office Underwriter but this underwriting authority requires the concurrence of the Local Underwriter or another Head Office Underwriter.

The Local Underwriter may in turn issue a Line of Authority to an agent. We recommend that the Local Underwriter does not issue the entire limit to the agent, but holds back some of this authority for monitoring purposes.

### Procedure

1. The Local Underwriter should request a Line of Authority on all active accounts that meet our underwriting standards.
2. Line requests are normally made on new accounts and annually when fiscal year end underwriting is completed.
3. Lines of authority have an expiration date, usually 120 days after the fiscal year end.
4. If there is unanticipated deterioration in the account's financial position, the line is automatically revoked.
5. The Local Underwriter is responsible for monitoring the financial condition of the account.
6. The Head Office underwriter will be granted authority, but to exercise this authority they need the concurrence of another underwriter.
7. On any surety requests that fall outside our reinsurance treaty support Head Office is responsible for obtaining the necessary reinsurance to maintain our agreed upon retention limits.

### Authority and Responsibility

Local Underwriter
- Obtain and maintain current lines of authority on all active accounts.

- Monitor the accounts interim financial condition and the contracts being bid on and entered into by the principal.
- Issue Line of Authority to Agent

Head Office Underwriters
- Operate within their assigned authority and obtaining the concurrence of another underwriter.
- Issue the Account Specific Letter of Authority for accounts that meet our underwriting standards and maintain a copy in the underwriting file.

Forms

Line of Authority, Company Format
Line of Authority, Agent Format

***UNDERWRITING***                    No.    **3 2010**
***GUIDELINE***

---

<u>Subject:</u>      **Lines of Authority  - Renewal Status**

<u>Background</u>

We issue lines of authority on accounts that typically expire four months after
the fiscal year end.  Our expectation is that an annual review can be
completed and new lines established during this period.  If the annual review
has not been completed within four months of the year-end, we can extend
the existing line for an additional three months.

These accounts are considered to be in "Renewal" status.  This extension
typically occurs where we are waiting for information to complete the annual
write-up and no new information has been identified which would indicate an
adverse change in the Principal's financial position.

<u>Procedure</u>

The Regional Underwriter will request that a Principal be assigned Renewal
status.  Upon National approval of this request, the Regional Underwriter has
the authority up to approve another contract bond for this contractor anytime
during the following ninety days from the date of authorization, subject to the
following conditions:

1. The contractor's aggregate work program is approximately the same as it
   was when the National Underwriter and the Regional Underwriter
   approved the bid or final bond.

2. The new contract is located in an area where the contractor has
   customarily worked.

3. The contract involves the type of work the contractor has been
   performing.

4. No adverse information, financial or otherwise, has developed in the
   interim.

5. The contract does not exceed $5,000,000.

6. The National Underwriter has not specifically excluded the use of this authority.

**Responsibility and Authority**

**Regional Underwriter**
- Ensure that all annual write-ups are completed on a timely basis.
- Make a request that a Principal be granted Renewal status if the annual write-up is not completed within four months of the year-end. This request can only made after reviewing the underwriting file to ensure that there is no adverse change in the Principals' financial position.
- Continue to operate the Principal's account within the level of authority delegated to him/her

**National Underwriter**
- Approve or decline requests for Renewal status.

***UNDERWRITING***                          No.   __4  2010____
***GUIDELINE***

**Subject:**      **Underwriting the Obligee**

**Background**

The successful conclusion of a bonded contract depends as much on the
Obligee as it does on the Principal.  We demand that our Principal have the
Character, Capacity and Capital needed to undertake its obligation under a
contract.  The Obligee must also have the Character, Capacity and Capital
needed to undertake its obligations under a contract.

Obligees have many duties to perform:
- Clear project concept
- Land acquisition
- Permitting and posting security
- Providing detailed plans and specifications
- Ensuring that these plans and specifications meet code compliance
- Providing clear contract documents
- Project administration
- Project coordination and scheduling
- Responding to Requests For Information
- Disclosure of environmental problems
- Project financing
- Prequalification of Contractors
- Approval of payment to contractors

The Obligee may not have adequate or qualified staff to perform all these
functions and will often obtain the services of others:
- Architects and Engineers
- Construction Managers
- Financial Institutions

These owner representatives help the owner meet the capacity or capital
requirements.  They also must be pre-qualified.  We need to be aware of their
reputations within the construction industry.  An architect or engineer that
provides a poor set of plans and drawings and does not respond in a timely
manner to a RFI can delay a project and adversely affect our Principal's ability
to perform.  A construction manager that does not provide and update critical
path schedules and coordinate subcontractors can adversely affect our
Principal.  A financial institution that interrupts the project financing can cause
our Principal sever cash-flow problems.

GCNA 00007

The owner, or the aforementioned owner representatives, may also try to pass its responsibilities to the contractor. This can greatly increase the Principal's risk and ours as Surety.

Most Obligees are public entities:
- Federal Government Agencies
- State Government Agencies
- County Government Agencies
- City or other district government agencies.

It is important to be aware of the reputation of the governmental agency. Some are well funded and staffed with competent people who understand the construction process. Other government agencies are under-funded and have little construction expertise or approach the process in a confrontational manner. While payment may be ultimately received, there can be extended delays, adversely affecting our Principal's cash flow and ability to perform.

Government entities are usually required by law to require contractors who are making physical improvements to realty to post performance and payment bonds. This is mainly to protect subcontractors, suppliers and labors, who do not have the protection of lien laws on public properties.

Private Obligees can be classified as:
- Owners
- Developers
- Contractors
- Subcontractors

These entities are not obligated to require performance and payment bonds. We need to be aware if they are selectively bonding. If they are selectively bonding, we need to determine why a bond is being requested from our Principal.

An example of an owner that we do not want as an Obligee is an individual that is building his or her own home. Rarely do these individuals have the qualifications necessary to perform. This often leads to disputes and problems on the project.

### Procedure

- Determine whether the Obligee is a public body or a private entity.
- Determine the Obligee's past construction experience and reputation for working with contractors and our Principal.
- If the Obligee is a private entity determine if they selectively bond contractors.
- If the Obligee is a private entity verify project financing.
- If the Obligee is employing owner representatives, the reputation and competence of these representatives must be determine.

**Responsibility and Authority**

**Regional Underwriter**

- On accounts being handled under lines of authority, it is the responsibility of the Regional underwriter to review the Obligee.
- The underwriter must be satisfied that the Obligee can fulfill its obligations, if there is any question, the National Underwriter should be consulted.

**National Underwriter**
- Inform the Regional underwriters of difficult Obligees.
- Review the Obligee with the local underwriter on Special Acceptance submissions.

GCNA 00009

| **UNDERWRITING** | **No.** | **5 2010** |
| --- | --- | --- |
| **GUIDELINE** | | |

**Subject:**    **Underwriting the Contract**

**Background**

The contract document or underlying agreement establishes the agreements between the Principal and Obligee.  We, as Surety, need to understand what has been agreed to prior to issuing bonds.

Many contracts are issued on standard forms and by public bodies that do not alter the provisions of their contracts.  There is no need to review these contracts, if the underwriter is thoroughly familiar with the terms of such contracts.  However, most contracts issued by private entities or on unique public jobs should be reviewed.  These contracts may include obligations that significantly increase the risk of a surety or call for additional premium charges.

**Procedure**

Here are some items to look for:

Determine that the identity of the parties to the contract is the same as the bonds covering it:
- The parties identified in the contract should match those named on the bond.
- Addresses on the contract should match addresses on the bond.
- The job description should match the description on the bond forms.
- The dates of the agreements should be consistent with those in the bond form.


Determine the form of the contract:
- prime contract
     design build (contractor is responsible for the design, refer to National Underwriter)
     fast track (design completed as project is built, refer to National Underwriter)
- subcontract
- purchase order

Determine how the contract value is established:
- lump sum basis,
- unit price basis,
- cost plus basis
- other basis. (refer to National Underwriter)

Determine progress payment terms:
- frequency of interim payments (Over 30 days, refer to National Underwriter)

- retainage (Amounts over 10% refer to National Underwriter)
- advance payments (Refer to National Underwriter)
- turnkey basis. (payment at completion, Refer to National Underwriter)
- payments other than in cash (refer to National Underwriter)

Determine time to Complete:
- Start time (delayed starts are a problem)
- Substantial completion times (Terms over 24 months are a problem)

Determine if there are penalties for late completion or financial consequences to the obligee for late completion.
- Is there a force majeure clause present? (If absent, the National Underwriter should review.)
- Dispute clauses (Some contracts allow the obligee's representative be the arbitrator, which in unacceptable.)
- Default provisions (Only material breaches should trigger default.)

Determine if there are any guarantees, the time period and dollar amount:
- Warranties for material and labour (Standard is 12 months, beyond 36 months, provides an underwriting challenge.)
- Efficiency guarantees or successful operations (Extremely hazardous and difficult to underwrite.
- Refunding or back-back provisions. (This type of clause must be removed.)

Determine if there are any maintenance and operational obligations
- Some construction contracts call for ongoing service contracts after the project is completed.  These contracts should be separated from the bonded construction contract.  If bonded they should be written on an annual basis and the bonds should have non-renewal or cancellation privileges.

These are the more common provisions for which to look.  There are always new provision that can prove harmful to our Principal and us.  We need to keep aware of changes and address them as them develop.

## Responsibility and Authority

### Regional Underwriter
- Know the contract provisions of the bonded obligations.
- Obtain, review and provide copies of contracts with all private entities and with public entities where the basic contract forms vary.
- Point out onerous contract clauses to the National Underwriter, the producer and contractor.
- Correctly charge for contract provisions as outlined in the SFAA Premium Rating Manual.

### National Underwriter
- Request copies of contracts where there may be onerous provisions or provisions that give rise to additional premium charges.
- Review contracts supplied to confirm that there are no onerous provisions.
- Decide whether we can safely write the contract, if it contains onerous provisions.
- Confirm that we have charged the appropriate premium for the risk.

*UNDERWRITING*                                    No.   6 2004
*GUIDELINE*

---

Subject:      **Underwriting the Bond Form**

**Background**

As a Surety, we must actively guard against onerous bond forms. The terms and provisions of
many bond forms are dictated by statute and therefore not negotiable.  Some Obligees, both
public and private, have drafted or selected forms that go far beyond statutory provisions.
The surety industry has attempted to use its influence to ensure that these forms are
balanced between the Obligee need for protection and the Surety, its Principal and third party
indemnitors need to limit their exposure. We must actively be engaged in fighting onerous
bond forms.

Sureties do not sign the underlying contracts, as they want to limit their liability.  Unlimited
liability would be unacceptable to the surety, its Indemnitors and insurance regulators who
are responsible for the solvency of insurance companies.  Bond forms should provide a
penalty limitation and a limitation as to what is being covered.

Some obligees have tried to reduce or eliminate the limitations that bond forms provide.
Other obligees have drafted forms that expand the obligations provided beyond want the
requirements of the underlying contract.  Still others have drafted forms that are used as
leverage against the contractor and its surety to expand the benefits the obligee negotiated
in the contract.

We can stop the proliferation of onerous forms if we challenge these forms as they come out
and before they become institutionalised.

This guideline is not intended to outline every onerous provision in bond forms, but rather to
give some guidance as to importance of reviewing bond forms.

**Procedure**

Look for clauses that:
- add multiple obligees;
- expand whom can make a claim  on the bond;
- expand the term of the obligation or time for filing a lawsuit;
- alter the bond penal sum limitation, by automatically increasing the penalty or adding
  interest and attorney fees;
- provide a waiver of the rights of  the Principal or Surety;
- provide indemnity to the obligee for liability emanating from third parties for bodily injury,
  contractual liability for delays, or liability for violation of environmental or other
  governmental regulations.
- limit the options available to us to respond to a claim;

GCNA 00012

- call for payment only;
- call for performance only;
- limit the time for the claim department to respond;
- allow the obligee to trigger a claim without a material breach to the contract.

### Responsibility and Authority

**Regional Underwriter**
- Be familiar with onerous bond form provisions.
- Support the local surety industry in fighting onerous bond form provisions.
- Review bond forms before they are issued.
- Determine if it is a standard industry form, a statutory form or a hybrid form.
- If the form contains onerous provisions, find-out how long it has been in use and if the local surety industry has been issuing the form.
- Obtain National Underwriter's authorization prior to issuing a bond with onerous provision.

**National Underwriter**
- Advise Regional Underwriters of onerous forms.
- Review bond forms when they are reported.
- Only provide approvals to onerous forms that have become institutionalized and where the risk is appropriate.

GCNA 00013

## UNDERWRITING GUIDELINE

No.  **7 2010**

**Subject:**   **Special Acceptance Submission**

**Background**

This guideline outlines the format in which Special Acceptance Submissions must be submitted to National Underwriter. A Special Acceptance is a contract bond request that:
- falls outside the parameter of a Line of Authority;
- names a Principal for whom a Line of Authority has not been established, or
- specifically is identified as a requiring Special Acceptance in US 2010-8.

**Procedure**

The following information must be provided to the National Underwriter when obtaining seeking approval for bonds covering a specific job.

1. The exact name of the principal with a reference to the overall account name
2. The obligee's exact name ( including financing or financial inf. on private obligees)
3. The bid date or contract date
4. A detailed project description highlighting any unusual aspects (attach a copy of  the RFP, or a copy of the Contract)
5. Start Date, Completion Time
6. Penalties/Liquidated Damages  with details on force majeure clause
7. Payment Terms (advance payments, retainage, no cash payments, etc.)
8. Bid Bond Amount ( any unusual aspects: forfeiture, automatically becomes a final bond)
9. Performance and Payment Bond percentage to the contract price
10. Maintenance Guarantees and if Separate Bonds are required
11. Efficiency guarantees or design hazards
12. Major sublet work and whether it is bonded
13. A description of the largest similar job the principal has completed (size, year, profit)
14. Financial Highlights on the principal
15. Principal's labor exposure and expected gross profit margin
16. Local Underwriter's recommendations.

E-mails should contain a reference heading as follows:
    Contractor's name
    (Parent name is applicable)
    Obligee's name
    Project description
    Contract price or estimate
    Bid date or contract date

The Special Acceptance Submission form will be used in the following circumstances.

GCNA 00014

Facultative reinsurance - These are situations where reinsurance will be required outside our normal treaty arrangements.

Treaty special acceptance - These are situations where we are looking for special acceptance from our treaty partners for existing business.

Joint venture participation - This covers situations where a joint venture occurs, and under normal circumstances, another surety will be involved, in which case the project will fall outside of our reinsurance treaty arrangements.
Not all sections of the form are relevant to all situations, and only the applicable sections need to be completed depending upon the nature of the special acceptance submission.

All Special Acceptance Submissions must include current financial information on the Principal.

**Responsibility and Authority**

Regional Underwriter
- Conduct appropriate underwriting analysis of bond request
- Recommend a bond request by preparing a complete Special Acceptance Submission in the attached format.

National Underwriter
- Review the Special Acceptance Submission within our service standards and make the underwriting decision in concurrence with the Local Underwriter.
- All Special Acceptance Submissions to reinsurers will be the responsibility of the VP of National Surety Underwriting.

