IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| GUARANTEE COMPANY OF NORTH AMERICA USA, a corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CIVIL NO. 2:09-cv-1003-MEF |
| SHERYL B. WAINWRIGHT, et al., | ) ) ) | |
| Defendants. | ) ) | |

**GUARANTEE COMPANY OF NORTH AMERICA, USA'S RESPONSE IN
OPPOSITION TO FIRST COMMUNITY BANK OF CENTRAL ALABAMA,
INC.'S MOTION FOR SUMMARY JUDGMENT**

COMES NOW, Plaintiff, Guarantee Company of North America, USA ("GCNA"), pursuant to the Court's Order of February 24, 2011 and Rule 56 of the *Federal Rules of Civil Procedure*, and hereby submits this Response in Opposition to First Community Bank of Central Alabama, Inc.'s ("FCB") Motion for Summary Judgment and states as follows.

**INTRODUCTION**

GCNA has brought a single count against FCB for breach of notary obligations, which is a claim for constructive fraud.[1]   This claim arises from the fraudulent notarization of at least two signatures to a General Agreement of Indemnity ("GAI") by FCB's employee, Denise Poole, who is a notary public.   The GAI, which is dated May

_____

[1] GCNA recently filed a Motion to Enlarge Deadline for Amendments and for Leave to Amend Complaint.   (Doc. 103.)   The proposed Amended Complaint seeks to add claims against FCB for suppression and civil conspiracy, which arise from the same set of allegations concerning the breach of notary obligations.

30, 2007, was executed in favor of GCNA, in order to induce GCNA, as surety, to issue performance and payment bonds on behalf of W.D. Wainwright & Sons, Inc. ("WDWS").  The signatories to the GAI agreed to hold GCNA harmless from and against all claims, damages, expenses, losses and costs related to the past or future execution of any surety bonds.  A necessary condition precedent to the issuance and release of any bonds on behalf of WDWS was the proper execution of the GAI by WDWS, Steve Wainwright, Sheryl Wainwright, Jeff Wainwright and Tracye Wainwright (collectively, "indemnitors") and authentication of their signatures.

Although each of their signatures appears on the GAI, Jeff and Tracye Wainwright maintain they did not sign it or authorize anyone to sign on their behalf.  Ms. Poole has admitted that she did not properly notarize the signatures to the GAI.  She believes it was notarized pursuant to the policy of the FCB branch where she was employed to notarize signatures at the direction of a bank officer without witnessing their execution.

At the time the GAI was purportedly executed, FCB had a long-term business relationship with WDWS and the individual indemnitors.  Moreover, FCB had a financial interest in WDWS obtaining surety bonds from GCNA in order that WDWS could continue its business and make payments to FCB on the various loans it held.

FCB argues that it is entitled to a judgment as a matter of law on the following grounds:  (1) GCNA failed to pled its claim with specificity, (2) FCB cannot be held vicariously liable for its employee's notarizing of documents, (3) GCNA did not rely on the execution of the GAI in issuing any bonds, (4) GCNA's conduct was the proximate cause of its loss, (5) GCNA has yet to incur any damages and (6) the claim is barred by

2

the statute of limitations.  The law and relevant material facts of this matter show, however, that FCB is not entitled to summary judgment on any of the above grounds.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1.      In 2007, Steve Wainwright was the president of WDWS, an industrial contractor that did primarily excavating work.  (Depo. of Steve Wainwright, pp. 9, 12, attached hereto as Exhibit A.)  His brother, Jeff Wainwright, was either the vice-president or treasurer.  (*Id.* at 26.)  They were the only shareholders in the company.  (*Id.* at 45.) Their wives were also employees of the company.[2]  (*See id.* at 9-10, 36.)  In the summer of 2008, Jeff Wainwright left the company, and Steve Wainwright is now the sole shareholder.  (*Id.* at 44, 46-47.)

2.      In 2007, WDWS decided to pursue public contracting projects, which required that it be bonded.  (*Id.* at 20-21.)  GCNA eventually issued multiple payment and performance bonds on behalf of WDWS concerning various construction projects in the State of Alabama.  Prior to the issuance of any bonds, however, GCNA required WDWS and its owners to indemnify it for any loss it may suffer as a result of issuance, in the past or future, of any bonds.  (*See id.* at 30; Doc. 96-6, GAI.)[3]

3.      At the time the GAI was executed, FCB had outstanding loans with WDWS in the amount of $1,761,085 and to Steve and Sheryl Wainwright in the amount of $373,000. (*See* Loan Docs., attached hereto as Exhibit B.)

---

[2] Steve and Sheryl Wainwright are husband and wife.  Jeff and Tracye Wainwright are husband and wife.

[3] When possible, GCNA will cite to FCB's exhibits to avoid duplication of documents.

{B1265266}

4.      The GAI is dated May 30, 2007.  (Doc. 96-6.)  The first signatory to the GAI is Stephen R. Wainwright as president of WDWS.  (*See id.* at 6.)  His signature was witnessed by Andrea Comstock.  (*See id.*)  The next signatory is Stephen R. Wainwright as an individual indemnitor.  (*See id.*)  His signature was witnessed by Bo Evans.  (*See id.*)  The third signature belongs to Sheryl B. Wainwright, who signed as an individual indemnitor.  (*See* Doc. 96-6.)  Her signature was witnessed by Steve Wainwright.  (*See id.*)  The final two signatures are William J. Wainwright ("Jeff Wainwright") and Tracye Wainwright as individual indemnitors.  (*See id.* at 6-7.)  Both of their signatures were also witnessed by Steve Wainwright.  (*See id.*)  Following these signatures pages, are notary pages where Ms. Poole notarized each of the indemnitors' signatures to the GAI as being authentic.  (*See id*.)