GCNA 00015

***UNDERWRITING***
***GUIDELINE***

No. 8  2004

**Subject:**     **Special Acceptances**

**Background**

This guideline defines situations and classes of construction, which require Special Acceptance approval and the parties that are responsible for authorizing these Special Acceptance approvals.

Special Acceptances are made when specific bond requests falls outside lines of authority or on cases where no lines have been established.

**Procedure**

A Special Acceptance Submission must be made for all standard situations where the bond request exceeds the line of authority issued to the Local Underwriter or is for a specific bond where there is no line in effect.

The following types of contracts, unless specifically identified by the Line of Authority, are those which require Special Acceptance Submissions to Head Office:

- Co-surety bonds
- Contracts with efficiency guarantees
- Design-build contracts
- Transportation of or decontamination of hazardous or environmentally sensitive materials
- Long-term maintenance guarantees beyond three years
- Warranties which are not a flow-through in nature from the manufacturer
- Turnkey projects
- Fast-track projects where the design is not being fully completed prior to commencement of construction
- Non-standard payment terms
- Completion bonds
- Bonds denominated in foreign currencies
- Bonds involving computer/software systems
- Lien bonds

The following types of contractors require Special Acceptance Submissions.

- Environmental decontamination
- Speciality manufacturers
- Consulting engineers
- Contractors involved in removal of hazardous substances
- Demolition
- Unique speciality contractors
- Speculative developers

- Home builders
- Swimming pool contractors
- Transportation contractors
- Glass contractors where the project is over a two storey building
- Curtain Wall installers
- Tire and Rolling stock
- Shipbuilders

**Responsibility and Authority**

Local Underwriter
- Ensure that a completed Special Acceptance Submission is forwarded to Head Office for the situations described above.  The Special Acceptance Submission will be in the form presented in US 2004-7.

Head Office
- Follow procedure as outlined in US2004-7 for evaluating Special Acceptance Submissions
- The Head Office Underwriters is responsible for operating within his or her assigned authority and obtaining the concurrence of another underwriter.
- The Head Office Underwriters is responsible for providing Local Underwriter with an underwriting decision within 24-hour service standard on a Special Acceptance.
- On any surety requests that fall outside our reinsurance treaty support Head Office is responsible for obtaining the necessary reinsurance to maintain our agreed upon retention limits

National Vice President
- Determine and assign individual levels of authority for each Local Underwriter and Head Office Underwriter
- Operate within our agreed upon risk retention limits.

GCNA 00017

I wonder when Wainright want on "Watch" list?

*UNDERWRITING*
*GUIDELINE*

No.   9 2009

---

<u>Subject:</u>     Watch List

<u>Background</u>

Each Regional Manager is responsible for maintaining a list of their accounts that do not comply with our underwriting standards and/or have any of the characteristics outlined below under Watch List Criteria. This "Watch List" is to be used to focus in on these accounts so that we can find or identify ways to improve our underwriting position or terminate support.

<u>Procedure</u>

The Regional Manager is responsible for completing the Watch List form (exhibit A) and submitting it to the National Manager with whom they are partnered. Either the Regional Manager or National Manager can add an account to the Watch List.

The report must be completed monthly within seven days of the month-end. The National Manager and Regional Manager should then jointly review these accounts.  The following questions should be asked.

- Should we continue to provide surety support?
- Can we get off this account without having a loss?
- Can we reduce the size or duration of the jobs we bond?
- If we continue, can we improve our position?
  - Can we increase our indemnity position?
  - Can we obtain collateral?
  - Can we obtain a higher premium rate?
  - Should we employ funds control?

By the fifteen day of each month the National Underwriting team will complete the review the Watch List.

**WATCH LIST CRITERIA:**

Accounts with any of the following characteristics should be added to the Watch List:
- The account is likely to become a surety loss.
- There have been numerous claim notices received in the past year.
- There is significant financial deterioration, i.e. a drop in equity of 50% or higher.

- Their underbillings levels at fiscal year end exceed 75% of their equity
- Their inventory levels at fiscal year end exceed 75% of their equity
- Their interest bearing debt due within the next three years exceeds 100% of their equity
- There is significant litigation outstanding.
- The account refuses to produce financial information.
- There are negative rumors or bad press.
- There is a single bid spread in excess of 50% of their equity or a series of bid spreads which combined exceed 100% of equity.
- There is a change of control of ownership or management.
- There is a departure from usual job type/territory.
- There is a pattern of fading job profits.
- The account's Paydex score is 51 or lower.

## REMOVAL FROM WATCHLIST

- Both the Regional Manager and the National Manager must agree on the removal of an account from the Watchlist.
- There are no outstanding claims issues on the file or it is too late to take action because that the account is a surety loss that is fully in the hands of our claims department.

### Responsibility and Authority

Regional Manager
- Review their accounts against the Watch List criteria on an ongoing basis
- Make additions to or recommend removals from the Watchlist monthly
- Identify ways in which we can improve our position for Watch List accounts
- Submit Watch List to National Manager monthly

National Manager
- Review the Watch List with each Regional Manager monthly.
- Ensure that all high risk accounts are included on the Watch List
- Approve removal of accounts from the Watch List as recommended by the Regional Manager.
- Store the completed Watch List form in ViewWise.

National Underwriting Team
- Provide reports to Managers which will help identify accounts that should be on the Watch List
- Review the Watch List and determine if any other actions should be taken.

GCNA 00019

*UNDERWRITING*
*GUIDELINE*                                              No.  **10 2004**

Subject:     **General Agreement of Indemnity**

### Background

Indemnity agreements provide rights and remedies in addition to those that we acquire from the Obligee under the principle of subrogation. These include the right to premium compensation, the right to review the books and records of the contractor or principal, as well as others more fully set out in the agreement itself.

The guarantees of third–parties in our favor may be necessary to induce the surety to issue a surety bond. Such third–parties may be:

- controlling stockholders or someone whose interests are closely related to the performing contractor or principal;
- companies related by common ownership or significant business transactions;
- spouses where jointly owned assets are considered necessary in support of the bonded risk, parent corporations and subsidiary corporations; and
- in some situations, corporations or individuals unrelated by ownership interest.

Generally, in order for a third–party indemnity to be binding and enforceable, the promise to indemnify must be supported by adequate consideration and be given on or before the date of issuance of the bond or bonds to be indemnified. Adequate consideration may be found to exist as a result of the ownership or business interests that exist between the contractor or principal and the indemnitor. With unrelated individuals or corporations, it is preferable that the consideration for the indemnity provided to us be documented by a written contract between the indemnitor and the contractor or principal, itself supported by adequate consideration.



When taking the indemnity of a corporation or trust as an inducement to issuing bonds for a principal, we must be concerned with the question of whether the indemnity will be legally enforceable. It is a quite common and accepted business practice to request an opinion of counsel for the corporation or trust stating that the corporation or trust does have the authority to execute the general agreement of indemnity and that it would be enforceable.

### Corporations

A corporation is a legal entity separate and distinct from its owners. Generally, the owners, called shareholders, are not responsible for the debts or other obligations of the corporation. A corporation has a life of its own and the transfer of ownership or the death of a shareholder has no legal effect on the life of the corporation. Corporations are a popular form of organization because they shield shareholders from liability and because an ownership interest can easily be transferred.

One of the disadvantages to ownership of a corporation is that as a separate distinct organization, the corporation is subject to federal income taxes. If the corporation distributes its net income to its owners, the owners are then also subject to federal income tax. Due to

GCNA 00020

this double taxation of earnings, most small companies are very reluctant to distribute their earnings by issuing dividends. While this is a disadvantage to the owners, creditors look at this as an advantage to them because it encourages retained earnings, which increases the company's financial strength.

The United States Congress, under pressure from small businesses, enacted a revision to the tax code that enables qualifying corporations, under the Subchapter S Act, to have its earnings directly taxable by its shareholders and not taxable at a corporate level. This allows corporations to distribute earnings without a tax barrier. Unfortunately, creditors can not feel as confident that earnings will be retained. Thus creditors of an S corporation often require the indemnity of the shareholders or an agreement from the shareholders that a certain level of retained earnings will be maintained.

A corporation is formed by filing articles of incorporation with a state agency. Presidents and Vice-Presidents of corporations usually have authority under the corporate by-laws to bind the corporation on business contracts. Treasurers, Controllers and other corporate officers do not generally have authority to bind the corporation on business contracts. Signatures of such officers on an indemnity agreement must be supported by other evidence of their authority to bind the corporation in the given situation.

Generally, a corporate secretary or assistant secretary should "attest" the signature of the President or Vice-President signing the general agreement of indemnity on behalf of the corporation. An "attestation" carries certain legal significance and may be required in some states.

## Corporate Resolutions

When a corporation is indemnifying on behalf of another entity, in which it has less than a 51% ownership interest or no direct control, a corporate resolution is necessary. Failure to secure a corporate resolution may provide the indemnifying corporation a defense on the grounds that the indemnity was an ultra virus act, not permissible under the corporate charter. The corporate resolution states that the board has ratified the indemnity and that sufficient consideration has been obtained.

## Corporate Seals

The practice of applying the corporate seal to documents is founded in the common law distinction between simple and formal contracts in which a promise under seal was enforceable without the necessity of consideration. In most states today, the seal is no longer considered a substitute for consideration. Seals are currently used primarily in connection with the execution of documents that have the special attestation of a sworn statement. Thus, today, the affixing of the corporate seal to documents is more a matter of form than of substance. Its presence lends additional credibility to the authority of the officer purporting to bind the corporation and, while not necessary to the creation of a legally binding instrument, its presence is desirable from that standpoint.

## Limited Liability Companies

State legislatures have also been pressured to find a way for business to maintain the advantage of limited liability but to avoid double federal taxation. One of the solutions has been the creation of Limited Liability Companies (LLC's). These entities blend the benefits of the limited liability of a corporation with the tax advantages of a partnership.

Like corporations, these entities are creatures of State law and their Articles of Organization must be filed with the state. Owners of an LLC are known as members, and individuals who are authorized to bind the LLC are usually referred to as Trustees. When taking indemnity, a copy of the LLC statute for the state of organization, a copy of the Articles of Organization with any amendments, and a copy of any operating agreement should be reviewed.

Provisions to look for include:
- who can bind the LLC;
- percentage ownership by member;

GCNA 00021

- voting rights;
- term of existence;
- core restrictions; and
- triggers for dissolution.

## Uniform Partnership Act

Under the Uniform Partnership Act, a general partner has the power to bind himself, the partnership and the other partners on obligations that further the business interests of the partnership. General partners are liable personally for partnership debts. However, the law governing this liability and its enforcement are complex and may differ from one state to the next.

Generally, when a partner leaves a general partnership, a technical dissolution of the partnership happens and a new partnership may be formed of the remaining partners. When there is not a formal settlement or liquidation of the former partnership's affairs, the new partnership appears to be a continuation of the old partnership and this presents difficulties in determining the liabilities of the old and new partners and partnerships.

Under most Partnership Statutes, partners newly admitted to a "continuing" partnership are liable only to the extent of the partnership's assets for those liabilities incurred after their admission to the partnership. "Departing" partners may be liable only for debts, which existed prior to their departure from the partnership. Therefore, for us to feel comfortable that we have adequate sources of reimbursement for any losses we may have to pay under the bonds we issues, we should be certain that our right of reimbursement with respect to a partnership is fixed at the time of the issuance of a bond by obtaining the signatures of each general partner as both general partner and as individual indemnitor.

## Limited Partnerships

The unlimited liability of general partners is a major reason for the unpopularity of the general partnership form of organization. Limited partnerships overcome this by limiting the liability of the limited partners to their investment in the partnership. However, limited partnerships must have at least one general partner subject to unlimited liability. The general partner is often a corporation. By taking the indemnity of the general partner, we would have recourse against the assets of the limited partnership plus the assets of the general partner.

## Proprietorships

A sole proprietor is liable personally for his or her business' debts. Proprietorship legal status is best denoted by use of the abbreviation "d.b.a.", standing for "doing business as", following an individual's name and preceding the trade style or name used. Thus, "Joe Smith, d.b.a. Smith Construction Company" clearly denotes a proprietorship whereas the name "Smith Construction Company" alone could denote a proprietorship or a corporation. Without the "d.b.a." designator, it would be wise to follow John Smith's signature with the appellation "proprietor", or else the legal status of the business and the personal liability of John Smith may be left in doubt or subject to contest.

## Trust

Sometimes, owners of closely–held businesses, prompted by estate planning considerations, transfer stock ownership in a corporation into a trust. The transferor individual, referred to as a "grantor", generally retains voting control of the stock through trusteeship and a life estate in the income of the trust. Upon the death of the grantor, control passes to the trustee or the beneficiaries of the trust, depending on the terms of the trust document.

GCNA 00022

Generally, the trust has no assets other than the stock of the corporation. Since assets of the corporation may be distributed to the trust and its beneficiaries, it may be prudent to seek the indemnity of the trust and/or grantor and/or trustees and/or beneficiaries. The decision as to whose indemnity to require is based on the factual circumstances and underwriting considerations.

When obtaining the indemnity of the trust itself, we must first determine through a review and/or modification of the trust agreement that the trust (1) has the right to conduct a business and (2) the power to indemnify. An opinion of legal counsel for the trust should be obtained to this effect. The indemnity agreement should be dated as of or subsequent to the date of the empowering amendment or trust agreement, whichever is later. The opinion of counsel should be addressed to the company (ies) that will be writing bonds for the contractor or principal. A sample letter is attached as Exhibit 1.

**Joint Ventures**

Joint ventures are also covered by the omnibus wording clause. It is not necessary or desirable to obtain the signature of an Indemnitor on a separate application when a General Agreement of Indemnity is already on-file. Where a separate application, such as the Surety Association of America Form 1 – (Open) Joint Ventures or Form 2 – (Silent) Joint Ventures, is necessary in order to obtain the indemnity of the other co–venturer, the legend "SIGNATURE NOT NECESSARY BY REASON OF INDEMNITY AGREEMENT ON FILE" should be typed where the Indemnitor's signature would normally go on that application.

**Witnesses and Notary Acknowledgements**

Signatures of witnesses and notary acknowledgements provide some level of assurance as to the authenticity of the signatures of Indemnitors or their representatives. They are not necessary to the creation of a binding agreement but are desirable and should be obtained as a matter of standard operating procedure.

**General Agreement of Indemnity's "Omnibus Wording"**

Our form of General Agreement of Indemnity contains "omnibus" wording which states that the agreement will apply to all bonds executed for the CONTRACTOR.

"CONTRACTOR" as used in this Agreement shall mean: any UNDERSIGNED; any partnership, association, corporation, successor, assign, affiliate, any related entity, subsidiary and/or division of the UNDERSIGNED; whether now existing or hereafter formed or acquired; and any other person who obtains BONDS from SURETY at the request of any Undersigned. "BONDS" as used in this Agreement shall include any BOND or BONDS written for CONTRACTOR operating under its legal name of any fictitious, assumed or trade name."

Among other things, this wording is intended to bind an Undersigned as an indemnitor on bonds written on behalf of its subsidiaries and affiliates and partnerships and joint ventures in which they participate. A corporation is a subsidiary of another corporation when voting control over its stock is vested with that corporation. Generally, affiliates are corporations in which the controlling interest in both is owned by the same person(s) or corporation(s). The indemnity of one corporation for bonds on behalf of another is third–party.