5.      Ms. Poole was hired by FCB as a financial service representative in 2006. (Doc. 96-14, Poole Depo., p. 7.)  Her supervisor at that time was Tracy Alexander, City President for the Prattville branch of FCB.  (*Id.* at 12-13.)  Ms. Poole obtained her notary license at the direction of FCB.  (*Id.* at 12-14, 16.)  FCB paid all fees associated with her notary license and further obtained and paid all premiums on a notary bond on her behalf from RLI Insurance Co.  (*See id.* at 13-14, 17-18.)  Ms. Poole notarized documents in the ordinary course of business of FCB and as part of her employment with FCB.  (Doc. 96-15, Alexander Depo., pp. 24-25.)

6.      At the time the GAI was notarized, the policy of FCB in Prattville was that a document with a signature could be notarized at the direction of a bank officer who had already witnessed its execution.  (Doc. 96-14, Poole Depo., pp. 20-21; Doc. 96-15,

4

{B1265266}

Alexander Depo., pp. 23-24.)  Ms. Poole had notarized documents before, at the direction of Mr. Alexander, without witnessing the Wainwrights' executing them.  (Doc. 96-14, Poole Depo., pp. 30-32.)

7.     Most of the surety bonds were issued after May 30, 2007.  (*See* e.g., Wiregrass Compl. & Payment Bond, attached hereto as Exhibit C.)  Subsequent to the issuance and release of all of the performance and payment bonds on behalf of WDWS, various parties asserted claims on many of these bonds.  *See id.*

8.     In May of 2009, two years after the execution of the GAI, GCNA first learned that Jeff and Tracye Wainwright disputed that they signed the GAI or authorized anyone to sign it on their behalf.  (Letters of June 30, 2009, attached hereto as Exhibit D.)

9.     After reviewing the signature cards for Jeff and Tracye Wainwright on file with the bank, Ms. Poole does not believe that their signatures on the GAI are authentic, because they do not match.  (Doc. 96-14, Poole Depo., pp. 39-40.)  Ms. Poole testified that she would not have notarized the GAI without being directed to do so by a bank officer.  (*Id.* at 41-42.)

10.    Steve testified that his multiple signatures on the GAI, as president of WDWS, as an individual indemnitor and as a witness to Sheryl Wainwright's, Tracye Wainwright's and Jeff Wainwright's signatures were authentic.  (Ex. A, S. Wainwright Depo., p. 53.)

5

## GCNA'S CONTENTIONS WITH FCB'S STATEMENT OF
## UNDISPUTED MATERIAL FACTS

The following averments set forth by FCB in its Statement of Undisputed Material Facts are in dispute.  GCNA generally disputes any legal conclusions set forth as "facts" in FCB's Statement of Undisputed Material Facts.

4.      Once a line of authority is established, a local underwriter may approve and issue bonds if its within the scope of what they have done in the past. (Doc. 96-2, pp. 20-21.)

5.      GCNA's business relationship with JSL is governed by an "Agreement for Surety Bond Producer/Agent/Broker," which is attached hereto as Exhibit E.  Per this agreement, GCNA disputes that JSL was a general agent of GCNA.

9.      A completed or fully executed GAI was not sent to GCNA on May 22, 2007. (*See* Doc. 96-7, Write Up, p. 00200; Doc. 96-9, Befort Depo., pp. 109-21.)

10.      Notarization is a requirement for issuance of any performance or payment bond. (*See* Dullard Aff. ¶ 4, attached hereto as Exhibit F.)

11.      GCNA disputes this paragraph to the extent it sets forth legal conclusions.

12.      GCNA disputes that Jeff Wainwright was the secretary of WDWS. (*See* Ex. A, Depo. of S. Wainwright, p. 26.)

14.      GCNA disputes that the term "released" means when the bonds are delivered to the owner.  (*See* Doc. 96-9, Depo. of Befort, pp. 97-99.)  Further disputed that bonds are always effective and binding on the surety once the bonds are signed and presented to the owner.  (*See id.* at 102-04.)

6

18.     Disputed that a line of authority cannot be established until a decision has been reached to release bonds.  (*See* Doc. 96-2, pp. 19-21; Doc. 96-9, pp. 35-36.)

19.     Disputed that Sentell Engineering, Inc. received the Payment and Performance Bonds on the Town of Gordo Project on or about May 24, 2007.  (*See* Doc. 96-13, Sentell Aff. and executed bonds attached thereto; Befort Aff. ¶ 6, attached hereto as Exhibit G.)

20.     Denise Poole admitted that she would not have notarized the GAI without direction from a bank officer.  (Doc. 96-14, Poole Depo., pp. 41-42.)

21.     Disputed that there is no evidence in the record that Poole was directed by Alexander or any other superior to notarize the indemnity agreement.  (*See id.*)

22.     Disputed that Bo Evans knew of a false notary acknowledgment at the time he witnessed Steve Wainwright's signature.  (Doc. 96-1, Evans Depo., pp. 64, 66-67.)

23.     Disputed that Bo Evans knew the notary acknowledgment was false.  (*See id.*)

## STANDARD OF REVIEW

Summary judgment is proper only where there is no genuine issue of material fact as to the claims asserted, and the movant is entitled to judgment as a matter of law.  *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997); Fed. R. Civ. P. 56(a).  Only when the moving party meets its initial burden—a showing that there is no "genuine issue as to any material fact"—does the burden then shift to the non-moving party.  *Id.*  "[T]he nonmoving party may avail itself of all facts and justifiable inferences in the record taken as a whole."  *Allen*, 121 F.3d at 646 (emphasis added).  Significantly, "[t]he evidence of

7

the non-movant is to be believed, and <u>all justifiable inferences are to be drawn in his favor</u>." *Id.* (emphasis added).