An indemnity, as discussed earlier, must be supported by "consideration". The existence of a controlling interest, as in the case of a parent corporation, would generally be considered adequate consideration. In the case of affiliates, the facts of the case may indeed create a presumption of consideration. However, because questions may arise as to whether the Indemnitor receives a direct benefit from the issuance of the bond, additional evidence, such

GCNA 00023

as an opinion of counsel and a corporate resolution from the Indemnitor authorizing the request to issue the bond on behalf of the affiliate, is advisable.

While the indemnity of a parent corporation alone may be sufficient for underwriting purposes, it is preferable to obtain the "cross–indemnity" of those subsidiaries and affiliates whose operating assets are significant to the overall case. This protects us against a spin-off of such assets to non–indemnifying stockholders of the parent or affiliate corporations

**Termination of Agreements**

Our policy is not to release indemnity. General Agreement of Indemnity contains a provision allowing Indemnitors to terminate their indemnity with respect to any bonds issued twenty (20) days after written notice has been sent by registered mail to the Head Office. Such termination has no effect with respect to bonds executed prior to such termination. Whenever Head Office Surety receives a notice of termination of indemnity, our practice is to acknowledge termination of such indemnity by issuing the letter attached as Exhibit "3". On rare occasions, it may be in our best interests to agree to release indemnity. In such cases, Head Office Surety will issue a letter releasing the Indemnity.

**Indemnity Agreements on Non-Current Forms**

There are indemnity agreements that were taken in the name of Mid-State Surety Corporation or Atlantic Alliance that are still in full force and effect and can be relied on. However, caution should be exercised and, when practical, a current agreement should be taken.

**Undersigned's Guidelines for Proper Execution of Bond Applications and Indemnity Agreements**

1.  The preferred indemnity agreement is the General Agreement of Indemnity. Head Office approval is necessary to take any other indemnity agreements.

2.  When obtaining the indemnity of a corporation, be certain that the officer signing for the corporation is a Vice-President or President.

3.  A signature of a corporate officer should be attested to by a Corporate Secretary or Assistant Secretary and sealed with the corporate seal.

4.  When obtaining the indemnity of a partnership, a general partner must sign on behalf of the partnership.

5.  General partners of a partnership should also sign separately as individual indemnitors.

6.  A proprietorship should be clearly denoted by the use of the "d.b.a." designator or the appellation "proprietor".

7.  Signatures of non-corporate general partners, proprietors or individual indemnitors should be witnessed.

8.  All signatures should be acknowledged by a notary public.

9.  Use of white out, erasures, scratching out of names or terms and cut–and–paste methods of splicing indemnity agreements together are to be avoided and may cause Head Office to reject an agreement as unacceptably deficient. At the least, any such changes must be initialled by all indemnitors.

10. Indemnitor's name, tax ID (Social Security or company ID) and street address should be typed or printed below the signature line.

11. Older editions of the General Agreement of Indemnity should not be used without Head Office prior approval. Special instructions for preparation of these editions may be needed.

12. ALL MODIFICATIONS OF THE STANDARD GENERAL AGREEMENT OF INDEMNITY MUST BE APPROVED BY Head OFFICE. This includes common modifications referred to later.

GCNA 00024

13.   ALL APPLICATIONS AND AGREEMENTS MUST BE DATED AS OF OR BEFORE THE DATE OF THE BOND(S) TO BE ISSUED.  IF INDEMNITY IS BEING TAKEN, THE AGREEMENT MUST BE RECEIVED PRIOR TO THE RELEASE OF ANY NON-CANCELABLE BOND.

14.   NEVER OBTAIN A BOND–SPECIFIC APPLICATION OR INDEMNITY AGREEMENT WHEN A GENERAL AGREEMENT OF INDEMNITY IS ON–FILE FOR THAT INDEMNITOR WITHOUT FIRST CONSULTING Head OFFICE.

15.   SUBMIT ANY REQUEST FOR THE RELEASE OF INDEMNITY TO THE HEAD OFFICE.

16.   If an indemnifying corporation owns less than 51% of the voting stock of the corporation for whom it is indemnifying, a form evidencing the passage of a resolution by the Board of Directors of the indemnifying corporation, ratifying or authorizing the execution of the General Agreement of Indemnity, should be obtained prior to issuance of any bonds, unless specific approval is obtained from Head Office. Resolution Authorizing or Ratifying Indemnity may be used for this purpose.

17.   INDEMNITY AGREEMENTS SHOULD BE EXECUTED IN AT LEAST TRIPLICATE, one executed copy to go to Head Office, one executed copy to be retained by the Agent, and one executed copy to go to each Indemnitor.

18.   Review the agreement and if it is properly completed, attach a "GIA Cover Sheet" and send it to Head office.

19.   Head Office will review the agreement to confirm that it has been properly completed. If it has not, Head Office will request that another agreement be obtained.   The improperly completed agreement will be returned upon receipt of the properly completed agreement.

20.   The Head Office will make a copy of the agreement, putting the copy in the Underwriting File and the original in a fireproof storage cabinet.

**Responsibility and Authority**

Local Underwriter
- Ensure that the General Agreement of Indemnity is properly executed;
- Refer any request for modification to or termination of our standard General Agreement of Indemnity to Head Office for approval.

Head Office Underwriter
- Verify that our General Agreement of Indemnity has been executed in accordance with this guideline.
- Take into account all relevant underwriting considerations when a modification or termination of our standard General Agreement of Indemnity has been requested.

GCNA 00025

**Forms**

General Agreement of Indemnity (U.S. 2004-10-Form 1)
GIA Cover Sheet (U.S. 2004-10-Form 2)
Notary Acknowledgement (U.S. 2004-10-Form 3)
Resolution Authorizing or Ratifying Indemnity (U.S. 2004-10-Form 4)

**Exhibits**

- Opinion of Counsel Letter For Indemnifying Trust
- Use of Schedules in Additional Signature Pages and Endorsements
- Letter Used to Acknowledge Receipt of Notice Terminating Indemnity
- SAMPLE SIGNATURE LINE SET–UPS

GCNA 00026

**EXHIBIT 1**

**DRAFT FORM - OPINION OF COUNSEL**

<u>FOR INDEMNIFYING TRUST</u>                    (dated)

The Guarantee Company of North America USA and its Affiliates

Southfield, Michigan 48075

Ladies and Gentlemen:

Reference is made to that certain General Agreement of Indemnity dated _____ (hereinafter the "Indemnity Agreement") entered into by and between (Contractor); (Trustee A), individually and as co-trustee of The XYZ Trust; (Trustee B), individually and as co-trustee of The XYZ Trust; (Trustee C), individually and as co-trustee of The XYZ Trust; all as Indemnitors, and The Guarantee Company of North America USA, as Indemnitee.

In connection with the opinions hereinafter expressed, I have examined originals or copies, certified or otherwise identified, of (1) the Indemnity Agreement, (2) The XYZ Trust, together with all amendments thereto, deemed necessary or advisable for purposes of this opinion. I have assumed the authenticity of all documents submitted to me as originals, the genuineness of all signatures, and the conformity to the originals of all documents submitted to me as copies.

Based on the foregoing and with regard to legal considerations which I deem relevant, I am of the opinion that (i) the Indemnity Agreement has been duly and validly authorized, executed and delivered by (names of above individuals), as co-trustees of The XYZ Trust and (ii) the Indemnity Agreement constitutes the valid, binding and enforceable obligation of The XYZ Trust from and after the date of said Indemnity Agreement until termination in accordance with the terms thereof.

Yours truly,

Counsel

GCNA 00027

**Exhibit 2**

**Use of Schedules in Additional Signature Pages and Endorsements**

The following provide an example of the use of Schedules with an Additional Signature Page

Agreement Dated:                         month, day, year

Undersigned:

                        Smith Sewer & Water Contractors, Inc.

                        John Doe Plumbing, Heating & Air Conditioning, Inc.

                        Doe & Smith Development Co., Inc.

                        Doe & Smith Equipment Leasing, Inc.

                        Doe & Smith Properties, Inc.

                        John Doe

                        Sally Doe

                        John Smith

                        Jane Smith

**Exhibit 3**

**Letter Used to Acknowledge Receipt of Notice Terminating Indemnity**

(Addressee)          (dated)

**Re:   General Agreement of Indemnity dated** _____

Dear Mr.:

The Guarantee Company of North America USA and its Affiliates acknowledge receipt of your notice dated _____ and received on _____.

Pursuant to your notice, we hereby acknowledge that your indemnity(ies) as respects any and all bonds executed subsequent to the date of your notification,      (date)          is (are) terminated.  This release in no way invalidates or affects your obligation to indemnify The Guarantee Company of North America USA and its Affiliates on any and all bonds executed prior to      (date)      , in accordance with the provisions of the General Agreement of Indemnity.

Sincerely,

GCNA 00028

**Exhibit 4**

**SAMPLE SIGNATURE LINE SET–UPS**

Smith Corporation

_____        _____ (L.S.

Clarence Smith, Secretary               John Smith, President

Witn                                     Tax Payer ID #  96 000 000 00

_____        _____

Street or P.O. Box      City      Sta    Street or P.O. Box      City      Stat

Smith General Partnership

_____        _____ (L.S.

Bob Jones                                John Smith, General Partner

Witn                                     Tax Payer ID #  96 000 000 00

_____        _____

Street or P.O. Box      City      Sta    Street or P.O. Box      City      Stat

John Smith

_____        _____ (L.S.

Bob Jones                                John Smith, Individual Indemnitor

Witn                                     Tax Payer ID # 000 00 0000

_____        _____

Street or P.O. Box      City      Sta    Street or P.O. Box      City      State

Smith Limited Partnership

_____        Smith Corporation, General Partner, (L.S.

Clarence Smith, Secretary                John Smith, President                )

Witn                                     Tax Payer ID #   96 000 000 00

_____        _____

Street or P.O. Box      City      Sta    Street or P.O. Box      City      State

_____        _____ (L.S.

Witn                                     Tax Payer ID #

_____        _____

Street or P.O. Box      City      Sta    Street or P.O. Box      City      State

GCNA 00029

*UNDERWRITING*
*GUIDELINE*                                        No.  **11 2004**

---

Subject:     **Modifications to Indemnity Agreement Wording**

**Background**
We normally do not want to make modifications to our standard General Agreement of
Indemnity.  There are, however, circumstances that may warrant modifications.  These
circumstances can either broaden or restrict our rights.  In either event, we need to come to
a "meeting of the minds" with our indemnitors as to the intent of the modification.

Head Office's approval is required before any modifications are made even those contained
herein.  Head Office may also want to consult with legal counsel before making any changes.

In this guideline we outline Modifications that have been reviewed by legal counsel.  While
these Modifications are legally acceptable, they do have a significant impact on our normal
underwriting and thus must be approved by Head Office before they are used.

These modifications should not be distributed to our agents or discussed with our indemnitors
without obtaining Head Office approval.  We do not want to give the impression that these
are routinely provided or that we are agreeable to modifying our General Agreement of
Indemnity.

**Common Modifications**

Head Office must approve all modifications to the standard General Agreement of Indemnity.
The following common modifications have been approved and may be used subject to the
approval of Head Office.

A.    Endorsement:  Identification with Indemnity Agreement

B.    To Provide a Homestead Exclusion

C.    To Limit Indemnity to a Specific Dollar Amount

D.    To Limit Spousal Indemnity to Jointly-Held Assets

E.    Protect Other Agreements Clause

F.    To Extend Indemnity to Cover Bonds on Behalf of Third-Parties Not Cross-
      Indemnifying

GCNA 00030

G.   To Limit Cross-Indemnification of Indemnitors

H.   To Extend Indemnity to Cover Bonds on Behalf of Employees or Agents (Undesignated)

I.   To limit indemnity to a specific bond or bonds related to a specific contract.

A.   **Endorsement:  Identification with Indemnity Agreement**

Whenever there is an endorsement to any Indemnity Agreement on a separate sheet, the endorsement should contain the following:

"This endorsement is attached to and made a part of a certain Agreement of Indemnity dated or to be dated the _____day of _____ 20__, between (Name of Principal) as Contractor, (Name of Indemnitor) as Undersigned and The Guarantee Company of North America USA, herein called the "Surety."

All endorsements should contain lines for acknowledgement by all Undersigneds and an officer of the Surety to acknowledge

B.   **To Provide a Homestead Exclusion**

In those cases where approved by Head Office, principal residences (i.e. homesteads) may be exempted by adding the following additional paragraph, contained in a separate endorsement (acknowledgement by Undersigneds not required) but an officer of the Surety should acknowledge it:

"The Surety hereby acknowledges and agrees that with respect only to the personal residence and real property appurtenant thereto of any Undersigneds hereto, when such residence is actually used and occupied as the principal residence of such Indemnitor within the meaning of applicable Homestead Exemption Law, the indemnity liability herein imposed is waived and released as to such personal residence and real property appurtenant thereto only, provided that any debt instrument secured by such principal residence is not prepaid or accelerated, in whole or in part, during the term of this Agreement and that no improvements or betterments are made to such principal residence during the term of this Agreement, without the prior written consent of the Surety."

**Note**: It may happen that we agree to waive the homestead only as to some Undersigneds and not all. In this case, the above should be modified to identify the specific Undersigneds and the endorsement should be acknowledged by ALL Undersigneds and an officer of the Surety.

C.   **To Limit Indemnity to a Specific Dollar Amount**

In those cases where approved by Head Office, Undersigned(s) may be permitted to limit the dollar amount of their indemnity by adding the following additional paragraph contained in a separate endorsement (acknowledgement by ALL Undersigneds required):

"The liability of (the Undersigned) (each Undersigned) (a specific Undersigned) hereunder shall not exceed the sum of            ($  ), but this indemnity shall be in addition to and not in lieu of the right of the Surety under any Subordination Agreement between the Undersigned(s) herein (herein named) as Creditor thereunder and the Principal (Contractor) and the Surety."

D.   **To Limit Spousal Indemnity to Jointly-Held Assets**

In those cases where approved by Head Office, indemnity of a non-stockholder spouse may be limited to specific jointly-owned assets described on a personal financial statement submitted to the Surety by adding the following additional paragraph, contained in a separate endorsement (acknowledgement by ALL Undersigneds required):

GCNA 00031

"The liability of  (Non-Stockholder Spouse) shall apply only to such real or personal property described in a financial statement submitted to the Surety, signed and dated , and attached hereto as Exhibit     , whether such property is now or hereafter titled individually in the name of  (Stockholder Spouse) or (Non-Stockholder Spouse), or in joint tenancy or as tenants in common with  (Non-stockholder Spouse) ."

E. **Protect Other Agreements Clause**

Taking a specific Indemnity Agreement or multiple Indemnity Agreements wherein different cross-indemnifying corporations are named may jeopardize the value of the indemnity provided under the earlier Indemnity Agreement.  If no other course of action is possible, however, the following language should be inserted in the later Indemnity Agreements

"The execution of this Indemnity Agreement by any of the parties hereto shall not be in exoneration, termination, supersession or novation of any other Indemnity Agreement hereto or hereafter executed by such party or of any other undertaking of any of the Indemnitors to indemnify the Surety, and the indemnity provided herein shall be in addition to and not in lieu thereof."