## ARGUMENT

### I.   GCNA PROPERLY PLED ITS CLAIM FOR FRAUD AGAINST FCB.

FCB has correctly recognized that GCNA's claim for breach of notary obligations is a claim for constructive fraud.  Under Rule 9(b) of the Federal Rules of Civil Procedure, a plaintiff must plead fraud with specificity.  The purpose of this rule is to put the defendant on notice of the "precise misconduct with which they are charged." *Durham v. Business Management Assocs.*, 847 F.2d 1505, 1511 (11th Cir. 1988).  A plaintiff may use alternative means to satisfy the rule.  *Id.* at 1512.  For example, in *Durham*, the plaintiffs submitted an affidavit along with their amended complaint, which the Eleventh Circuit held met the requirements of Rule 9(b).  *Id.*

FCB argues that GCNA failed to plead its claim with the requisite specificity when it incorrectly stated in paragraph no. 37 of the Complaint that Ms. Poole notarized the GAI on June 22, 2007, but the fraudulent notarization actually occurred on May 30, 2007.  (Doc. 96, pp. 18-22.)  FCB believes it is entitled to a dismissal of this claim, because it will otherwise "have to prepare for a moving or unknown target of a fraud claim."  (*Id.* at 20.)

Nothing could be further from the truth.  The only allegation of a fraudulent notarization in the Complaint concerns a GAI containing the signatures of Steve, Sheryl, Jeff and Tracye Wainwright.  A true and correct copy of the GAI, which clearly shows

{B1265266}

that Ms. Poole notarized it on May 30, 2007, was attached as an exhibit to the Complaint. (*See* Doc. 1.)  Therefore, to the extent that paragraph no. 37 is deficient, submission of the document that contains the purported misrepresentation and date of the misrepresentation, along with the Complaint, should constitute a permissible, alternative means for satisfying Rule 9(b) under *Durham*.

In addition, it is beyond dispute that FCB has at all times been aware of the specific fraud at issue in the Complaint.  As noted above, attached to the Complaint was the GAI with the correct date that it was notarized.  FCB immediately recognized the error in the Complaint, denied paragraph no. 37 in its Answer on this very ground, and affirmatively stated that "the signatures notarized by Denise Poole were notarized on May 30, 2007, not June 22, 2007 as alleged."  (Doc. 24, p. 4.)  Furthermore, prior to the filing of the Complaint, counsel for GCNA notified Ms. Poole that it was investigating the authenticity of the May 30, 2007 signatures to the GAI based upon Jeff and Tracye Wainwrights' denial that they signed it.  (*See* Letter of Aug. 18, 2009, attached hereto as Exhibit H.)  Finally, during depositions of Ms. Poole, Mr. Alexander, Steve Wainwright, Tracye Wainwright and Jeff Wainwright, the only fraudulent notarization discussed was the May 30, 2007 GAI.  (*See, e.g.,* Doc. 96-14, Poole Depo., p. 25.)  In fact, there is no evidence that Ms. Poole ever notarized any other document concerning GCNA.

Clearly, FCB has suffered no prejudice.[4]  It's claim that it has been unable to "prepare arguments addressing the elements of a fraud claim" or "establish a chronology

---

[4] FCB has never filed a Motion to Dismiss or a Motion for More Definite Statement concerning the date alleged in the Complaint.  Neither has FCB directed any discovery to GCNA regarding a June 22,

{B1265266}

of events in defense of the reliance claim" is nonsense and inconsistent with the remainder of its own brief.

Assuming arguendo that GCNA's claim does not meet the pleading requirement because of the incorrect date in paragraph no. 37, FCB's request for a judgment in its favor on this ground is extreme.  GCNA's claim against FCB would not be decided on the merits, despite all of the meaningful discovery that has taken place in this matter over the last ten months.  Instead, the Court should allow GCNA to amend the Complaint to correct the date of the alleged fraudulent notarization by the Defendants to reflect the same date that is shown on the GAI and that was submitted along with the Complaint. *See* Fed. R. Civ. P. 15(a)(2); Wright & Miller, 6 *Federal Practice & Procedure* § 1474 (3d ed. 2010).  "The Supreme Court of the United States has held that leave to amend should be given '[i]f the underlying facts or circumstances relied upon by the plaintiff may be a proper subject for relief.'"  *Short v. Mando Am. Corp.*, 2011 WL 486144 *1 (M.D. Ala. Feb. 7, 2011) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

## II.   FCB IS VICARIOUSLY LIABLE FOR THE FRAUDULENT NOTARIZATION OF THE GAI BY ITS EMPLOYEE, DENISE POOLE.

Again, FCB has correctly recognized that GCNA's claim against it is for fraud based upon Ms. Poole's improper notarization of signatures to the GAI.  There is substantial evidence in support of GCNA's claim.  FCB, however, argues that it cannot be held vicariously liable, as a matter of law, for the conduct of its employee, Ms. Poole, in executing her duties as a notary public.  FCB takes the position that, as a notary, there

---

2007 fraudulent notarization.  Instead, FCB has conveniently waited until the deadline for dispositive motions and near the close of discovery to raise this issue.

{B1265266}

is no principal/agent relationship between itself and Ms. Poole.  If Ms. Poole was not acting as the agent of FCB in improperly notarizing the GAI, then FCB argues it cannot be held vicariously liable for her actions.

A clear exception to this apparent rule, however, is when the employer participates in the notary's misconduct.  "We add that the private employer of a notary public might be liable for the notary's breach of duty if the employer participated in that breach, as for example if the employer should ask or encourage the notary to act without appropriate inquiry."  *Commercial Union Ins. Co. v. Burt Thomas-Aitken Constr. Co.*, 230 A.2d 498, 501 (1967).  Caselaw that has addressed the specific facts at issue in the present matter have found that a bank may be held vicariously liable for fraudulent notarization.  *See, e.g., Transamerica Ins. Co. v. Valley Nat'l Bank*, 462 P.2d 814 (Az. Ct. App. 1969).