**Note:** The same rule applies to specific applications containing indemnity provisions.

F. **To Extend Indemnity to Cover Bonds on Behalf of Third-Parties Not Cross-Indemnifying**

A corporation may agree to indemnify the Surety for bonds on behalf of another corporation in which it has no ownership interest (i.e. third-party indemnity) or the corporations may have some stockholders in common but not all, or the ownership interests may be in different proportions.  Unlimited cross-indemnification of the companies in such cases may not be acceptable to the stockholders or considered appropriate.  Unlimited third-party indemnity may be accomplished by adding the following   additional   paragraph,   contained   in   a   separate   endorsement (acknowledgement by ALL Indemnitors required):

"This General Agreement of Indemnity shall apply to bonds, undertakings and other writings obligatory in the nature of a bond, written by the Surety on behalf of (Principal)          , (or any of its wholly or partially owned subsidiary companies, or partnerships, joint ventures or co-ventures in which it has an interest or participation, whether open or silent, now in existence or which may hereafter be created or acquired), in whose bonds and undertakings each Indemnitor does hereby affirm to have a substantial material and beneficial interest."

**Note:** The General Agreement of Indemnity should be signed by the Indemnitor(s) only; the Principal corporation would not sign this agreement but would sign a separate General Agreement of Indemnity along with any stockholders of that corporation, if appropriate.  An opinion of counsel that the indemnity would be enforceable should be obtained.

G. To Limit Cross-Indemnification of Indemnitors

Limited cross-indemnification of Indemnitors can be accomplished by taking separate General Agreement of Indemnity containing the language in "E" above. It may in some circumstances be more desirable to have all Indemnitors signing one General Agreement of Indemnity.  Subject to Head Office review and approval, this may be accomplished by inserting the following additional paragraph in a separate endorsement (acknowledgement by ALL Indemnitors required):

"Anything in the above to the contrary notwithstanding, the Surety and the Undersigned indemnitors agree that          (Indemnitor(s)       will not be bound by any bonds or undertakings on behalf of                         (Principal) (or any of its wholly or partially owned subsidiary companies, subsidiaries of subsidiaries, divisions or affiliates,

GCNA 00032

partnerships, joint ventures or co-ventures in which it or any of its wholly or partially owned subsidiary companies, subsidiaries of subsidiaries, divisions or affiliates have an interest or participation whether open or silent; jointly, severally, or in any combination with each other or an Indemnitor hereunder) (EXCEPT) (list of specific joint ventures, partnerships or subsidiaries to be covered)."

If the indemnity of several Indemnitors is to be limited as to the same Principal(s), each Indemnitor's name may be listed in the one paragraph.   If the indemnity of several indemnitors is to be limited as to different Principals, each such limitation should be accomplished by a separate additional endorsement.

H.   **To Extend Indemnity to Cover Bonds on Behalf of Employees or Agents (Undesignated)**

Certain employees or agents of an Indemnitor may be required to furnish bonds to various government authorities in the course of their employment or agency for which the Indemnitor, as an inducement to the Surety to write such bonds, would be willing to indemnify the Surety.  This may be accomplished by the following additional paragraph contained in a separate endorsement (acknowledgement by ALL Undersigneds required):

"This General Agreement of Indemnity shall apply to bonds, undertakings and other writings obligatory in the nature of a bond, written by the Surety on behalf of any employee (or agent) (of the Indemnitor(s) or any of them) (of list of specific Indemnitor(s)) (their) (its) (subsidiaries, subsidiaries of subsidiaries, divisions or affiliates) (partnerships, joint ventures or co-ventures in which they or any of them have an interest or participation, whether open or silent; jointly, severally, or in any combination with each other; now in existence or hereafter created or acquired) PROVIDED such bonds, undertakings or other writings are required in the normal course of their employment or agency.  A written request for the issuance of such bonds, undertakings or other writings signed by _____ shall be prima facie evidence that such bonds, undertakings or other writings are required in the normal course of such employment or agency."

I.   **To Limit Indemnity to a Specific Bond or Bonds Related to a Specific Contract.**

Limiting indemnification of Undersigneds to a specific bond or bonds related to a specific contract can be accomplished by taking an Indemnity Agreement containing an endorsement to standard General Agreement of Indemnity.

"Anything in the above to the contrary notwithstanding, the Surety and the Undersigneds as Indemnitors, agree, that for the purposes of this agreement, they will only be bound as to obligations under bonds directly required by or growing out of the contract

between_____a

nd   _____

for_____

dated_____.

OR

"Anything in the above to the contrary notwithstanding, the Surety and the Undersigneds as Indemnitors, agree, that for the purposes of this agreement, they will only be bound as to the obligations under bonds issued in the names

of_____

_____as principal, naming

_____

_____as obligee.

GCNA 00033

**Responsibility and Authority**

Local Underwriter
- Obtain approval from your National underwriter prior to providing our agent with a copy of the proposed modification or discussing it with an indemnitor.
- Correctly make the National approved modification to the General Agreement of Indemnity, before it is signed by our indemnitor(s).

Head Office
- Approve any modification to our General Agreement of Indemnity Seek legal guidance when new modifications are proposed.
- Verify that our General Agreement of Indemnity has been properly executed and that the modifications were properly approved and made to the agreement.

GCNA 00034

*UNDERWRITING GUIDELINE*                No.      12 2004

Subject:     **Subordination Agreement**
                **and Retention & Indemnity Agreements**

**Background**

Retention & Indemnity Agreements and Subordination Agreements are taken when we want a legally enforceable commitment that capital will not be withdrawn from the Principal without our consent. Capital can be in the form of either redemption of equity or repayment of debt. The withdrawal of this capital can adversely affect an entity's ability to perform or pay bonded obligations.

The signatory parties to these agreements covenant not to withdraw capital and to subordinate to us their claim to the assets. If these parties withdraw capital in violation of the terms of the agreement, they also agree to indemnify the surety for its entire loss.

These agreements are usually taken along with our General Agreement of Indemnity . If we already have a full indemnity of the shareholders, it may not be necessary to obtain these agreements because these agreements will not materially improve our protection. However, we would require a Subordination Agreement when we only have limited dollar indemnity or have excluded assets from the General Agreement of Indemnity. Also, Subordination Agreements may strengthen our position when confronted with claims on the assets from the estate of an Indemnitor.

**Retention and Indemnity Agreement**

This agreement is taken when capital is committed in the form of ownership equity, but there are few if any barriers preventing the withdrawal of this equity, or there is a reason to believe that the equity may be withdrawn. (Form 1) Examples of such situations include, Subchapter 'S' Corporations, Limited Liability Companies, and where there is a likelihood that a major shareholder's interest will be purchased.

**Subordination Agreement (General)**

This agreement is taken when capital has been committed to the entity in the form of debt. This debt is often payable to the owners of the entity or to related parties, but it could also be payable to a major creditor. This agreement is taken when we are relying on the shareholder debt as equity and we have no specific plans on allowing the reduction of the principal amount of the debt during the term of the agreement.

**Subordination Agreement (General - Allowing Payments)**

This agreement is taken when capital has been committed to the entity in the form of debt, and we are prepared to allow principal amount of this debt to be reduced during the term of this agreement, usually to a pre-approved minimum level. In this situation, the surety wants a legally enforceable commitment that the planned payments will not be accelerated. (Form 3) This situation most commonly occurs when an owner's interest

GCNA 00035

has been purchased by the entity and a note was issued where principal payments are to be made over an extended period of time.

**Subordination Agreement (Special)**

*This agreement is taken when capital has been committed to the entity, in the form of debt, to support a specific bonded project. (Exhibit 4) The agreement does not allow for a reduction in the principal amount of this debt. The agreement remains in effect until the surety has been furnished with competent legal evidence of the release or exoneration of such bond(s) issued in connection with the agreement.*

**Termination of Agreements**

The Retention and Indemnity Agreement and the Subordination Agreement (General) agreements are continuous in nature and must be canceled by the signatory parties providing thirty (30) days written notice to the surety of their intent. The Subordination Agreement (General - Allowing Payments) is also canceled when the debt is repaid in accordance with the term of the agreement. Only the Subordination Agreement (Special) covers a specific obligation and because of this it is the only agreement that does not have a termination clause wherein the signatory parties can terminate their obligation.

**Notice of Termination**

Termination can come in one of two ways, a written letter from the signatory parties sent in accordance with the agreement or by withdrawal of capital in violation of the agreement. In either case, when we believe this withdrawal may cause it harm, it is incumbent on us to notify the signatory parties that we object to the withdrawal of these funds and that it will to look to the signatories to indemnify us against any loss we may suffer as the result of said withdrawal. (exhibit 1) Generally, we should object to the signatory parties after notice of a violation. If we believe that the risk of harm to us is remote, rather than sending Exhibit 1, Exhibit 2 may be sent. In the exceptional case in which we are certain no harm will be caused, we may choose to do nothing.

If there is no violation and a termination notice is simply being acknowledged, a letter in the form of Exhibit 3 should be used.

**Procedure**

These agreements require a great deal of care in their preparation. It is recommended that the Head Office review these agreements prior to being sent out for signature.

The signatory parties' to the agreements must be competent and legally authorized to bind the entity the signatories represent.

The Retention and Indemnity Agreement requires a recital of financial information. This should be a recital of the last fiscal year CPA report. If there is a material change in accounting methods, a new agreement should be taken. Under III Covenants (1) an annual dollar amount should be inserted. (Example: One Hundred thousand and no/100 dollars ($100,000.00)annually.) This amount should be large enough to cover typical annual dividends, but it should not be so large that it can materially impact the entity. If the entity has an exceptionally profitable year and wants to dividend out a greater amount of money, the surety can issue a specific consent. Another method is to insert under III Covenant (1) a minimum equity requirement. (Example: an amount that would reduce equity below Two million and no/100 dollars ($2,000,000.00).) The

GCNA 00036

problem with this method is the amount may become outdated quickly due to growth in the entity's operations or a reduction in equity not caused by withdrawals. No matter which method is used these covenants must be monitored closely and violations must be addressed in writing.

The Subordination Agreements must clearly identify the debt instrument and a copy of this instrument should be attached to the agreement. The Subordination Agreement (General - Allowing Payments) should clearly outline what payment of principal can be made. (Example: annual payment of principal of Ten Thousand and no/100 dollars ($10,000.00).)

If there is insufficient space on these forms to insert the necessary information, this information can be inserted by rider.

**Responsibility and Authority**

Local Underwriter
- Consider the use of a Subordination Agreement in securing our position and make a recommendation to Head Office.
- Obtain a properly documented Subordination Agreement from our Principals and its shareholders, as may be required by Head Office

Head Office
- Work with Local Underwriter to determine that this document is the most appropriate way to protect our interest.
- Ensure that the agreement has been properly prepared.

<u>Forms</u>
1. Retention and Indemnity Agreement
2. Subordination Agreement (General)
3. Subordination Agreement (General - Allowing Payments)
4. Subordination Agreement (Special)

<u>Exhibits</u>

1. Letter Used to Notify Stockholders or Creditors of a Violation

2. Letter Used to Notify Stockholders or Creditors of a Violation

3. Letter Used to Acknowledge Receipt of Notice of Termination

**Exhibit 1**

**Letter Used to Notify Stockholders or Creditors of a Violation**

(Addressee)          April 9, 2010

Re:  <u>(Retention and Indemnity Agreement or Subordination Agreement)</u>  dated
__

Dear Mr.:

The Guarantee Company of North America USA received information to the effect that you have violated the terms and conditions of the  <u>(Retention and Indemnity Agreement or Subordination Agreement)</u> dated_____   which was provided in support of the bonds executed on behalf of _____ .

We, as surety, look to you to either immediately restore the funds withdrawn or to hold in trust for our protection all funds and the value of any property and any benefit received in connection with the withdrawal.  Further, we look to you to pay us on demand for any loss or damage sustained, caused or contributed to by such breach.

Sincerely,

**Exhibit 2**

**Letter Used to Notify Stockholders or Creditors of a Violation**

(Addressee)        April 9, 2010

Re:  (Retention  and  Indemnity  Agreement  or  Subordination  Agreement)  dated
—

Dear Mr. :

The Guarantee Company of North America USA (GCNA) have received information to the
effect that you have violated the terms and conditions of the  (Retention and Indemnity
Agreement or Subordination Agreement) dated_____  which was provided in support
of the bonds executed on behalf of _____ .

GCNA expressly reserves any and all rights under the _____ Agreement and
nothing contained herein shall be deemed a waiver or estop GCNA from asserting any
such rights. Further, we look to you to pay us on demand for any loss or damage
sustained, caused or contributed to by such breach.

Sincerely,

**Exhibit 3**

**Letter Used to Acknowledge Receipt of Notice of Termination**

(Addressee)          April 9, 2010

Re: <u>(Retention and Indemnity Agreement or Subordination</u>
<u>Agreement)</u> dated _____

Dear Mr. :
The Guarantee Company of North America USA acknowledge receipt of your notice dated
terminating _____ obligation under the <u>(Retention & Indemnity</u>
<u>Agreement or Subordination Agreement)</u> to <u>(limit withdrawals to XX dollars(XX) or</u>
<u>maintain a minimum equity position of XX dollars (XX) or not liquidate or change the</u>
<u>indebtedness of xx dollars (XX))</u>  provided in support of bonds executed on behalf of _
, et al.

This termination notice shall be limited to bonds furnished after the effective date of this
notice.

Sincerely,
(Head Office Underwriter)

**UNDERWRITING
GUIDELINE**

No.   13   2008

Subject:   Collateral Procedures

**Background**

Collateralized surety business is viewed by the surety industry as high-risk business, where the principal's credit is not strong enough to support the risk. We normally do not take collateral in our underwriting process and do not want to be considered a high-risk market. Furthermore, handling collateral is expensive and entails additional risk. However, we do realize that there will be times when we need to take collateral for a good business purpose.

This guideline outlines what we will accept as collateral, the individuals authorized to approve a bond with collateral, how the collateral is to be taken and maintained, and what procedures are to be followed before returning the collateral or converting it to cash.

Bankruptcy courts can seize assets of our principal and indemnitors, even those held as collateral. Thus, if we take collateral, we do not want it subject to the demands of other creditors. A third party guarantee in the form of a standby letter of credit, hereafter referred to as an Irrevocable Letter of Credit (ILOC) is the only form of collateral that is acceptable to us.

**Procedure**

We only will accept collateral in the form of an Irrevocable Letter of Credit (ILOC) issued by acceptable banking institutions. To be acceptable the bank must meet the following criteria:
- The bank must be a member of the US Federal Reserve System
- The payment amount should not exceed 5% of the banks equity
- They should have a Lace Financial Corp rating of C or better.

The ILOCs must be on a bank's letterhead and in the format shown in US 2008-13 Form 1. There are three key features to this format:
1) Payment is unconditional. "Except as stated herein, this undertaking is not subject to any condition or qualification. Our obligation under this Letter of Credit shall be our individual obligation, in no way contingent upon reimbursement with respect thereto."