The facts concerning the execution of the GAI are still unclear at this point as Jeff and Tracye Wainwright deny signing it, Steve Wainwright has refused under the Fifth Amendment to provide testimony regarding their signatures and Ms. Poole cannot remember who asked her to notarize the signatures.[5]  Yet, the totality of the evidence shows at the very least that Jeff and Tracye Wainwrights' signatures were not properly notarized by Ms. Poole.  Assuming the truthfulness of Jeff Wainwright's testimony, Alexander could not have witnessed their signatures and could not have represented to Poole that he did.  These unresolved factual issues are not appropriate for summary judgment.

---

[5] Discovery is ongoing.  GCNA is in the process of scheduling the depositions of Andrea Comstock, another employee of FCB who witnessed Steve Wainwright's signature to the GAI as president of WDWS, and Trey Cosby, who is the CEO of FCB.

11

The undisputed facts are that Ms. Poole was an employee of FCB at the time she notarized the GAI and that notarizing documents was a part of her employment. (Doc. 96-14, Poole Depo., p. 7; Doc. 96-15, Alexander Depo., pp. 24-25.)  It was at the direction of FCB that she obtained a notary license. (Doc. 96-14, Poole Depo., pp. 12-14, 16.)  FCB wanted at least two notaries in the Prattville branch. (*Id.* at 13.)  FCB paid all fees associated with her notary license and further paid RLI Insurance Co. for a notary bond on behalf of Ms. Poole. (*See id.* at 13-14, 17-18.)  More importantly, when Ms. Poole improperly notarized the signatures of Jeff and Tracy Alexander, she did so at the direction of FCB. (*Id.* at 41-42.)  It is beyond dispute that her notarization of the GAI was within the scope of her employment with FCB. (*Id.*; Doc. 96-15, Alexander Depo., pp. 24-25.)

In addition to these facts, the evidence shows, especially in light of the rule that "all justifiable inferences are to be drawn in [the non-moving party's] favor," that Jeff and Tracye Wainwrights' signatures on the GAI may have been forged. Both Jeff and Tracye Wainwright deny that they signed the GAI or gave anyone authority to sign it on their behalf. (*See* Docs. 10 and 13, Answers.)  Although Steve Wainwright confirmed that his signature on the GAI is authentic, he refused to answer any questions regarding the signatures of his brother and sister-in-law under the Fifth Amendment, including whether he forged their names. (*See* Ex. A, S. Wainwright Depo., pp. 49-53.)  Jeff Wainwright testified that he believed his brother forged his name on the GAI without his permission, because Steve knew that Jeff would not have signed it. (Doc. 96-10, J.

{B1265266}

Wainwright Depo., pp. 8-9.)  In fact, Jeff disagreed with Steve's initial idea to pursue public works contracts, which required the obtaining of bonds.  (*Id.* at 13-15.)

In *First Bank of Childersburg v. Florey*, one of the claims on appeal, unlike the cases relied upon by FCB, was a claim for fraudulent notarization—the same claim at issue in the present matter.  676 So. 2d 324 (Ala. Civ. App. 1996).  The factual allegations were that a signature to a document at issue had been forged and subsequently notarized by a bank employee.  *Id.* at 326.  The trial court submitted this claim to the jury which returned a verdict against the bank defendant in the amount of $35,000.  *Id.* at 325.  On appeal, the appellate court affirmed the judgment finding that it was not error to submit the claim of fraudulent notarization to the jury.  *Id.* at 333.  Specifically, the court found that "[t]he jury's affirmative answer to the special interrogatory demonstrates that it found [the notary] (and, therefore, the bank) liable on the fraudulent notarization, or constructive fraud, claim."  *Id.*  (emphasis added).  In other words, under Alabama law a bank can be found liable for fraudulent notarization performed by its employee.

Likewise, in *Transamerica Ins. Co.*, the plaintiff brought an action in Arizona state court against a notary and her employer, Valley National Bank of Arizona, concerning the forgery of certain documents.  462 P.2d at 814-15.  The trial court granted summary judgment in favor of the bank, but the appellate court reversed.  *Id.* at 814, 819.  At issue on appeal was whether the bank could be vicariously liable for the action of its employee/notary—the same issue set forth in FCB's Motion for Summary Judgment.  *Id.* at 814.

13

The law of agency governed the court's ruling. *Id.* at 818. The applicable test was "[w]hether the employee was acting within the scope of her employment at the time the alleged negligent act took place." *Id.* The court further explained "[t]he conduct of a servant or agent is within the scope of his employment if '(a) it is of the kind he is employed to perform; (b) it occurs substantially within the authorized time and space limits; and (c) it is actuated, at least in part, by a purpose to serve the master.'" *Id.* (quoting the Restatement, 2d, Agency § 228 (1958)). Similarly, "[u]nder Alabama law, the acts of employees are deemed to be within the scope of their employment if the acts are 'so closely connected with what the servant is employed to do and so fairly and reasonably incidental to it, that they may be regarded as methods, even though quite improper ones, of carrying out the objectives of the employment.'" *Shrader v. Employers Mut. Cas. Co.*, 907 So. 2d 1026 (Ala. 2005) (quoting *Ex parte Atmore Cmty. Hosp.*, 719 So. 2d 1190, 1194 (Ala.1998)).

Regarding the *Transamerica Ins. Co.* court's analysis of the first element, the court found as follows:

> … it appears that the [bank] supplied all the necessary paraphernalia for Mrs. Sullivan to act as a notary public; that she held this office at the request of her employer; and that she had in the past, with the knowledge of her employer, notarized non-bank transactions. In our opinion there are sufficient facts here over which reasonable men might differ as to whether the notarization of a document in a non-bank transaction was within the type of duties expected of Mrs. Sullivan.

{B1265266}

462 P.2d at 818.   As to the second element, there was no dispute that the notary performed the authentication of the signature during her hours at the bank.  Likewise, the court found in favor of the plaintiff concerning the third element:

> … we cannot say, as a matter of law, taking into consideration that the present day banking business is of a competitive nature and the availability of a notary public for bank customers could be an effort on the bank's part to improve customer relations, that the act of Mrs. Sullivan in notarizing the document in question would not be in furtherance of a purpose to serve the bank. This is especially true when the bank encouraged Mrs. Sullivan to so act.