GCNA 00041

2) The ILOC is automatically renewable and cancellation can only occur at a specified time. "It is a condition of this Letter of Credit that it shall be deemed automatically extended without amendment for one (1) year from the expiration date hereof, or any future expiration date, unless sixty (60) days prior to any expiration date we shall notify you by Registered Mail to your address set forth above that we elect not to consider this Letter of Credit renewed for any such additional period."

3) The ILOC specifically refers to Uniform Customs Practice for Documentary Credits and notes specifically agrees to effect payment if this Letter of Credit is drawn against within thirty (30) days after the resumption of our business

Prior to releasing a bond based on collateral, the Head Office must review the ILOC. The ILOC must:
- use our wording.
- correctly identify The Guarantee Company of North America USA as the beneficiary.
- correctly show our address.
- correctly show our indemnitor(s) name.
- be in the agreed upon amount.

The ILOC should be sent to the Head Office by registered mail or by an express mail carrier.
- The sender should keep a copy of the ILOC.
- The Head Office custodian will acknowledge receipt of the ILOC.
- The Head Office custodian will maintain a log of collateral with the following information: the name of the issuing bank, the name of our Principal(s), the amount of the ILOC, expiration date, and whether a cancellation notice has been received.

To release collateral we require:
- A written request from the local underwriter with a copy of the evidence releasing our liability or an explanation why we no longer need collateral.
- A written authorization by the Head Office underwriter approving the release of the collateral.
- A written authorization of the Claim department approving the release.

The collateral should be returned by certified mail or by an express mail carrier to the issuing bank.

If we receive a non-renewal notice and we believe we still have exposure that requires collateral, we will draw on the letter of credit thirty dates prior to the expiration. Also, the claim department is authorized to draw down on this collateral to make payments under our bond(s). The Accounting Department and the Claim Department are responsible for drawing on the letter of credit and having the proceeds placed in a trust account or a claims account.

**Responsibility and Authority**

Local Underwriter
- Obtain authorization to accept collateral.
- Obtain collateral in the form of an Irrevocable Letter of Credit,

GCNA 00042

- Follow the collateral procedures
- Obtain evidence that our liability has been released or the exposure substantially diminished.

Head Office
- Approve the acceptance of collateral in the form of an ILOC only when there is a good business reason.
- Review the form of ILOC to ensure it meets all our criteria.
- Log the ILOC in when it is received and notify the local underwriter.
- Present the ILOC to the Accounting Department for safekeeping.
- Notify the claim department and accounting department if a cancellation notice has been received.
- Approve release of the ILOC when the local underwater has issued a written request with acceptable evidence that our exposure has been released or substantially diminished.

Claim Department
- Draw down on any letter of credit where we have received a cancellation notice and where we still have exposure that requires collateral protection.
- Draw down on any ILOC where we have or are about to make a payment on a collateralized bond.

Accounting Department
- Hold the collateral in safekeeping
- Assist in drawing on the ILOC and having the funds placed in a Trust account or Claims account.

GCNA 00043

***UNDERWRITING***
***GUIDELINE***

No.   <u>14 2004</u>

<u>Subject:</u>   **Lien Bonds**

<u>Background</u>

Lien Bonds also know as Discharge of Mechanics Lien or Release of Lien are needed when a person or an entity claims that they have not been paid for improvements made to a piece of property and files a lien with the county recorder where the real estate is located. This effects the title to the property. A lender would be reluctant to lend money on the property or a buyer would be reluctant to purchase the property, unless the lien was released or a bond was filed protecting their interest.

We often are requested to issue these bonds for our Principals. A subcontractor or a supplier may have filed a lien and the owner refuses to pay the contractor until a release of lien bond has been posted. The bond penalty is usually set at 125% to 200% of the claimed unpaid debt.

While it is easy to file a lien, the lienholder must then get a court judgement to enforce the lien. There is a statutory period in which a lawsuit must be filed.  These are court bonds and like all court bonds, payment is immediately due after a judgement is rendered, unless an appeal, with an accompanying appeal bond is filed.

The Surety Association of America classifies these obligations as court bonds  and they are rated as strict financial obligation.   Despite the SAA classification, we treat Lien Bonds as part of Contract Surety department.  As such it is the responsibility of the Local Contract Underwriter and Head Office to deal with requests for Lien Bonds from our Principals.

We are not a market for these obligations and will only issue these bonds for our Principal when we have posted performance and payment bonds for the improvement of the real estate.  Where performance and payment bonds have not been posted on behalf of our Principal for a specific project, we will usually seek 100% collateral before issuing a Lien Bond.

<u>Procedure</u>

1.   Unless the Local Underwriter has authority on a specific account for a line of authorization for Lien Bonds, all requests for Lien Bonds must be submitted to the Head Office.
2.   When the request is made for issuance of a release of Lien Bond, full underwriting details are required to describe the nature of the dispute.
3.   The Lien Bond Requisition, as per Appendix A, must be completed for each request.
4.   Collateral will usually be required for these bonds unless specifically waived by Head Office.

## Responsibility and Authority

Local Underwriter
- Prepare Lien Bond Requisition and forward to Head Office for approval, unless Head Office has previously established a line of authority for Lien Bonds for the specific Principal.

Head Office
- Consider Lien Bond Requisition as submitted by the Local Underwriter.
- Advise Local Underwriter of the underwriting decision on a timely basis.
- Head Office must approve the issuance of these bonds

## UNDERWRITING GUIDELINE

No.   15 2004

**Subject:**   **Aged Listings – Accounts Payable**

### Background

We should obtain aged listings of accounts payable for two major reasons. The first is for determining the payment habits of our principal, and the second reason is to determine the nature of the payables.

If there is a frequency of unacceptably slow payables, this will be an indication that the contractor may have payment and cash flow difficulties, at which point we should also order a current credit report to investigate the reasons for the slow payment patterns.

Slow payables on bonded work may also be a red flag for potential claims under our labour and material payment bond obligations.    Depending on the nature and extent of the slowness in paying its obligations, consideration  should be given to placing the Principal on the Watch List.

It is also advisable to determine the nature of the payables, as often there can be work in progress items such as over billings, which have been included in the payables account in the balance sheets. There could also be payables to related entities, or to other creditors who do not seem to be normal creditors for the particular class of contractor. This may provide an indication of other operating activities outside normal construction operations.

### Procedure

We recognize that accounts payable listings are not available in all cases.   However, we should use our best efforts to obtain this information, especially for accounts with bonding programs in excess of $5 million.

1. Aged listings of payables should be obtained with the year-end statements, and wherever possible, with the quarterly financial information.   They should be reconciled to the relevant balance sheet entries.

2. If related payables are identified from the listings, these items should be extracted and treated separately in the overall analysis of the economic group in our underwriting file.

### Authority

Head Office
- Determine whether we require aged accounts payable listing for a specific Principal

Local Underwriter
- Obtain this information in cases where required by the Head Office Underwriter
- Analyze account payable listing in order to identify potential payment problems

GCNA 00046



GCNA 00047

**UNDERWRITING**
**GUIDELINE**

No. <u>16 2004</u>

<u>Subject:</u>     **Private owners – Financing paragraph**

<u>Background</u>

Authority to issue performance and payment bonds on private construction projects is predicated on verification of financing and standard payment terms.

Our normal practice is to add a Financing Paragraph to bid bonds and to Consents of Surety where the Obligee is a private owner. A copy of the preferred wording of this paragraph is attached in Appendix "A".

This, however, should not be done automatically as our Principal may have already verified the Obligee's financing. We also want to avoid situations where financing paragraphs have been attached to bid bonds for some principals, while omitted on bonds for others on the same tender.

Every attempt should be made to discuss the nature of the private owner and its financing, prior to unilaterally affixing the financing paragraph. If no information is available, it is naturally prudent to attach the paragraph to the bid bond. It is also prudent to advise our Principal that it is in its own interest to be protected from a financing risk prior to the issuance of final bonds on a project.

<u>Procedure</u>

1. Where it is apparent that a private owner will be the Obligee, enquiries should be made from the Principal as to its knowledge of the private owner, and to the steps the Principal may have taken, if relevant, to protect itself from a financing risk on the project.

2. If it becomes evident that the private owner is substantial and all prudent enquiries have been made by the Principal to confirm financing, the inclusion of the paragraph should be at the Principal's option.

3. If no information can be obtained regarding the owner or relevant financing, the private owner's Financing Paragraph must be attached to the bid bond and to the Consent of Surety, if applicable.

<u>Responsibility and Authority</u>

Local Underwriter
• Investigate and document what steps our Principal has taken to verify the private owner's project financing.

- Require that our standard Financing Paragraph be attached to the bid bond or Consent to Surety, if the Underwriter is not satisfied that the financing risk has been adequately addressed by the Principal,
- Where limits have been established for our Principal, the Underwriter has the authority to provide direction to the broker as to the inclusion of the Financial Paragraph.
- Make a recommendation as to the inclusion of the Financing Paragraph to the Head Officer Underwriter, where there are no current limits on a file.

Head Underwriter
- Assess Local Underwriter's recommendation regarding the use of the Financing Paragraph and advise Local Underwriter of the decision.

GCNA 00049

<table>
<tr><td><b><i>UNDERWRITING<br>GUIDELINE</i></b></td><td><b>No.   17  2004</b></td></tr>
</table>

**Subject:**         **Work On Hand – Bond requests**

**Background**

The best estimate of a contractor's Work On Hand is needed to be able to assess whether we believe the contractor is working with an overall program limit which is manageable and warranted.

The Work On Hand should include the estimated cost of work to complete in the contractor's program together with any outstanding tenders, and any projects where the contractor has been awarded the project but has yet to commence work.

**Procedure**

The Work On Hand should be calculated as the last total of cost to complete on the work in progress schedule received from the contractor, plus any low tenders, together with outstanding bids for which there has yet to be a result. It should be borne in mind that all of the above amounts include both bonded and unbonded work.

Where the Work On Hand information is fairly old, an allowance must be made for the estimated run-off of work completed by the contractor since that time.

The simple formula shown below indicates how this can be calculated.

| | |
|---|---|
| WOH as at: _____ | $_____ |
| Minus completed work: | $_____ |
| Plus Change Orders _____ | $_____ |
| Sub-total: | $_____ |
| Plus outstanding bids: | $_____ |
| Plus: Awards not yet Contracted | $_____ |
| Plus low tenders: | $_____ |
| Sub-total: | $_____ |
| Plus this request: | $_____ |
| Potential WOH: | $_____ |

GCNA 00050

If this data is inaccessible, or unavailable, the Underwriter should at least make an attempt to obtain a verbal Work On Hand from the agent, and this can in due course be verified for accuracy once a quarterly work-in-progress report is received from the contractor.

**Responsibility and Authority**

Local Underwriter
- Obtain and check and/or calculate this information when bond requests are received.

Head Office
- Ensure that this information has been obtained and appropriately analysed when considering Special Acceptance Submissions and conducting annual reviews.

**UNDERWRITING
GUIDELINE**

No.   <u>18 2004</u>

<u>Subject:</u>   **Aged Listings – Accounts Receivable**


<u>Background</u>

Aged listings of accounts receivable that reconcile with the entries to the balance sheet are a valuable tool.   These reports help us analyze the Principal's financial statement, assess the availability of bank credit and serve as a sign as to the progress of a job and the relationship with an owner.

Receivable items, excluding retainage, over 90 days old, should be excluded from the working capital.  We need to investigate these items and make a determination as to the likelihood of these items being collected.  If it is unlikely that they will be collected, the net worth should be reduced in our analysis.

Bank lines often are secured by receivables with the stipulation that the receivables be less than ninety days old.  Thus a large past due receivable could decrease our Principal's available bank line.

Receivables can also be a red flag to possible problem projects.  All such items must be investigated, preferably at a meeting with the Principal.  It has been our experience in the past where no subsequent investigation of these items has taken place, we have often found that we would have been in a more advantageous position in claims/disputes situations if made aware of the problem at a much earlier date.  It should be borne in mind that disputes on unbonded work may lead to problems on bonded jobs if the principal's cash flow is impacted by any project with hung receivables.

Commentary upon the reconciliation of the aged listings, and upon any significant concerns, should be noted in the annual write-up.

<u>Procedure</u>

1. Accounts receivable items in excess of 90 days should be considered as long term assets and excluded from working capital.
2. Receivable items, where it is unlikely that they will be collected, should be excluded from the working capital and the net worth in our analysis.
3. Related party items should be extracted and treated separately in the overall analysis of the economic group.
4. Where our investigation of receivables shows the likelihood of a claim, the situation should be immediately identified to the Head Office Underwriting and the Claims Department.

**Responsibility and Authority**

Local Underwriter
- Obtain and monitor the receivable items on a quarterly basis and to reconcile them to the financial statements.
- Make appropriate adjustments to working capital and equity for overdue accounts receivable
- Refer potential claims to Head Office and Claims Department.

Head Office Underwriter
- Ensure that this information has been obtained and appropriately analysed when considering Special Acceptance Submissions and conducting annual reviews.

GCNA 00053

## UNDERWRITING GUIDELINE

**No.**   **19 2004**

**Subject:**   **Bank Letter**

### Background

Understanding our Principal's banking needs and whether or not these needs are being adequately fulfilled by its current arrangements is critical in our underwriting process.

Bank credit is important to finance project start-up costs, payrolls, inventory, equipment, and unexpected problems.  Few contractors have the cash reserves necessary to operate without a back-up line of bank credit.  The lack of a bank line, in the absence of substantial cash balances or the use of the majority of the available bank line is an underwriting concern.

Banks are often reluctant to provide a candid view of their customer.  Written bank references letters may also be difficult to obtain and few banks will release a copy of their loan agreements to a third party. We suggest that a complete copy of the loan agreements be obtained from our contractor.

In obtaining the loan documents, we are not interested in the note, but in the terms and conditions of the loan agreement.

Underwriting considerations include:
- How much credit is available?
- Is the amount of credit available based on the amount of fluctuating current assets?
- Is it based on receiving financial information on a monthly or quarterly basis?
- Does the contractor need to meet financial covenants?
- What collateral is being provided?
- Is the loan at prime rates or several percent over prime?

All of these are important questions in evaluating the bank line and the contractor's financial strength.

In order to standardize our documents, we have designed the Bank Letter as shown in Appendix "A".  We should attempt to get this form completed by the Principal's bank or at least get the answers the questions it asks.

### Procedure

A Bank Letter should be obtained on an annual basis.  If the Principal does not have a bank line of credit, the Local Underwriter should calculate whether the Principal has two or more months of cash on hand at all times.

**Responsibility and Authority**

Local Underwriter
- Obtain the bank information as outlined in this guideline through our standard Bank Letter.
- Use alternative means of obtaining this information from the bank or the Principal if the Bank Letter is not available.

Head Office Underwriter
- Ensure that our file is appropriately documented with the Principal's banking information.

GCNA 00055

---

### UNDERWRITING
### GUIDELINE

No.   20 2004

---

**Subject:**    **Financial Analysis of Marketable Securities & Investments**

#### Background

In general terms, the basic treatment for analysis of investments, and particularly marketable securities, is to enter the lower of cost or market value in the current assets section of the balance sheet analysis. While this treatment of the asset is generally acceptable, we often do not receive a breakdown of the actual investments to determine their nature either in terms of the liquidity of the investments or the risk attached to them.