*Id.*  The court summarized its reversal of summary judgment in favor of the bank as follows:

> In the case before us here, it is undisputed that Mrs. Sullivan was requested by her employer to notarize documents dealing with bank business without the necessity of actually witnessing the signatures involved. While it is disputed as to whether the bank asked or encouraged Mrs. Sullivan to act 'without appropriate inquiry' in connection with non-bank business, there is sufficient evidence in this regard to raise a material fact issue …

*Id.* at 819.

*Transamerica Ins. Co.* is entirely on point.   In the present action, Ms. Poole testified that the bank routinely asked her to notarize signatures on documents without witnessing the individual sign it.  (Doc. 96-14, Poole Depo., pp. 20-21, 30-32.)  Likewise, Tracy Alexander, the City President of FCB in Prattville, testified that at the time this agreement was executed the policy of FCB in Prattville permitted the notarizing of

{B1265266}

signatures at the direction of a bank officer who had already witnessed their execution.[6] (Doc. 96-15, Alexander Depo., pp. 23-24.)   Ms. Poole further testified that she had notarized documents before, at the direction of Mr. Alexander, without witnessing the Wainwrights' executing them and that she does not believe that the signatures of Jeff and Tracye Wainwright on the GAI are authentic, because they do not match their signature cards on file with the bank.  (Doc. 96-14, Poole Depo., pp. 30-32, 39-40.)   Although Mr. Alexander did not remember how the GAI was executed on May 30, 2007—that is, whether Ms. Poole actually witnessed Jeff and Tracye Wainwright sign the agreement— Ms. Poole testified that she would not have notarized the GAI without being directed to do so by a bank officer.  (*Id.* at 41-42.)   Under *Transamerica Ins. Co.*, the only case before the court that is entirely on point, summary judgment is not proper.

FCB relies primarily on two cases in support of its argument that there can be no vicarious liability from the actions of a notary:  *Constantine v. U. S. Fidelity & Guaranty Co.*, 545 So. 2d 750 (Ala. 1989); *Higgins v. Pacesetter Corp.*, 694 So. 2d 1265 (Ala. Civ. App. 1996).   Neither of these cases address the specific issues or set of facts as in the present matter.  In *Constantine*, for example, there was no allegation of forgery.  In fact, the plaintiff in *Constantine* never disputed that she signed the mortgage document.  She merely argued that the mortgage was void, because the notary authenticated her signature outside of her presence and after the fact.  This is entirely different from the present set of

---

[6] Interestingly, this was not the policy at any other FCB location and has subsequently been discontinued at the Prattville location.  (Resp. to Interrog. No. 6; attached hereto as Exhibit I; Doc. 96-14, Poole Depo., pp. 43-44.)

facts, in which there is evidence that someone may have forged the signatures of Jeff and Tracye Wainwright on the GAI.

Also distinguishing *Constantine* is that the issue addressed by the appellate court was whether the defense of estoppel applied. In reaching its holding, the Court provided no analysis in its finding of a lack of a principal/agent relationship between the bank and the notary in order to affirm the directed verdict for the defendants. *See* 545 So. 2d at 755. Taken in conjunction with *Florey*, the holding in *Constantine* should be limited to its set of facts and should not be extended to a case in which a forged signature was notarized by an employee of a bank, which had a financial interest in the document being notarized. *See id.* at 756, Hornsby, C.J., *dissenting* (where he appears to limit the majority opinion's holding regarding the lack of a principal/agent relationship "in this context").[7]

*Higgins* is also distinguishable on the ground that there was no allegation or evidence that anyone's signature had been forged or was not authentic. *See* 694 So. 2d 1265. Moreover, the issue in *Higgins* was whether the plaintiff, the notary public, could maintain a malicious prosecution action against the mortgagee. *Id.* at 1266. In a previous action, the mortgagee had brought a claim for wrongful acknowledgment of a mortgage against the notary. *Id.* The action was dismissed after the mortgagee failed to appear at trial. *Id.* In the malicious prosecution action, the trial court granted summary judgment

---

[7] FCB also cites Justice Hornsby's dissent in an attempt to buttress its argument that any action against a bank for the conduct of its employee performing notary duties should fail. (*See* Doc. 96, p. 25.) Clearly, this is not what Justice Hornsby wrote. In fact, this portion of his dissent can very easily be read as a criticism of the majority for finding that no agent/principal relationship existed.

in favor of the mortgagee. *Id.* On appeal, the plaintiff argued that whether the mortgagee had probable cause to sue him was a question for the jury. *Id.* This was the question answered by the Alabama Court of Civil Appeals when it merely cited the Supreme Court of Alabama's finding in *Constantine* that there was a lack of a principal/agent relationship between that particular bank and notary. *Higgins*, 694 So. 2d at 1267. The *Higgins* court then concluded that the mortgagee did have probable cause to file its earlier action. *Id.* Nowhere does *Higgins* address whether a fraudulent notarization claim can proceed against a bank. *See id.* Further distinguishing *Higgins* from the present facts is that it is unclear if the notary in *Higgins* was even an employee of the mortgagee. *See id.*

FCB also relies on a case from the Supreme Court of New Jersey, *Commercial Union Insurance Co. of New York*, 230 A.2d 498. GCNA agrees that this case is very similar factually to the present matter. Yet, there is one key distinguishing factor. In *Commercial Union Insurance Co.*, the bank did not direct the notary to notarize documents without properly authenticating the signatures.[8] *See id.* In fact, the Supreme Court of New Jersey agreed that if the bank had participated in the notary's breach of her obligations by "ask[ing] or encourag[ing] the notary to act without appropriate inquiry," then the bank might also be liable. *Id.* at 501; *see also Villanueva v. Brown*, 103 F.3d 1128 (3d Cir. 1997). Clearly, there is evidence that FCB participated in the fraudulent conduct at issue in the present matter as Ms. Poole testified that she only would have

---

[8] Unlike the present case, the defendant bank also "denied the notary acted as its employee." *Id.* at 499.