A particular concern to us is that our Principal may be investing in some volatile instruments, which may depreciate substantially in value, and which will have a similar negative impact on the Principal's equity.

#### Procedure

1.    If the financial statements provide a detailed breakdown of the investments, and these can be readily determined to be liquid and sound investments, it is appropriate to include them in current assets for purposes of our financial analysis.

2.    Enquiries should be made to determine whether any of these investments have been pledged as security for debts of the Principal, in which case they must be treated as long-term assets.

3.    If no detailed breakdown of the investments is available in the financial statements, this information must be obtained from other sources to determine the nature and quality of the investments.    In that regard, it may be advisable to obtain correspondence from the Principal's stockbroker or the auditor to support the information.

#### Responsibility and Authority

Local Underwriter
- Obtain details of the Principal's investments included in working capital
- Analyze the marketability and liquidity of the investments as well as whether they have been pledged as collateral for long-term indebtedness in order to determine if the Principal's working capital needs to be adjusted
- Obtain guidance from Head Office for unusual investments, or if there is some doubt as to the quality of the investments.

Head Office
- Review the analysis of investments when analyzing the Annual Write-up of the Principal

GCNA 00056

*UNDERWRITING*                           No.   <u>21  2004</u>
*GUIDELINE*

<u>Subject:</u>      Continuity

<u>Background</u>

It is essential that we have a full understanding of the continuity of management and ownership of our Principals.  There are usually only two or three key people, and sometimes one sole owner, upon whom we rely for the management of the Principal.

We must review the plans that have been made in the event that the key people are unavailable either through death or some form of incapacity.

Continuity can also be interrupted by a change in management through new share ownership arrangements.

Another important factor to consider is the age of the key shareholders and management of our Principals, where they may be approaching retirement age.   We must ensure that we know what transition plans have been developed for the Principal to continue in business under new management and ownership.

GCNA 00057

### Procedure

In the annual write-up, the continuity plans must be fully explained, and we must also include the year of birth of the major shareholders of the Principal.

There are many variations in continuity arrangements, and these should be fully detailed in the write-up. They may comprise a mixture of: key-man life insurance coverages, buy/sell plans, disability buy-outs, or changes to the share capital arrangements of the Principal.

### Responsibility and Authority

Local
- Fully explain the continuity arrangements for each Principal in the Annual Write-up.

Head Office
- Ensure that the Principal's continuity plan has been adequately reviewed in the Annual Write-up prior to approving limits

GCNA 00058

**UNDERWRITING
GUIDELINE**

No.   **22 2004**

Subject:     **Claims and disputes procedure**

## Background

It is essential that lines of communication are kept open between the Claims and Underwriting departments on any potential disputes or claims brought to the attention of either department. If either department does not co-ordinate with the other and obtain their input, it is likely that errors can be made in our handling of a dispute or potential claim situation, which may increase our potential loss or may compromise our indemnities. All relevant information must be made available to the Claims Adjuster or Underwriter who is dealing with the situation at hand.

## Procedure

1. Any dispute/claims correspondence received by the Field should be reviewed by the Local Underwriter and who then passes on all documentation to the Claims Department and Head Office Underwriting. If the correspondence involves a legal suit, it should immediately go to the Claims Department and a dialogue shall commence between the two departments.
2. The file should go on the Watchlist if the claim notice threatens contract termination, is a lawsuit or is a significant financial threat to our principal's financial position.
3. If correspondence indicates a definite claim, the Claims Department should take the appropriate action, but only after involving the Underwriting Department in the situation. The Head Office Underwriting Department may decide to stop issuing new bonds. The Underwriting Department will provide background information and any assistance requested by the Claims Department to settle the claim.
4. If the situation is a dispute, a timely written response must be made by the Claim Department to the complainant after co-ordinating between the two departments as to the relevant parties to contact. The response should reference the complainant's letter by its date together with the date it was received in our branch office.
5. For Watchlist accounts where the Underwriting Departments feels there is a strong likelihood of a claim arising, the Claims Department will be advised by the Underwriting Department. The background of the situation should be made available to the Claims Adjuster, so that we are well informed ahead of the point where a claim becomes evident.

## Responsibility and Authority

Local Underwriter
- Inform Claims Department of dispute notices and potential claims
- Recommend account for the Watchlist, if warranted

- Work with Claims Adjusters in order to co-ordinate efforts so that everyone is informed of the situation and appropriate claims and underwriting responses can be taken.

Head Office Underwriter
- Add account to Watchlist and monitor the account
- Advise Claims Department of likely claims
- Work with Claims Adjusters in order to co-ordinate efforts so that everyone is informed of the situation and appropriate claims and underwriting responses can be taken.


Claims Department
- Investigate all dispute and claims notices received from Local Underwriter
- Work with Local Underwriter and Head Office in order to co-ordinate efforts so that everyone is informed of the situation and appropriate claims and underwriting responses can be taken.

GCNA 00060

*UNDERWRITING*                              No.    23  2004
*GUIDELINE*

Subject:      **Organization Charts / Related Company Groups**


## Background

In order to effectively underwrite an account we need to know how our Principal and related companies are owned and/or how their relationships are organized with related companies. Our file must contain information on the exact shareholdings of the Principal and the relationships between the Principal, indemnitor companies and other related corporations or partnerships. The clearest manner in which this can be demonstrated is with organization charts.

Cash demands from an owner or a related party may place an unforeseen stress on our Principal's capital structure. The first step in, determining if this is exposure is present, is to identify the owners and related entities. This information is also important in determining if there are other potential indemnitors available.


## Procedure

An organization chart must be included in the annual write-up on all underwriting files.

The footnotes to our Principal's financial statement are the primary source of information identifying related entities. The personal financial statements of our Indemnitors should also be reviewed for the mention of operating entities. Finally, credit reports are another important source for these disclosures.

We need to know if these related entities are operating entities. Does the entity have interest bearing debt? Is the entity involved in development activities? Has our Principal or any of our Indemnitors guaranteed the debt of the related entity? How significant to our Principal's financial position is the exposure to the related entity?


## Responsibility and Authority

Local Underwriter
- Ensure that organization charts are included in the underwriting material.
- Understand and document cash flows and funding requirements between our Principal, its shareholders and affiliated companies

Head Office Underwriter

GCNA 00061

- Ensure that the annual write-up includes the organization chart and appropriate analysis of cash flows and funding requirements between the Principal and related parties.

GCNA 00062

## UNDERWRITING GUIDELINE

No.   24 2008

Subject:     **Work-In-Progress & Trend Analysis**

### Background

A work-in-progress analysis (WIP) and an accompanying trend analysis are essential to the understanding of a contractor's balance sheet and its ability to make a profit.

Most contracts call for the contract proceeds to be paid according to a schedule of values. This often results in unbalanced payments, where funds are not received in relationship to the costs incurred or risks involved. The standard American accounting practice is to recognize profit in relationship to the cost incurred relative to the estimated total cost of the project. This income recognition method is called cost-to-cost percentage of completion. Using this method, profits are earned in relationship to the percentage complete, which is calculated by dividing the cost to date by estimated total cost of a job. If a job is projected to be unprofitable, the entire loss is recognized immediately.

While this method of income recognition helps to correct the imbalance between cost and the receipt of contract proceeds, it does rely heavily on estimates, which can create misleading financial results over the lifetime of the project. To evaluate the reliability of these estimates we use WIP and trend analyses.

Things to look for are:
- Large increases in contract prices, which can signal unapproved change orders.
- Large underbillings can signal unapproved change orders or a problem with the acceptability of the work.
- Large overbillings along with minimum cash balances or short term bank usage can signal potential cash flow problems.
- Profit fades on jobs, especially those over 80% complete, may significantly overstate contractor's net worth.
- Unearned profits historically low in relationship to overhead can signal unprofitable operations.
- Underbillings that are on jobs being preformed for related entities.

For this type of analysis to be truly useful, jobs must be tracked in relationship to the way they are treated on the contractor's financial statements. Thus we want to match the financial statement date, contract prices, billings to date, cost to date and the related estimates with the figures presented in the financial statement.

Cost-to-cost can be misleading, because it measures cost not risk. The simply delivery of a large piece of equipment will trigger the recognition of a substantial amount of the job profit. It is important that the underwriter understand the job,

GCNA 00063

the risks involved and how this translates to the recognition of profits.  This subject should be covered in detail in the annual write-up.

Our WIP & Trend Analysis tool is an Excel workbook.  There are 12 WIP schedules, each WIP workbook is able to analyze up to 200 jobs and the trend analysis can track 200 jobs.  In reviewing the workbook please note that the fields are color-coded for ease of use:
- White & Gold areas are input fields.
- Green areas are output fields
- Gray areas are descriptions.

The **Jobs** schedule is the second tab in the workbook.
> Each job to be track is assigned a **Job ID** (number) and given a **Contract Description**.  The Contract Description will then appear when entering number on the Trend Analysis or WIP.
> The Bond Number and original Contract Price fields do not have to be completed.

The **Trend** analysis is the second tab in the workbook.
> The white input fields on the Trend Analysis are:
- **Contractor**: this field is used to fill-in the name on the WIP schedule(s).
- **FS FYE Date**: this field references the month and day of the contractor's year end financial statement.
- **Job ID**: is a unique job number assigned to a contract on the Jobs Schedule. This number is used to track the job and triggers a search function that populates the trend analysis.
- **Contract Description**: automatically populates based on the Job ID.

The Trend Analysis only trends jobs selected by the underwriter. For each job to be tracked, type in the Job ID from the Job schedule.

The Work-in-Progress schedules (WIP) are the next twelve tabs.
The white input fields are:
- **Date**: used in the trend analysis and to determine number of months to completion.
- **Prepared by**: a reference field indicating who prepared it.
- **Job ID**: populates the description field.
- **Contract Price**: used to determine Gross Profit
- **Cost to date**: used to calculate percentage completed and Gross profit
- **Current estimated cost to complete**: This field can be completed by inputting the number in column E **or** if the total estimated cost in column AH. Column E is populated with the formula =AI row#. Column AI titled "Estimate Cost to Complete" subtracts Cost to Date (column D) from Estimated Total Cost (column AH), the number inputted into this column. The result is shown in column AI.
- **Billed to date**: used to calculated over and under billings
- **Estimated Completion Date**: used to determine number of months to completion, which is needed to complete profit projections.
- **Annual G&A**: used to estimate and calculate monthly G&A.

Each WIP can calculate: the Estimated Gross Profit, the Estimated G&A and the resulting Estimated Operating Profit by month.  The WIP can also calculate a 12 month estimate of these items.

**Procedure**

1. Secure work-in-progress information and completed job information on contractor principals, as of their fiscal year end or more frequently as may be required under the monitoring terms of the line.
2. If the contractor does not have WIP information or if it is not meaningful, document this fact in the annual write-up.
3. Complete a WIP and Trend analysis, on significant projects for all contractor principals,
4. Investigate substantial increase to the contract price, substantial underbillings, large profit fades, or lack of progress on projects
5. On completed bonded jobs, check for potential changes in the contract price which would produce over or under run premium situations and closed these out in Oracle with appropriate premium adjustment.

### Responsibility and Authority

Local Underwriter
- Complete a WIP and trend analysis at least annually on all accounts which have jobs that carry-over from one fiscal year end to the next.
- If the contractor does not have WIP information or if it is not meaningful, document this fact in the annual write-up.
- Identify and discuss potential issues that may impact the contractor's balance sheet or profitability.
- Look for completed jobs and changes to contract prices on bonded jobs and have premium adjustments made and bonds closed out in Oracle.

Head Office
- Review the WIPs and trend analysis before approving the line of authority.
- Review the analyses and ensure that potential issues that may impact the contractor's balance sheet or profitability are appropriately considered and addressed.
- Review the analyses and ensure that for completed jobs and changes to contract prices on bonded jobs, premium adjustments have been made and that completed bonds have been closed out in Oracle.

GCNA 00065

**UNDERWRITING
GUIDELINE**                    No.   25-2004

Subject:          Shareholders' Loans

Background

This will outline how shareholders' loans should be treated in our financial analysis of contract surety accounts.

Shareholders loans to the company can be an important source of the Principal's capital. However, we can not take these loans at face value. Often they may be paid-off so that the shareholder can pay other outside obligations. Sometimes these shareholder loans are untaxed earnings and, as such, are overstated on the balance sheet. The underwriter must understand both the source of the shareholder loan and the personal and related entity obligations that the shareholder may face.

If the funds for these loans came from free cash held by the shareholder, we may be able to consider this as long term subordinated capital. If, however, the funds came from a short-term personal loan, we should treat it likewise in the analysis of the contractor's financial statement.

Another factor to consider is whether we have the full indemnity of the shareholder. If the loan came from debt-free cash, the shareholder is personally indemnifying and has committed to keep the funds in the company on a long-term basis; we will consider this as committed capital.

If we do not have full personal indemnity, we will need a subordination agreement in order to consider the loan as long term capital. If the repayment term is less than two years, we would not consider the loan as long term capital.

Shareholders loan that are dependent of short borrowings of the shareholder or which have not been formally termed out should be treated a current liability.

Procedure

All shareholders loans should be treated as current liabilities in absence of documentation to the contrary.

For us to consider the loan as long term capital we need:
- to know the source of the money,

GCNA 00066

- a personal statement reflecting the absence of short term interest bearing debt, and
- the full personal indemnity of the shareholder or a formal subordination agreement executed by the Principal and the shareholder.

### Responsibility and Authority

Local Underwriter
- Investigate the nature and source of all shareholder loans;
- Make the proper adjustment to the as reported equity if the shareholder loan satisfies our criteria for treating as capital.

Head Office Underwriter
- Review the Local Underwriter's explanation and analysis in order to confirm that whether or not the shareholder loan can be treated as capital.

GCNA 00067

## UNDERWRITING GUIDELINE

No.  <u>26 2005</u>

<u>Subject:</u>      **Underwriting Files – Write Up**

### Background

A completed Write-Up is required on every active contract file.  The Write-Up consists of two documents, the cover page and the write-up page. The cover page is produced by our data base system (Oracle) in the Principal Analysis section.  The write-up page is a Microsoft Word document, 26 2005 Form 1, and is completed by the Regional underwriter and attached to the Principal Analysis page in Oracle.

After an account review is completed, the Write-up is saved in our document management system and a copy of the write-up page is also saved in our document storage system (Underwriting File/ViewWise).

The copy of the write-up page stored in Oracle is a historical document.  The copy of the write-up page stored in Underwriting File/ViewWise is a working document that will be updated during the year.  The updates will be all correspondence between the local underwriter and the National underwriter, including specific bond approvals.

### Procedure

Complete/update the Contact Management, Financial Analysis and Principal Analysis sections in Oracle.