{B1265266}

notarized the GAI at the direction of a bank officer.  (Doc. 96-14, Poole Depo. pp. 41-42.)  Consequently, FCB is not entitled to summary judgment.

Interestingly, FCB attempts to argue that *Florey* is not good law, even though it has not been overturned or distinguished in any manner, on the ground that it was decided months before *Higgins* and decided by the same judge who decided *Higgins*.[9]  Obviously, *Florey* is not inconsistent with *Higgins*, and it would be improper to grant more weight or authority to *Higgins* merely on the basis of when it was decided or by whom.  The cases address separate and distinct issues.  As discussed above, *Florey*, not *Higgins*, more closely addresses the issues and facts facing the Court in FCB's Motion for Summary Judgment, and, therefore, provides the correct rule of law.

### III.    THE EVIDENCE SHOWS THAT FCB FRAUDULENTLY INDUCED GCNA TO ISSUE VARIOUS BONDS ON BEHALF OF WDWS ON THE BASIS OF THE FRAUDULENTLY NOTARIZED INDEMNITY AGREEMENT.

#### A.    GCNA Actually and Reasonably Relied on the GAI in Issuing the Bonds.

FCB attempts to show a lack of reliance on the GAI by focusing on the routine, preliminary steps taken by GCNA and its independent broker in preparation for issuing and releasing certain bonds to WDWS.  The underwriting procedure often proceeds simultaneously with other procedures necessary for the issuance and release of bonds as construction contracts between the owner and principal are frequently being finalized at the same time.  (*See, e.g.*, Ex. G, Befort Aff. ¶ 6.)  Also, multiple bonds are often issued over a period of time.

---

[9] FCB fails to acknowledge that *Florey* was also decided <u>after</u> *Constantine*.

{B1265266}

It is important to distinguish between "issuance" of a bond and "release" of a bond. A bond is not binding on the parties until it has been released. (*See* Doc. 96-9, Befort Depo., pp. 97-98.) Therefore, the fact that some bonds were "issued" or possibly delivered shortly before the GAI was notarized does not show a lack of reliance, especially since the GAI applies to previously issued bonds. (*See* Doc. 96-6, GAI.) Neither are any of the decisions of the underwriters made prior to May 30, 2007, to approve a line of authority relevant to this inquiry.

The undisputed fact is that no bonds written on behalf of WDWS were released until after the GAI was executed by all of the indemnitors. (*See* Doc. 96-9, Befort Depo., pp. 97-104; Ex. G, Befort Aff. ¶ 6.) It is important to understand that although a bond may be given a date prior to May 30, 2007, that is not evidence that it was issued, delivered or released prior to that date, because bonds are often backdated to correspond with the date of execution of the underlying construction contract. (Ex. G, Befort Aff. ¶ 6.) It is also significant to note that there been no loss on any "issued" bond until well after the GAI was executed. More importantly, Stephen Dullard, Vice President of Surety National Underwriting Standards with GCNA, Richard Miller, the Home Office Underwriter with GCNA, and Jim Befort, Regional Surety Manager of GCNA, have all testified that GCNA would not have released any bonds without a GAI executed by Steve, Sheryl, Jeff and Tracye Wainwright and without their signatures being properly authenticated by a notary public. (*See* Ex. F, ¶ 4; Ex. G, ¶¶ 5,7, and 9**;** Miller Aff., ¶ 3, attached hereto as Exhibit J.) If they had known any of the signatures were disputed as authentic, they would have discontinued the bonds and terminated the bond line. (*See*

20

{B1265266}

*id.*)  Therefore, the evidence is that GCNA actually relied upon as well as reasonably relied upon Ms. Poole's notarization of the GAI that took place on May 30, 2007.

      1.     <u>Knowledge of the improper notarization was not imputed to GCNA.</u>

      GCNA never had knowledge of any irregularities with the execution of the GAI until May of 2009.  (Ex. D, Letters of June 30, 2009.)  FCB argues that Bo Evans, an employee of J. Smith Lanier, knew that Ms. Poole's notarization of the GAI was fraudulent at the time it was made and that his knowledge is imputed to GCNA.  (*See* Doc. 96, pp. 34-36.)  This is incorrect for several reasons.  First, J. Smith Lanier is not a general agent of GCNA but an independent contractor.   (*See* Ex. E, Agmt.)   The relationship between J. Smith Lanier and GCNA is governed by an "Agreement for Surety Bond Producer/Agent/Broker."  (*See id.*)  Pursuant to this agreement, J. Smith Lanier is, at most, a soliciting agent for GCNA.  (*Id.* at 1-2.)  The agreement expressly disclaims anything more:  "[n]othing contained in this agreement shall be construed to create the relationship of the employer and employee between [GCNA] and [J. Smith Lanier] or any of its employees."[10]  (*Id.* at 3.)  Notice to a soliciting agent is generally not imputed to its principal.  44A Am. Jur. 2d *Insurance* § 1567 (2d ed. 2010); *see Inter-Ocean Ins. Co. v. Richardson*, 35 Ala. App. 462, 464, 48 So. 2d 60, 62 (1950).

      Moreover, FCB's allegation that Mr. Evans had knowledge of the fraud precludes the imputation of the same to GCNA.  A soliciting agent's knowledge of fraud cannot be imputed to its principal.  *Crumpton v. New York Life Ins. Co.*, 27 Ala. App. 137, 166 So.