Attach a copy of the write-up to the Principal Analysis section.  The write-up page, 26 2005 Form 1, is a template that has the following headings:
- HISTORY & BACKGROUND
- ORGANIZATION
- INDEMNITY & SURETY AGREEMENTS
- INTERNAL CONTROLS/PROCESSES/RISK MANAGEMENT
- FINANCIAL
- BANK FACILITIES
- CREDIT REPORTS/REFERENCES
- MONITORING & RECOMMENDATIONS
- NATIONAL COMMENTS & RESPONSE
- SUBSEQUENT EVENTS & COMMENTS

The template provides suggested commentary in 'green type' under each heading.  When completing the write-up the local underwriter should insert comments in 'black type' and delete the suggested commentary in 'green type'.  These consideration points under each heading are illustrative only and are not designed to represent a complete list of underwriting consideration for a given contractor. Attach the write-up to the cover sheet in the Principal section in Oracle.  Then the Head Office underwriter should be notified by e-mail that the account is ready for review.

The National underwriter will complete the Head Office Comments & Response section and lock this document into Oracle. The write-up will also be saved in ViewWise. The write-up can be 'launched' from ViewWise during the year, updated and saved.

## Responsibility and Authority

Regional Underwriter
- Prepare and document a complete analysis of all underwriting considerations along with a recommendation of proposed terms and conditions which is supported by the analysis
- Updated Oracle
- Complete the write-up page and save a copy to the Principal Analysis section
- Notify the National underwriter that the account is ready to be reviewed
- Update write-up during the year and save in ViewWise

National Underwriter
- Confirm, modify or decline the field office recommendations, as may be considered appropriate
- Complete the Comments & Response section of the annual write-up and lock this document into Oracle and save a copy in ViewWise
- Notify the Regional underwriter by e-mail that the review has been completed
- Confirm specific bond authorizations and document interaction with local underwriting during the year

GCNA 00069

***UNDERWRITING***
***GUIDELINE***

**No.    27 2004**

<u>Subject:</u>      **Specialty Contractors and Non-Construction Principals**

<u>Background</u>

The bulk of our portfolio, and consequently of our underwriters' experience, is related to construction companies, but we are often requested to provide surety facilities for companies involved in different industries.

While our preference is for construction Principals, there can be situations where other non-construction accounts are accommodated for good supporting agents. In those circumstances, a business decision is made to provide a surety facility for their clients.

<u>Procedure</u>

In order to underwrite a specialty contractor or a Principal in an industry other than construction, it is necessary for the Local Underwriter to have a clear understanding of the industry in which they are involved. In that manner, it is possible to make an assessment of the risks which are inherent in the particular Principal's contract, and to determine whether there are adequate means for the Principal to protect themselves against such risks.

One possible area of protection may be through some form of insurance, perhaps under the Principal's Commercial General Liability policy or under a specific insurance coverage. In such cases, it is mandatory that details of the relevant insurance coverages are obtained in the underwriting process.

It is essential that the write-up include a comprehensive review of the potential risks in bonding the Principal, together with an explanation of the manner in which the relevant Principal protects itself from risks inherent in the contract.

Given the unique risks of these types of bonds as well as specific exclusions under our reinsurance coverage, we will only write bonds for this class of Principal on a Special Acceptance basis.

<u>Responsibility and Authority</u>

Local Underwriter
- Understand and outline any unique exposures involved with the Principal's business and any unusual aspects to the underlying contract.
- Prepare a Special Acceptance Submission and submit to Head Office

GCNA 00070

Head Office
- Fully understand the risk prior to establishing a line of authority or approving a Special Acceptance.

GCNA 00071

**UNDERWRITING
GUIDELINE**

No.   28 2004

Subject:   **Internal Correspondence**

**Background**

Underwriting file or bond file communications between the Head Office and the Local
Underwriter needs to be confirmed in writing.  This communication whether in the
memorandum, standard GCNA USA form or e-mail must be stored in the appropriate file or
files.

**Procedure**

Whenever any communication regarding any underwriting file or bond file takes place
between the Local Underwriter and Head Office, the communication is to be put in writing and
a hard copy shall be placed in the underwriting or bond file.  -  All underwriting decisions
must be properly documented.

**Responsibility and Authority**

Local Underwriter
• Ensure that all correspondence relating to underwriting decisions, regardless of their
  form, are properly documented in the underwriting file.

GCNA 00072

*UNDERWRITING*                          No.   <u>33 2004</u>
*GUIDELINE*

<u>Subject:</u>    **Data Base Management/Oracle**

<u>Background</u>

Oracle is our data base management system.  It is accessed via the internet through our secured server or through a secured VPN connection.  Oracle is the trade mark name the data base provider.

We use Oracle to appoint producers, to bill premium, analyze financiall information, keep track of our principal's, and the track the performance of our underwriters.

<u>Procedure</u>

It is the responsibility of the Local Underwriter and the document management team to ensure that the files are kept in good order and that all redundant or out-of-date documents are discarded.

To assist in this procedure, a checklist is attached indicating the relevant - documents to be retained in an underwriting file

<u>Responsibility and Authority</u>

Local Underwriter
- Ensure that proper file maintenance is carried out annually
- Ensure that the documents in the attached checklist US 2004-29A are maintained for the specific time periods

GCNA 00073

**UNDERWRITING**
**GUIDELINE**

No.   <u>30 2004</u>

<u>Subject:</u>     **Underwriting Meetings with Principals**

<u>Background</u>

Contract surety is a relationship business. Our relationships with our contractor-principals will only be improved with regular meetings.  It is helpful from an account retention standpoint to have strong personal relationships with our principals, built up through regular meetings.

<u>Procedure</u>

1.   For new accounts with surety needs in excess of $1 million, no commitment should be made to provide a surety facility unless our Local Underwriter has met the Principal.

2.   For active accounts with surety bonding needs in excess of $3 million, the Local Underwriter should meet with the Principal for an underwriting meeting on at least an annual basis. These underwriting meetings can also happen on a more periodic basis, where unusual events are taking place such as an exceptionally large or unusual bid request, or where there is a serious concern about  underwriting aspects of the account.

<u>Responsibility and Authority</u>

Local Underwriter
• Ensure that a knowledgeable relationship is established between the Principal and us. Underwriting meetings are an important way to accomplish these goals.
• Arrange underwriting meetings with each Principal as set out in this guideline.

Head Office
•  Ensure that the underwriting meetings occur between the Principal and the Local Underwriter for new accounts with bonding needs over      $1 million and all existing accounts with a bonding program in excess of $3 million.

GCNA 00074

***UNDERWRITING***
***GUIDELINE***

No.   <u>31 2005</u>

---

<u>Subject:</u>   **Credit Reports**

<u>Background</u>
There are two broad categories of credit reports:
Commercial Credit Reports which are obtained on businesses and
Personal credit reports, which are obtained on individuals.

**Commercial credit reports** are our primary source for verifying payment habits and public record information.  We use Dun & Bradstreet (D&B) as the primary report, but we may also use Experian for additional documentation.

D& B's Business Information Report (BIR) is the report that should be ordered.  We use the Paydex score and the Capital & Credit rating score in our underwriting process.  We also look to the historical background information and the details of public filings.  D&B also issues a Comprehensive Report, which provides several additional scoring models.  We, however, do not see the benefit to these scoring models in relationship to the additional cost.  We also only order D&B reports on a normal delivery basis.  We do not want to pay an additional fee for a rush delivery.

D&B's Paydex Score is a 1 to 100 score.  Scores under 60 need an explanation.  Lower scores may be the result of one large dollar disputed item. D&B provides a separate score that does not take the dollar amount into consideration.  If that score is also low, extreme caution is warranted.

**Personal credit reports** are obtained from Experian or Equifax. The US Consumer Credit Act regulates the issuance and use of these reports under Title VI, the Fair Credit Reporting Act. The Federal Trade Commission and other federal agencies enforce compliance with the act.  This law provides for both fines and imprisonment for unlawful use or distribution of these reports.  Thus we need to exercise caution when ordering these reports.

The consumer must authorize us to obtain a personal credit report.  If the consumer is providing us with personal indemnity, this is constructive authorization.  In addition, most of our indemnity agreements cite that the indemnitor provides authorization for us to order credit reports.  If we do not have indemnity the consumer can still authorize us to us to order a report, but we want this authorization in writing.  A fax copy of the authorization is acceptable documentation.  We have a short form application that can be used for this purpose. This short form application also requests the basic information needed to obtain a report. (US 2005 Form 1)

Personal credit reports are a valuable tool especially when evaluating a small account (a net worth under $500,000) or accounts where there is a history of substantial financial

transactions between the account and the indemnitor. In these instances, we recommend one be obtained.

**Procedure**

Contract account should have a D&B report that is no older that 12 month at the time a line of authority is issued. This report should reflect a Paydex score of 60 or higher, or the file should contain a detailed explanation why an exception is being made. The report should be free of any federal tax liens or indications of litigation that could potentially have a serious financial impact on the company.

The Head Office will be charged with the responsibility of confirming that we have written authorization to obtain a personal credit report and will order these reports when they are requested and documentation is provided. The names of the individuals should be entered in to Apollo so that we can easily identify them and provide documentation is requested.

**Responsibility and Authority**

Local Underwriter

The local underwriter is responsible for keeping active files current with a current D&B reports.

When personal credit reports are needed, making sure the "contact information" of the individual is in Apollo (our underwriting management system), confirming that we either have the indemnity of or the written authorization of that individual and requesting Head Office to order the report.

Head Office

The Head Office is responsible for confirming that a current D&B report is on file and has no adverse information, or an acceptable explanation has been obtained.

Ordering personal credit reports and keeping records of these reports by confirming that the contact information has been entered into Apollo and that we have written authorization from the individual to obtain a report or have been provided with the personal indemnity of the individual.

- 

GCNA 00076

*UNDERWRITING*                          No.    U.S. 2005-32
*GUIDELINE*

Subject:    US Small Business Administration
            Surety Bond Guarantee Program, Plan A

Background

We want to assist qualified small business concerns and disadvantaged small
contractors to obtain surety bonds that would not otherwise be obtainable
without a SBA guarantee.  The SBA Surety Bond Guarantee Program (SBG)
enables us to do this even though these contractors do not qualify under all of our
standard guidelines.  SBG should be used when these contractors do not possess,
to the degree normally required, the necessary experience, net worth or working
capital to qualify for normal surety support.  Whatever underwriting deficiencies
exist must be temporary shortcomings that can be overcome by gaining
experience and accumulating earnings on work obtained through this program.
We are particularly interested in assisting disadvantaged small emerging
contractors and should make a special effort to write bonds for these accounts.

The SBG program is government reinsurance.  The SBA reinsurers the surety for
80 or 90% of the bonded exposure.  A 90% guarantee is provided on bonds under
$100,000 or if the principal is a qualified disadvantaged contractor.  The surety
cedes 26% of the gross premium to the SBA for this protection and the Principal
pays a per thousand fee directly to the SBA.  A submission must be made to the
SBA Regional Office where the contractor is located the SBA requires the
information outlined in their SOP 50 45 2.

Completing a SBA submission requires expertise and a substantial time
commitment.  There are several qualified agents that have gained this expertise

GCNA 00077

and it is our intent to only offer this program to these agents. We will grant qualified agents authority to make SBA submissions on our behalf. However, we will also require that a copy of any submission be electronically submitted to the Head Office in Michigan. Submission in excess of the agent's authority will require the approval of both the local and Head Office underwriter.

- In addition to SBA criteria the following underwriting conditions must be complied with:

  – The contractor, its affiliates and owners must not be in bankruptcy, have a history of bankruptcy or be in imminent danger of bankruptcy or have any outstanding federal tax liens.

  – The contractor, its affiliates and owners must not be in default or in imminent default under any construction contracts.

  – The applicant does not consist of a joint venture.

  – We are furnished with a copy of the contract that clearly sets forth the duties, rights and obligations of the principal and obligee; and there is an architect or engineer representing the owner.

  – We are furnished with a copy of the bond forms with the signature of the attorney-in-fact.
  – The bond or bonds cover any public work or private non-residential work where evidence of full financing has been obtained prior to the execution of the bond or bonds. If the contract to be bonded is payable in a form other than cash, or involves advance payments, submit to Company underwriter with complete details.

  – The bond is not in support of a defaulted contract, covering a contract on which construction is under way at the time of the request, or covering a contract with asbestos, toxic or hazardous waste exposures.

  – The bond is not a completion bond or a bond covering a contract involving financing or design hazards.

GCNA 00078

— The construction contract is self-funding or the contractor has arranged the necessary financing.

— The term of the contract is one year or less and the maintenance guarantee period is not more than one year, limited to workmanship or materials and contains no efficiency guarantees.

— Each bond file must document the amount of work subcontracted on a particular project.

Annual reviews of SBA accounts will be performed. We will look at the Credit Risk Tolerance Guidelines and the Underwriting Guidelines to see what criteria are missing or lacking. If there are lacking criteria or qualities we should suggest ways to overcome these problems. If we find that the account meets the Credit Risk Tolerance Guidelines and the Underwriting Guidelines, we should write the account without SBA assistance.

Premium Processing:
When processing premium the bond will be coded to reflect that this is SBA reinsured business. We will also indicate whether we received an 80 or 90% guarantee. This business is excluded from our regular treaties, so no premium should be ceded to our treaty members.

The SBA will receive 26% of the gross premium; there is no ceding commission.

The agent commission on this business will be 24%.

To pay the SBA, log on to the SBA module https://el.sba.gov/prodsbg. Enter in your login ID and password, which SBA will provide. Identify the bonds that will be paid and print out the bordereau any send it along with a check to:
U.S. Small Business Administration
Office of Financial Operations
721 19th Street, 3rd floor
Denver, Co 80202

GCNA 00079

Attn: Surety Bond program
The SBA complete user guide is attached.

## Authority/Responsibility

### Local underwriter

– Prequalify the agency to participate in the SBA program.

– Review all submissions to the SBA

– Review and approve or decline submissions agent's authority.

### Head Office Underwriter

– Access the agency appointment and authorization with the local underwriter.

– Review and approve or decline submissions in excess agent's authority.

– Review bonds for compliance with SBA underwriting guidelines and reporting standards.

– Confirm that all bonds issued under lines of authority have been reported to the SBA within 15 days of issuance.

### Operations

– Approve acceptable agencies for the program.

– Issue agency contracts and letters of authority in accordance with procedures.

GCNA 00080

## Accounting

— Reconcile SBA bordereau with our records and process payments

## UNDERWRITING GUIDELINE

No.   <u>33 2006</u>

<u>Subject:</u>   **Federal Income Tax Analysis**

<u>Background</u>

Underwriters need to understand and recognize the impact of US Federal income tax when analyzing financial statements of businesses.

For income tax purposes, there are two types of for-profit business entities. A regular corporation (also known as a C corporation) which is taxed as a separate entity under the tax laws. All other for-profit business entities (pass-through) are not liable for the tax liabilities emanating from their operations; however, their owners are liable for the tax liabilities. This will usually require the owners to withdraw money from the business to pay these taxes. These pass-through entities take the form of proprietorships, partnerships, Subchapter 'S' corporations, and limited liability companies (LLC).

**Regular Corporations**

Businesses established as regular corporations are easier to analyze because tax liabilities are documented on their balance sheets and footnoted.  However, fewer businesses are electing to be taxed as regular corporations. This is because after income tax is paid on their business's income, any distribution made to their stockholders is again taxed at the stockholders' tax rates as dividends.