---

      [10] Noticeably absent from this agreement is any duty placed upon J. Smith Lanier to witness or authenticate signatures of individual indemnitors.  (*See id.*)

21

730 (1936); *Alexander Eccles & Co. v. Louisville & N.R. Co.*, 198 F. 898 (N.D. Ala. 1912).   As such, any knowledge J. Smith Lanier may have had that the GAI was improperly notarized cannot be imputed to GCNA.[11]

FCB's argument is incorrect on another ground—Mr. Evans did not have knowledge that the GAI had been improperly notarized when he witnessed Steve Wainwright's signature.   Mr. Evans testified that he could not remember whether Ms. Poole had already notarized Steve Wainwright's signature, which appears on separate pages at the end of the GAI, when he witnessed Steve Wainwright's signature on page six of the GAI.  (Doc. 96-1, Evans Depo., p. 64.)  Furthermore, it did not occur to Mr. Evans at the time he witnessed Steve Wainwright's signature that there was anything improper about the authentication of Steve Wainwright's signature.  (*Id.* at 66-67.)  Because of his lack of knowledge of any fraud, there is nothing to impute to GCNA.

FCB appears to argue that Mr. Evans *should* have known about the fraudulent notarization.  (*See* Doc. 96, p. 35.)  In other words, Mr. Evans and J. Smith Lanier should be charged with constructive notice of the fraud.  FCB has offered no legal authority in support of this position.  Even if it did, it would be futile.  The law of imputing notice from an agent to a principal, which does so by applying constructive notice to the principal, requires actual knowledge on the part of the agent.  *See, e.g., Sullivan v. Ala.*

---

[11] In all of the cases relied upon by FCB, the agent appears to have been a general agent unlike in the present matter.  *See, e.g., Aetna Ins. Co. v. Kennedy*, 50 So. 73, 161 Ala. 600 (1909).  Moreover, none of the cited cases address whether knowledge of an improperly notarized document may be imputed to the insurer.  Instead, the cases merely support general concepts of notice under principal/agency law that are not applicable to these facts.

{B1265266}

*Power Co.*, 246 Ala. 262, 270, 20 So. 2d 224, 230 (1945).  For these reasons, GCNA did not have notice of any irregularities with the GAI until May of 2009.

Finally, FCB's argument for imputing Mr. Evan's knowledge to GCNA is entirely irrelevant as it only relates to Steve Wainwright's signature, the authenticity of which is not in dispute.  Mr. Evan's signature only appears on page six of the GAI and only next to the signature of Steve Wainwright as witness.  (Doc. 96-6, GAI, p. 6.)  Mr. Evans did not witness the signatures of Jeff and Tracye Wainwright or any other indemnitor.  (Doc. 96-1, Evans Depo. pp. 36-37, 40.)   In fact, all of the indemnitors' and witnesses' signatures on page six, except for Mr. Evans and Mr. Wainwright as an individual indemnitor, were on the GAI prior to it being given to Mr. Evans to sign.  (*Id.* at 36-37.)  As such, the only potential issue Mr. Evans could have discovered was that Steve Wainwright did not sign his name as an individual indemnitor in the presence of a notary public.

Yet, the only signatures at issue in GCNA's claim against FCB are the authenticity of Jeff and Tracye Wainwrights' signatures.  (*See* Doc. 1, ¶¶ 36-41.)   Both of their signatures were already affixed to the GAI when given to Mr. Evans, as well as the signature of Steve Wainwright as witness thereto and possibly the signature of Ms. Poole as notary.   Therefore, Mr. Evans' signing of the GAI is entirely unrelated to any argument that GCNA had constructive notice of the fraudulent notarization at the time it took place.

**B.    The Fraudulent Notarization of Signatures to the GAI is a Proximate Cause of GCNA's Damages.**

FCB further attacks GCNA's claim by arguing that the proximate cause of GCNA's injury was its alleged failure to follow its own underwriting guidelines.  (Doc. 96, pp. 38-40.)  First, the underwriting guidelines are intended as a reference and guide to surety and other insurance professional underwriters and are not rigid requirements, according to Stephen Dullard who authored the guidelines.  (Ex. F, Dullard Aff. ¶¶ 1, 2.)  In fact, it is not always possible to follow each and every guideline.  (Ex. G, Befort Aff. ¶ 8.)  For example, the suggestion that a GAI be executed in triplicate is not a standard practice as it often creates confusion.  (*Id.*)  Regardless, the indemnitor typically keeps a copy of the GAI once he/she executes it. (Ex. F, Dullard Aff. ¶ 3.)  Likewise, GCNA was not obligated to have the Secretary of WDWS witness Steve Wainwright's signature as president of WDWS.

More importantly, there is no evidence to support FCB's claim that the apparent forgery could have been avoided had Jeff Wainwright merely been required to witness Steve Wainwright's signature as the Secretary of WDWS.  This is sheer speculation.  First, Steve could have simply forged Jeff's signature as the corporate officer/witness as Jeff alleges someone did regarding his signature as an individual indemnitor.  Alternatively, Steve could have represented to his brother that GCNA only required WDWS to be an indemnitor.  After obtaining his brother's actual signature as a witness, he could have forged his brother's signature as an individual indemnitor without his knowledge.  In fact, there are multiple scenarios in which Jeff and Tracye Wainwrights'

24

signatures could have been forged to the GAI as individual indemnitors even with Jeff actually signing it as a corporate officer.

Furthermore, the GAI did contain what was purportedly the signature of the Secretary of WDWS. That his signature appears as an individual indemnitor as opposed to a witness reduces FCB's argument to nothing more than a mere technicality. In fact, that his signature is now contested as authentic is conclusive evidence that any alleged failure to follow underwriting guidelines was not the proximate cause of GCNA's damages.