A regular corporation's financial statement can have both income tax assets and liabilities.  This occurs because certain income and expenses are recognized in different periods for taxes and financial reporting purposes.  The sources of these temporary differences should be scheduled in the footnotes to the financial statement.  They include: uncompleted contracts, depreciation, operating loss carry forward and charitable deductions.

Underwriters will generally accept the CPA's classification of the tax provisions.  The rule to follow is: if the asset producing the liability is current, then the liability should also be classified current.  This is true even if the tax may not fall due for several years. Deferred taxes emanating from differing depreciation methods are classified as non-current because they emanate from a fixed asset and would only become due if that asset was sold.

Regular corporations may also have tax assets.  The realization of this type of asset is contingent on future taxable earnings.  Thus the underwriter must feel confident that there will be future taxable earnings to allow the asset.  Even when the underwriter is confident of this event, this asset should be classified as non-current in the analysis.

**Pass-through Business Entities**

Pass-through business entities are not liable for income tax. That liability falls on the individual owners of these business entities.  The CPA should footnote the business's tax status.  The absence of a tax provision on the income statement is also an indication of a pass-through business entity.

Few owners of closely held businesses are able to meet the tax liabilities emanating from the earnings of the business without drawing on the resources of the business. Thus the underwriter needs to quantify the potential liability and make a provision for it in the financial statement analysis.

The financial reporting and tax reporting can be on different income recognition, inventory valuation and depreciation methods.  As such there may be a substantial tax liability and the pass-through entity's working capital and equity position may be grossly overstated.

**Establishing a Tax Provision**

A tax provision for analysis purposes is an estimate of the taxes accruing to the owners as a result of income earned and recognized for financial statement reporting but not tax reporting.  This analysis assumes that the owners will need to dividend out or withdraw the money to pay these taxes. This analysis does not give credit to the owner's ability to personally pay this liability nor does it provide an allowance for personal tax credits.  These adjustments can be taken into consideration only with the full cooperation of the owner and the owner's CPA.

**Unrecognized Taxable Income**
A balance sheet approach is the preferred method to determine unrecognized taxable income. This is accomplished by subtracting the tax basis net equity from the financial reporting net equity. The difference is unrecognized net taxable income. This unrecognized net taxable income figure is then multiplied by an estimated tax rate.  Typically a 35% rate is used, which includes a 3% state tax provision.  Some states do not recognize pass-through business entities for state income tax purposes. In these instances, the reporting basis financial statement may include state tax provisions. If state taxes are accrued on the statement, then a 32% Federal rate would be used.

The preferred source of a tax basis balance sheet is the business's independent CPA. The CPA should know the net worth on a tax basis and how much money the owners have paid in interim installment tax payments.

If the business's tax basis is the same as its financial statement reporting, there will be an absent of unrecognized taxable income.

**Recognized Taxable Income**
The underwriter should also make a provision for recognized taxable income.  The tax base income statement or tax return will provide this information.  If the business's taxable income is the same as the financial reporting income, the financial statement income statement will provide this information.  Often the owners will have made installment payments during the year reducing this liability. The underwriter should inquire as to how much money was withdrawn during the year

GCNA 00083

and how much will be withdrawn after the fiscal year end to cover this year's pending tax bill.

**When we are not provided with sufficient information**

If we can not get the tax information necessary from the CPA, we can make our own estimates. This requires the underwriter to convert the financial statement to the business's tax basis. The first step is determining the method income is being recognized for tax. This information can be derived from a footnote to the financial statement or by getting a copy of the business's tax return. A business is required to file a tax return, despite being a pass-through entity.

Income recognition methods can be broken into two categories, cash and accrual.

Under the cash method income is recognized when cash is received and expense is recognized when cash is paid out. Using the cash method a business can increase or decrease its income by changing the timing of collections and payments.

There are three types of accrual methods: straight, completed contract and percentage of completion. Most contractors use the percentage of completion method for financial reporting purposes.

Under the straight accrual method income is recognized when billed and cost is accrued at the time the cost becomes known. Like the cash method the income can be accelerated or decrease simply by changing the timing of the billings.

Under the completed contract method an asset (underbillings) or a liability (overbillings) is established on the balance sheet to eliminate profits on open jobs or to compensate for underbillings on profitable jobs. The result is profits are not recognized until the job is closed out. Here too the business can delay profit recognition by not closing a job.

The percentage of completion method is where profits are earned in proportion to some event, usually the incurrence of costs. Like with the completed contract method an asset (underbillings) or liability (overbillings) is established on the balance sheet, but rather than to eliminate earned profit they are used to recognize estimated earnings in relationship to the earning provision.

Do not rely upon the balance sheet in the tax return as an identifier of the existence of any deferred income. Unfortunately, the tax preparers can put any balance sheet that they desire on the tax return and can, in fact, leave it blank. In the past, many underwriters have seen the same balance sheet and net worth figures in the tax return and automatically (and incorrectly) assumed that the two methods were the same and that no timing differences existed. Sometimes the tax return will contain a tax basis balance sheet and if this is confirmed to be the case, then the difference between the equity figures is the amount of deferred income on which to calculate the tax liability.

For 'S' corporations, the Accumulated Adjustments Account on the bottom of page four of the tax return is also a tool for determining whether there is any deferred income. This account is used for accumulating information regarding all 'S' corporation income, loss, and expense, since the election of 'S' status (or after

GCNA 00084

December 31, 1982, if 'S' corporation prior to that date). The number is supposed to reflect the 'S' corporation's taxable earnings after distributions and will, in essence, result in the taxable net worth when added to any pre-election regular corporation tax basis retained earnings.

Cash Basis
Businesses utilizing the cash basis for taxable income recognition will generally have a lot of unrecognized income and a large corresponding unrecognized tax liability. It is possible to determine the amount of unrecognized income by reviewing the financial statement's balance sheet for those items that, on a cash basis, will be future income and future expense.
The cash basis recognizes income as it is physically received and expenses when they are actually paid. Therefore, unrecognized income can be determined using this formula:

| Future income | | Accounts Receivable |
|---|---|---|
| | plus | Underbillings |
| | plus | Prepaid |
| Future expenses | less | Accounts Payables |
| | less | Overbillings |
| | less | Accrued expenses |
| | = | Deferred income |

This formula can be utilized regardless of the company's method of income recognition for financial reporting purposes.

Completed Contract Basis
Contractors on this basis will not recognize any income or pay any taxes from their jobs in progress until the jobs are completed. If the contractor is on the percentage of completion method for financial reporting, calculating the amount of deferred income is easily calculated. If a contractor has earned gross profits to date on work-in-progress of $186,000 then this is the amount of deferred income to be utilized for calculating the tax liability. Since the contractor is receiving the benefits of the profits in the analysis, it is necessary to match the tax liability calculated with the source of the deferred income i.e. the deferred income tax should be a current liability.
Accrual
To obtain the deferred income for a straight accrual taxpayer for a percentage of completion or completed contract financial statement, simply remove the underbillings and overbillings from the financial statement. This will in effect provide a tax basis balance sheet and the difference in the equity figures will be the amount of deferred income on which to base the tax provision.
Miscellaneous
It is also important to know when a company's current method of income recognition for taxes was chosen. If a business recently converted to the percentage of completion method for tax purposes, there is still a chance that a deferred tax liability exists as the income from contracts in progress at the time of the election must continue to be recognized on the former method. If the CPA denotes in the financial statement that the same method of income recognition is used for both financial reporting and tax purposes, but the revenue figures on the income statement and tax return differ, an investigation is warranted.

When contractors convert to a different method of income recognition for tax purposes, they may be able to elect with the IRS to pay the deferred tax liability that

GCNA 00085

previously existed over several years. Detailed information should be secured from the company's independent CPA or tax advisor so that a proper understanding of the tax situation is obtained. In this type of situation, it is proper to reflect the payments beyond one year as long-term liabilities like any other amortized obligation.
When contractors hit a certain volume of sales, they are required to utilize certain methods of income recognition for tax purposes. For example, a contractor whose sales average over $5 million for a three year period is unable to utilize the cash basis for tax purposes and is required by the IRS to utilize an accrual method. However, in the event the contractor was an 'S' corporation prior to 1986, they may be able to continue on the cash basis. Contractors averaging over $10 million in sales over a three year period must be on the percentage of completion method for tax purposes.

If a company suffers a tax loss, the owner(s) may be due a tax refund. While any refund will be theirs personally, if they inject these monies back into the company, a positive adjustment to working capital and net worth should be made in the analysis when receipt of the monies is confirmed.

The lack of tax provisions on business's financial statement that pass through these tax liabilities to their owners cannot be ignored. They do indeed exist and underwriters extending surety credit must take these into consideration.

The failure to make a provision for the tax liability emanating from the non-taxable entity unrecognized and recognized income will result in an overstated financial condition. This in turn may cause an over extension of credit and surety losses.

Exhibit A provides an example of income recognition methods and the resulting income tax provision that would be made in the financial statement analysis.

<u>Procedure</u>

Determine how the business is taxed, if it is a regular corporation or a pass-through entity.

If the business is a regular corporation, review the footnotes to the statement and the tax assets listed on the financial statement.
- Make adjustments to the financial statement analysis as appropriate.

If the business is a pass-through entity, determine if income is recognized on a different basis than the financial reporting basis.
- If income is recognized on a different basis than the financial reporting basis, obtain information on unrecognized income or a tax basis balance sheet from the business's CPA and a copy of the tax return.
- Obtain information on the tax rates of the owners.
- Make appropriate provisions in our financial statement analysis.
- If the CPA does not provide us with sufficient information, use the procedures herein to estimate unrecognized income, apply an appropriate tax rate and then make a provision in our financial statement analysis.
- Obtain information on recognized income which is the responsibility of the owners, determine if additional withdraws are needed to pay the tax liability.

**Responsibility and Authority**

Regional Underwriter
- Obtain information on the Federal tax basis of our account's business.
- Determine if there should be an adjustment to our financial statement analysis.
- Make adjustments to the financial statement analysis as outlined in this guideline.

National Underwriters
- Confirm and ensure that the account write-up and financial statement analysis adequately addresses tax issues.

**UNDERWRITING
GUIDELINE**

No.   **34 2006**

Subject:   Risk Management and Insurance Coverages

**Background**

Protection of income and balance sheets from both liability and property loss rely
heavily on risk management procedures and insurance coverages. It is very
important that the surety understand the principal's insurance coverages and risk
management procedures.

Risk management is more than obtaining the right insurance coverages, it is a
strategy of how to protect the entity from loss at the lowest cost. This strategy
revolves around identifying risk and then treating the risk by avoiding, controlling, or
transferring the risk. The decision of to retain, avoid, control or transfer risk must
be well thought-out and not left to chance. There are certain risks that can be
treated or can be easily absorbed by operational cash flows of the entity and are
retained.

Typical coverages carried by a construction company include:
- Commercial General Liability Policy
- Environmental Liability Policy
- Professional Liability Policy
- Fidelity
- Umbrella
- Workers Compensation
- Business Auto
- Premise Coverages
- Aviation

General contractors or owners also need specific project coverages. These coverages
include:
- Builders Risk
- Surety Bonds
- Subcontractor Default Insurance
- Railroad Protective
- Marine coverages
- Wrap-ups
    1. Owners Controlled Insurance Programs (O-CIP)
    2. Contractor Controlled Insurance Programs (C-CIP)

Coverage amounts, types of coverage (occurrence or claims made) potential gaps in
coverage, deductibles, and exclusions all need to be verified and documented. A
letter from the company's insurance agent should be obtained annually outlining the
insurance program and its coverages, gaps and deductibles.

Common Commercial General Liability Policy exclusions:

Pollution
War
Asbestos
Nuclear Energy
Eminent Domain
Workers Compensation
Exterior Insulation Finish System (EFIS)
Construction Defects
Completed Operations
Professional Liability

Often insureds will need to purchase a specific policy for these excluded exposures. Some insurance companies will add these coverages by endorsement to the Commercial General Liability Policy, but beware often these riders do not provide the broad liability that a specific policy will offer.

Deny claim
Reservation of rights letter
Defense Costs
Time Limits
Statute of Repose

Read the Full Policy
Certificate of Insurance

Professional Liability

**Responsibility and Authority**

Local Underwriter
- Obtain information.
- Determine if there
- Make.

Head Office Underwriters
- Confirm and ensure that the account.

GCNA 00089

**UNDERWRITING**
**GUIDELINE**

No.   <u>35 2009</u>

---

<u>Subject:</u>   **Set Aside Work**

<u>Background</u>
The US Federal government has established programs to set aside work and or provide preferences for economically or historically disadvantaged groups or military veterans. There are numerous rules governing who is eligible for this work.  Unfortunately many of those who are eligible do not have the financial capacity and/or experience to perform this work.  Thus they seek the help of those who may not be eligible for the work, but do possess the financial capacity and experience to perform this work.  We are then asked to provide the bonds for these projects based on the indemnity of these third parties.

We have several concerns:
Is consideration adequate to support the indemnity?
Is the indemnity provided legal and thus not voidable?
Does our agent and/or underwriter have legal liability, if they advise them on how to qualify for a set aside program?

<u>Procedure</u>

Do not provide advice on the legality of these arrangements. They must seek the opinion of their own legal counsel.

If our underwriting of the case is based on the indemnity of a third party, an opinion of counsel letter is required.  The letter must outline that the arrangement is within the rules of the program and that the indemnity to be take is proper and enforceable.

These letters should be obtained from the attorney who prepared the agreements between the parties.  If they do not have an attorney involved, we are not interested in supporting bonds for these jobs.

Below is a sample letter.  Depending on the circumstances these letters can cover all jobs and bonds between these entities or just the job and bonds in question.

GCNA 00090

**DRAFT FORM - OPINION OF COUNSEL**

The Guarantee Company of North America USA and its Affiliates
25800 Northwest Highway, Suite 720
Southfield, Michigan 48075

Re:   name of principal appearing on our bond and underlying contract.

Ladies and Gentlemen:

An agreement has been entered into between Contractor, Entity A, Entity B, and Entity C (Parties) to pursue work and enter into contracts with_____ (Owner) for _____ (Work), which has been set aside for companies owned and operated by: disabled veterans, minorities, women, and/or small businesses located in historically underutilized business zones (HUB Zones).

The aforementioned Parties requested The Guarantee Company of North America USA or its Affiliates (Surety) to issue surety bonds based on the indemnity of one or more of the Parties. The requested bonds are required by the applicable Set Aside Program rules, regulations, and/ or the Parties' contractual provisions.

Before issuing such bonds, The Guarantee Company of North America USA seeks assurance, via an opinion of counsel letter, that there is adequate consideration to support the indemnity and the indemnity provided by the Parties is legal and thus not voidable.

Accordingly, I have examined the Government Program's set aside rules and regulations, including the Federal Acquisition Regulations (FAR), the agreements entered into by the Parties, and all other documents necessary to provide you with this opinion.

Based on my research and analysis, I am of the opinion that: (i) there is adequate consideration to support the indemnity being provided to the Surety by the Parties; (ii) the Government set-aside rules and/ or regulations and the structure and agreements of the various Parties involved in this transaction do not void the indemnity provided by the Parties; and (iii) the indemnity provided by the parties is fully enforceable and legally binding on the Parties.

Very truly yours,

Legal Counsel