The evidence is that GCNA relied on the notarization of Jeff and Tracye Wainwrights' signatures for issuance and release of all bonds on behalf of WDWS. (Ex. G, Befort Aff. ¶¶ 5,7; Ex. J, Miller Aff. ¶¶ 2-3.) Richard Miller, a Home Office Underwriter with GCNA, would not have approved the issuance of any bond on behalf of WDWS and would have immediately discontinued any bonds already issued if he had known about the improper notarization of their signatures. (Ex. J, Miller Aff. ¶¶ 1, 3.) Likewise, James Befort, the Regional Surety Manager with GCNA, would not have recommended the issuance of any bonds on behalf of WDWS if he had known of any issues with the authenticity of any signatures to the GAI. (Ex. G, Befort Aff. ¶¶ 1, 7.) Furthermore, Mr. Befort's recommendation to issue bonds on behalf of WDWS was subject to the execution of a GAI by the corporation, both of its shareholders (i.e., Steve and Jeff Wainwright) and each of their spouses (i.e., Sheryl and Tracye Wainwright). (*Id.* ¶ 5.) Therefore, it was the fraudulent notarization of Jeff and Tracye Wainwrights'

{B1265266}

signatures that is the proximate cause of GCNA's damages as GCNA would not have issued any bonds on behalf of WDWS without their signatures.

### C.     FCB is Liable to GCNA for Damages.

FCB argues that GCNA's claim against it is contingent on whether GCNA is able to first recover from Jeff or Tracye Wainwright.  (Doc. 96, p. 40.)  This is incorrect. GCNA's claim against FCB concerns the fraudulent notarization of the GAI.  Whether the Court rules that Jeff or Tracy Wainwright are ultimately bound by the terms of the GAI is a separate and distinct issue from FCB's liability for directing Ms. Poole to notarize signatures she did not witness.

FCB also alleges that GCNA has no damages.  GCNA, however, has recently settled various claims on bonds issued on behalf of WDWS.  Attached hereto as Exhibit K, is a true and correct copy of the most recent summary of claims paid by GCNA on said bonds, which now totals more than $500,000.  GCNA fully expects the amount of these damages will grow.

### IV.    GCNA'S COMPLAINT WAS FILED WITHIN THE STATUTE OF LIMITATIONS FOR A CLAIM OF FRAUD.

Regarding FCB's final defense, the statute of limitations on GCNA's fraud claim did not begin to run until May of 2009.  The evidence in the record shows that GCNA did not have notice that the signatures of Jeff and Tracye Wainwright to the GAI were disputed as authentic until May of 2009.  (*See* Exhibit D, Letters of June 30, 2009.) Since the Complaint was filed on October 30, 2009, it was clearly filed prior to the end of the two-year statute of limitation on a claim for fraud.  (*See* Doc. 1.)

{B1265266}

Regarding FCB's argument that GCNA had constructive notice of the fraud on May 30, 2007, through its agent, GCNA has already addressed this argument in Section III of this brief showing why GCNA did not have notice of any irregularities with the signatures of either Jeff or Tracye Wainwright until May of 2009.  (*See supra.*)

Moreover, FCB's argument raises a question of fact for a jury to decide.  "The question of when a party discovered or should have discovered fraud so as to begin the running of the statutory period of limitations is generally for the jury."  *First Bank of Childersburg v. Florey*, 676 So. 2d 324, 327 (Ala. Civ. App. 1996) (quoting *Allen Group Leasing Corp. v. McGugin*, 537 So. 2d 22, 23 (Ala. 1988); *Vandergrift v. Lagrone*, 477 So. 2d 292, 295 (Ala. 1985)); *see also Foremost Ins. Co. v. Parham*, 693 So. 2d 409, 421 (Ala. 1997) (stating that this issue is only to be decided as a matter of law "where the undisputed evidence indicates that the party or parties claiming fraud in a particular transaction were fully capable of reading and understanding their documents, but nonetheless made a deliberate decision to ignore written contract terms").  As such, FCB's argument under the present set of facts is not proper for a motion for summary judgment.

## CONCLUSION

While the record in this case is incomplete, it is clear beyond question that FCB's Denise Poole was instructed by her employer to falsely represent that she had personally witnessed the signatures of all of the WDWS indemnitors, and that GCNA was thereby induced to act as surety. As a result, FCB received a financial benefit, and GCNA has incurred losses in excess of $500,000. There is substantial evidence that supports all

27

elements of GCNA's fraud claims against FCB.  Further, FCB's arguments based upon the alleged (but disputed) knowledge of the independent agent, and upon alleged non-compliance with GCNA's underwriting guidelines are riddled with factual disputes and speculation.  Accordingly, GCNA respectfully submits that the Motions of FCB and Poole should be denied

 

                                  s/ G. Matthew Keenan
                                  L. Graves Stiff, III
Bar No. ASB-0693-S70L
G. Matthew Keenan
Bar No.  ASB-4664-G63K
Attorneys for The Guarantee Company of North America USA
Starnes Davis Florie LLP
Seventh Floor, 100 Brookwood Place
Post Office Box 598512
Birmingham, Alabama 35259-8512
Telephone:  (205) 868-6000
Fax:  (205) 868-6099
E-Mail:  gstiff@starneslaw.com
             mkeenan@starneslaw.com

## CERTIFICATE OF SERVICE

I do hereby certify that on March 9, 2011, I electronically filed the foregoing with the Clerk of the Court using the Alafile system which will send electronic notification of such filing to the following:

Freeman Elam, Esq.
969 E. Main Street
Prattville, AL 36068

{B1265266}

Robert B. Reneau, Esq.
RENEAU & THORNTON
PO Box 160
Wetumpka, AL 36092

Barry A. Brock, Esq.
Vernon W. Wells, Esq.
JONES, WALKER, WAECHTER, POITEVENT,
 CARRERE & DENEGRE, LP
1819 5th Avenue North, Suite 1100
Birmingham, Alabama  35203

Nancy Kirby, Esq.
141 West Main Street, Suite A
Prattville, Alabama 36067

Joseph Saloom, Esq.
ROUNTREE & ASSOCIATES
448 Saint Lukes Dr
Montgomery, AL 36117-7104

Ahrian Davis Tyler, Esq.
Chirayu Madhu Shah, Esq.
CHRISTIAN & SMALL LLP
505 20th Street North, Suite 1800
Birmingham, Alabama  35203
adtyler@csattorney.com

s/ G. Matthew Keenan
Of Counsel

{B1265266}