IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| GUARANTEE COMPANY OF NORTH AMERICA USA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 2:09-cv-1003-MEF |
| | ) | |
| SHERYL B. WAINWRIGHT, *et al.*, | ) | (WO- DO NOT PUBLISH) |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

On October 30, 2009, Guarantee Company of North America USA ("Guarantee")
filed this action against several defendants in relation to performance bonds Guarantee
issued. (Doc. # 1). Three motions for summary judgment are pending before the Court,
and this memorandum opinion and order addresses the arguments made in each. For the
reasons set out below, all pending motions for summary judgment (Docs. # 66, 95, and
97) are due to be DENIED.

## I. JURISDICTION AND VENUE

The Court has jurisdiction in this case pursuant to 28 U.S.C. § 1332, as there is
complete diversity of citizenship between the plaintiff Guarantee and all defendants,[1] and

---

[1] Guarantee is incorporated under the laws of Michigan, with its principal place of
business in Michigan. (Doc. # 1). All individual defendants are citizens of Alabama. *Id.*
Defendant First Community Bank ("First Community") is incorporated under the laws of
Alabama, with its principal place of business in Alabama. *Id.* Defendant RLI Insurance
Company ("RLI") is incorporated under the laws of Illinois, with its principal place of
business in Illinois. *Id.*

the amount in controversy exceeds $75,000.  The parties do not assert that this Court

lacks personal jurisdiction over them, and there is no dispute that venue is proper

pursuant to 28 U.S.C. § 1391(a).

## II. LEGAL STANDARD

Summary judgment pursuant to Federal Rule of Civil Procedure 56(a)  is

appropriate "if the movant shows that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law."  A party may demonstrate the

existence of or absence of a genuine dispute as to any material fact by pointing to

materials in the record "including depositions, documents, electronically stored

information, affidavits, or declarations, stipulations . . . admissions, interrogatory

answers, or other materials."  Fed. R. Civ. P. 56(c).  The movant "always bears the initial

responsibility of informing the district court of the basis for its motion," and identifying

those evidentiary submissions "which it believes demonstrate the absence of a genuine

issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant

can meet this burden by presenting evidence showing there is no dispute of material fact,

or by showing the non-moving party has failed to present evidence in support of some

element of its case on which it bears the ultimate burden of proof.  *Id.* at 322-23.

Once the moving party has met its burden, Rule 56 "requires the nonmoving party

to go beyond the pleadings" and by its own evidentiary submissions or those on file,

demonstrate that there is a genuine factual dispute for trial.  *Id.* at 324.  The Court must

draw all justifiable inferences from the evidence in the non-moving party's favor.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  After the nonmoving party

has responded to the motion for summary judgment, the court must grant summary

judgment if there is no genuine dispute of material fact and the moving party is entitled to

judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).

### III.  FACTUAL AND PROCEDURAL HISTORY

Beginning in 1995 and until some time in 2008, brothers Stephen and Jeff

Wainwright[2] co-owned and operated W.D. Wainwright & Sons, Inc., ("WDWS") an

excavation company.  (Doc. # 70 Ex. 1).  Steve served as president, and Jeff served as

secretary.  (*Id.* at 9; Doc. # 96 Ex. 10 at 23–24).  Until 2008, Steve's wife Sheryl and

Jeff's wife Tracye both worked in the WDWS office.  (Doc. # 70 Ex. 1 at 36).  In 2006,

WDWS lost its largest contract and Steve and Jeff decided to expand the business into

public contracting.[3]  *Id.* at 20–21. In order to submit bids for public contracting work,

WDWS needed to obtain performance bonds.  *Id.* at 23.  In order to obtain the necessary

performance bonds, WDWS established a business relationship with Bo Evans ("Evans"),

a Senior Account Executive at J. Smith Lanier insurance agency.  (Doc. # 70 Ex. 1 at

---

[2]  Because several individuals involved in this case, including three of the
defendants, share the surname Wainwright, the Court will refer to each member of the
Wainwright family by his or her first name.  Additionally, Stephen Wainwright will be
referred to as Steve and William J. Wainwright will be referred to as Jeff.

[3]  Jeff claims that he did not support the decision to enter public contracting, but
could no longer "control" his brother, who Jeff claims was making important business
decisions without his knowledge.  (Doc. # 96 Ex. 10 at 23).

21–24).  J. Smith Lanier, through Evans and Bond Manager Jeff Cutshall, ("Cutshall"),

collected financial information about WDWS and sent it to Jim Befort ("Befort"),

Guarantees's local underwriter.  (Doc. # 97 Ex. 2 at 21).   J. Smith Lanier, as Guarantee's

agent, was authorized to issue bonds for Guarantee once the local underwriting process

was complete.  (Doc. # 96 Ex. 5).

Before Guarantee would agree to issue performance bonds for WDWS, Guarantee

requested that WDWS and Steve, Jeff, Sheryl, and Tracye (collectively "the

Wainwrights") execute a General Agreement of Indemnity ("Agreement") in which the

Wainwrights agreed to indemnify Guarantee in the event it sustained any loss relating to

the bonds.  (Doc. # 1 Ex. A).

The Agreement, dated May 30, 2007, bears signatures purportedly belonging to the

Wainwrights.  (Doc. # 96 Ex. 6 at 6).  Steve signed, in his capacity as president of the

company, for WDWS.  *Id.*  Andrea Comstock witnessed Steve's signature in his capacity

as WDWS president.[4]  *Id.*  The next signature on the Agreement is Steve's, in his capacity

as an individual indemnitor.  *Id.*  Evans witnessed Steve's signature.[5]  *Id.*  Signatures for

---

[4] Steve testified that Andrea Comstock is an employee at First Community's
Prattville, Alabama location.  (Doc. # 70 Ex. 1 at 52). Guarantee's underwriting guidelines
state that a signature of a corporate officer "should be attested to by a Corporate Secretary
or Assistant Secretary and sealed with the corporate seal."  (Doc. # 96 Ex. 8 at GCNA
00024).  Jeff, and not Andrea Comstock, was the WDWS secretary at the time the
Agreement was signed.  (Doc. # 96, Ex. 10 at 23–24).  A corporate seal does not appear
next to either Steve or Andrea Comstock's signature.

[5] Evans testified that he witnessed Steve's signature as individual indemnitor
during a meeting at the J. Smith Lanier office in Birmingham.  (Doc. #97 Ex. 2 at 43).

Sheryl, Jeff, and Tracye follow. *Id.* Steve signed as witness to each. *Id.* Denise Poole ("Poole"), a notary public employed at First Community, notarized each signature on the Agreement. *Id.* at 8. RLI, as surety, issued a $10,000 notary bond on behalf of Poole. (Doc. # 1at ¶ 43).

Jeff and Tracye contend that they neither signed the Agreement nor authorized someone else to sign it for them. (Doc. # 66). In fact, Jeff claims that he did not discover the Agreement existed until going through some of his father's paperwork in April 2009. (Doc. # 96 Ex. 10 at 27–28). Poole testified that she does not remember notarizing the document, but that if she did notarize it, she must have either witnessed the individuals sign or been instructed by her supervisor to notarize the document after it had been signed. (Doc. # 66 Ex. 2). Jeff suspects that Steve forged his and Tracye's signatures on the Agreement. (*See* Doc. # 1 at ¶ 14). At his deposition, Steve repeatedly invoked his Fifth Amendment rights when asked about the Agreement. (*See, e.g.*, *id.* at 49–52).

The Agreement is dated May 30, 2007. However, there is some evidence that Guarantee received the Agreement before that time. A memo Befort wrote to the Guarantee home office and dated May 22, 2007, says "we have the [Agreement]." (Doc. # 97 Ex. 3 at 109). Poole's notarization of the Agreement is dated May 30, 2007—a

---

Evans believes that at the time he signed the Agreement as a witness, the other individual indemnitors' signatures already appeared on the document. *Id.* at 48. Evans agrees that Poole was not present in his office when either he or Steve singed the Agreement, and therefore that Poole did not witness Steve sign the document in his capacity as an individual indemnitor. *Id.* at 66-68.

week after Befort claims to have already received it.  Befort testified, however, that the date on the memo may not accurately reflect the date the memo was sent to the Guarantee home office.  *Id.* at 85–86.  He testified that after dating a memo, he often returns to the document to make final edits and changes, without subsequently correcting the date information.  *Id.* at 84.  Additionally, he testified that while he may finish writing a document one day, he may not mail the document to the Guarantee home office for another week.  *Id.*  Befort also suggested that a grammatical mistake may be responsible, and that the memo should have read "we *will* have the [Agreement]." *Id.* at 111.

There is also some evidence that Guarantee issued bonds before receiving the Agreement, despite the testimony of several employees that a bond would never be issued before receipt of the Agreement.  For example, the date on the Agreement conflicts with the date that appears on bond paperwork.  The bond detail sheet for bond # 40008021, which was prepared by an employee at J. Smith Lanier, states that the effective date for the bond was May 16, 2007.  (Doc. # 96 Ex. 11).  This effective date is two weeks before Poole notarized the Agreement on May 30, 2007.  The same is true of the bond # 40008020, which has a bond detail sheet dated May 17, 2007.  (Doc. # 96 Ex. 12).  Cutshall testified in his deposition, however, that the date on the bond detail sheet does not reflect the date on which the bond was actually executed.  (Doc. # 96 at 2).  The bond detail sheet may reflect the date on which the bond paperwork was *prepared*.  *Id.*  But the bond itself is usually left blank so that the parties can all sign and date it concurrently.  *Id.*

6

Therefore, the date on the bond detail sheet may be much earlier than the date on which the bond was delivered and signed.  Cutshall also testified that J. Smith Lanier would not have updated the bond detail sheet after its creation to reflect the actual bond execution date.  *Id.*

During the summer of 2008, Jeff decided that he no longer wanted to be a part of WDWS, and transferred all of his shares to his brother Steve. (Doc. # 70 Ex. A at 44). From that point, Steve owned 100% of the shares in WDWS.  *Id.* at 47.  At some point after the Agreement was executed, WDWS encountered financial difficulties that prevented it from performing the bonded projects.  (Doc. # 1 at ¶ 12).  Accordingly, Guarantee financially assisted WDWS in completing the projects, incurring $135,039.16 in losses.[6]  *Id.*

Guarantee filed this lawsuit against WDWS, the Wainwrights, Poole, First Community, and RLI.[7]  (Doc. # 1).  Guarantee requests that the Wainwrights deposit $175,000 to secure Guarantee against any further losses incurred in relation to WDWS's performance bonds, and that the Wainwrights indemnify Guarantee for the losses already incurred in accordance with the Agreement.  *Id.*  Guarantee also requests a

---

[6] Guarantee claims at the time of this opinion that it has actually suffered close to $500,000 in losses related to WDWS bonds.  (Doc. # 110 Ex. K).

[7] The Complaint contained a request for preliminary injunction and temporary restraining order.  (Doc. # 1).  The request for a temporary restraining order was denied (Doc. # 3), but a preliminary injunction was entered against WDWS, Steve, and Sheryl. (Doc. # 18).

declaratory judgment as to any obligation Jeff and/or Tracye have to indemnify Guarantee. *Id.* The complaint also includes counts for breach of notary obligations against Poole and First Community, and breach of notary bond against RLI in the event that the signatures on the Agreement are found not to be Jeff and Tracye's. *Id.*

On January 20, 2011, Steve and WDWS filed suggestions of bankruptcy, indicating that both had filed Chapter 11 bankruptcy. (Doc. # 76–7). The Court dismissed Guarantee's claims against WDWS and Steve without prejudice on February 9, 2011. (Doc. # 92).

Jeff and Tracye filed a motion for summary judgment on October 19, 2010. They argue that because they did not sign the Agreement, they cannot be bound by it. First Community filed a motion for summary judgment on February 18, 2011. It argues that the claim of breach of notary duty should be dismissed against it on the basis of inadequate pleading, statute of limitations, Guarantee's failure to demonstrate evidence in support of its claim, and the absence of vicarious liability. Last, Poole filed a motion for summary judgment on February 18, 2010. All of the arguments Poole raises are also raised in First Community's motion, and Poole incorporates by reference all of the arguments raised by First Community.

# IV.  DISCUSSION

The arguments presented in each motion for summary judgment will be discussed separately below.

## A.  Jeff and Tracye's Motion:

Jeff and Tracye argue that they did not sign the Agreement, and therefore that the Alabama Statute of Frauds prevents Guarantee from holding them liable under the terms of the Agreement.  In support of their motion, Jeff and Tracye  submit Jeff's affidavit and an excerpt from Poole's deposition.  In his affidavit, Jeff states that he did not sign the Agreement and did not give anyone permission to sign on his behalf.  (Doc. # 66 Ex. 1). In her deposition, Poole testified that she did not remember notarizing the Agreement, but that if her signature appeared on the document, she either witnessed all of the parties sign the document or that a supervisor at the bank had requested that she notarize the document.  (Doc. # 66 Ex. 2 at 36).

Whether or not Jeff and Trayce signed the Agreement is a genuine dispute of material fact to be resolved at trial.  There is evidence that Jeff and Tracye did not sign the Agreement, including Jeff's deposition testimony and affidavit.  There is also evidence, however, that Jeff and Tracye did sign the Agreement, or at least had authorized Steve to sign it for them.  Poole testified that she did not remember notarizing the document, and therefore her *testimony* does not support either side's contentions. However, the fact that she did indeed notarize Jeff and Tracye's signatures is some

evidence that Jeff and Tracye's signatures are authentic.  Additionally, under Alabama law, a notary's signature creates a presumption that the document is authentic and correct. *See Cent. Bank of the S. v. Dinsmore*, 475 So. 2d 842, 845 (Ala. 1985) ("The certificate of a notary is presumptively correct, and the evidence necessary to impeach it must be clear and convincing.").  Steve refused to answer any questions at his deposition relating to signatures on the Agreement, except to say that every one of his signatures, including as a witness to Jeff and Tracye's signatures, was authentic.  Steve testified that he and Jeff often authorized either their wives or other WDWS employees to sign documents for them.  (Doc. # 70 Ex. 1 at 77–78).

Additionally, as Guarantee points out in its response to Jeff and Tracye 's Motion, it is possible that the Agreement is enforceable against Jeff and Tracye either because 1) they authorized someone, possibly Steve, to sign the Agreement for them or 2) their actions ratified the Agreement, and therefore the Agreement can be enforced against them regardless of whether or not it was signed.  Jeff and Tracye did not file a reply brief, and therefore have not responded to these arguments.

Because Jeff and Tracye have failed to establish the absence of a genuine dispute of material fact, their motion for summary judgment (Doc. # 66) is due to be DENIED.

**B.  First Community's Motion:**

Guarantee's Complaint brings a single claim against First Community for "Breach of Notary Duties."  Under Alabama law, a notary has a legal duty to use reasonable care

in the execution of her duties.  *See Butler v. Olsham*, 191 So. 2d 7, 16 (Ala. 1966) ("We are of the opinion that the duty of a notary requires that he not wilfully and intentionally certify that a person has acknowledged the execution of a conveyance when such person has not acknowledged such execution before the notary."); *Eason v. Bynon*, 781 So. 2d 238, 241 (Ala. Civ. App. 2000) ("If a notary public does not witness the signatures of the mortgagors. . . and the mortgagors do not acknowledge to the notary that they executed the mortgage . . . the notary's act of signing his name and affixing his notarial seal to the mortgage is a violation of his legal duty."); *First Bank of Childresburg v. Florey*, 676 So. 2d 324, 331 (Ala. Civ. App. 1996) ("A notary has the duty to use ordinary reasonable care in the performance of his functions.").

The parties agree that under Alabama law, a claim for breach of notary duty is essentially a constructive fraud claim.  (Doc. # 96 at 15; Doc. # 112 at 8).  This Court agrees that some Alabama courts have applied constructive fraud concepts to a claim for breach of notary duty.  *See Florey*, 676 So. 2d at 332–33 (upholding the trial court's judgment where "fraudulent notarization, or constructive fraud, claim" was properly submitted to the jury; interpreting *Butler v. Olsham* as applying constructive fraud principles to a claim for fraudulent notarization).  However, other courts have referred to breach of notary duty claims in terms of negligence.  *See Ex parte Floyd*, 796 So. 2d 303, 304 (Ala. 2001) (describing plaintiff's complaint as "claiming [the notary] had *negligently* breached her duty as a notary public, and analyzing the claim based on the

"two-year statute of limitations applicable to *negligence* claims") (emphasis added).[8]  For

purposes of ruling on this motion, the Court assumes (without deciding) that constructive

fraud is the correct body of law under which this breach of notary duty claim should be

analyzed.

Guarantee claims that Poole breached her notary duties, and therefore that her

employer, First Community, should be held vicariously liable for that breach.  (*See* Doc. #

112 at 11).  First Community puts forth the following arguments regarding why it cannot

be held liable for the alleged breach of notary duties: (1) Guarantee did not plead their

claim with the required specificity because the complaint misidentifies the date on which

the alleged fraud occurred; (2) Guarantee's claim is barred by the statute of limitations;

(3) Guarantee cannot demonstrate several elements of a constructive fraud claim; and (4)

that Alabama law does not create vicarious liability for banks whose employees

fraudulently notarize a document.  Each argument will be discussed in turn.

### 1.  Guarantee pled its fraud claim with sufficient particularity to satisfy Rule 9(b)

Federal Rule of Civil Procedure 9(b) provides that "[i]n alleging fraud or mistake,

a party must state with particularity the circumstances constituting fraud or mistake."

Guarantee's complaint states that "[o]n June 22, 2007, Defendant Denise Poole, during

---

[8] While *Ex parte Floyd* discussed the statute of limitations problem in terms of
"the two-year statute of limitations applicable to *negligence* claims," this Court notes that
Ala Code (1975) § 6-2-38(*l*) applies to both negligence claims and to fraud claims.

the course of her employment with [First Community], notarized signatures of William J. Wainwright and Tracye Wainwright which appear on the General Agreement of Indemnity."  (Doc. # 1 at ¶ 37).  It is clear at this point in the case that the actual notarization took place May 30, 2007.  The copy of the notarized agreement attached to the complaint is dated May 30, 2007, and no evidence has been presented that Poole notarized subsequent documents for WDWS or any of its employees or owners.  At the time it filed its answer, First Community recognized that the notarizations relevant to this matter took place on May 30 and not June 22, 2007.  Paragraph 37 of First Community's answer states "the signatures notarized by Denise Poole were notarized on May 30, 2007, not June 22, 2007 as alleged."  (Doc. # 24).

Based on the inaccurate date contained in Guarantee's complaint, First Community argues that Guarantee has failed to meet the pleading standard contained in Rule 9(b). First Community now forcefully asserts that complaints alleging fraud must contain accurate dates, and that otherwise "due process would be abrogated."  (Doc. # 96 at 18). First Community argues that Guarantee should not be permitted to amend its complaint at this juncture, because such an amendment would force defendants "to prepare for a moving or unknown target of a fraud claim."  *Id.* at 20.

The purpose of Rule 9(b), however, is to "provide fair notice of the alleged fraud to the opposing party."  *Buckmasters, Ltd. v. Action Archery, Inc.*, 915 F. Supp. 1188, 1194–95 (M.D. Ala. 1996) (DeMent, J.); *see Ziemba v. Cascade Int'l, Inc.*, 256 F.3d

13

1194, 1202 (11th Cir. 2001) (stating that Rule 9(b) "serves an important purpose in fraud actions by alerting defendants to the precise misconduct with which they are charged and protecting defendants against spurious charges of immoral and fraudulent behavior.  The application of Rule 9(b), however, must not abrogate the concept of notice pleading").  In *Buckmasters*, Judge DeMent found that a plaintiff's complaint satisfied the strictures of Rule 9(b) when "any confusion as to what Buckmasters was claiming as fraud" had been clarified by the motion for summary judgment.  *Id.* at 1195.  The *Buckmaster* court found defendant's concerns about the sufficiency of the complaint to lack merit at the summary judgment stage where "the defendants never challenged the sufficiency of the pleadings in a Rule 12(b)(6)" nor requested a more definite statement of the plaintiff's claims under Rule 12(e).  *Id.* at 1194–95.

The purpose of Rule 9(b) is to ensure that defendants have notice of the alleged fraud.  In this case, it is clear that First Community had notice of the true nature of Guarantee's fraud claim less than one month after the case commenced.  While the text of the complaint itself claimed June 22, 2007 as the date of the alleged fraud, the exhibit attached to the complaint makes clear that the notarization took place on May 30, 2007.  At no time did First Community file a motion either under Rule 12(b)(6) or 12(e) in response to the inaccurate date contained in the complaint.  Any doubts about the notarization date have now been resolved by Guarantee's response to summary judgment.  Accordingly, First Community's motion for summary judgment is due to be denied to the

extent that it seeks judgment based on the inaccurate date contained in Guarantee's complaint.

### 2. *Guarantee's claim is not barred by the applicable statute of limitations*

Next, the Court will take up First Community's argument that Guarantee's claim against it is barred by the two-year statute of limitations applicable to fraud claims.   Ala. Code (1975) § 6-2-38(*l*).   Alabama Code (1975) § 6-2-3 provides that "[i]n actions seeking relief on the ground of fraud where the statute has created a bar, the claim must not be considered as having accrued until the discovery by the aggrieved party of the fact constituting the fraud."   First Community claims that Guarantee was aware, or should have been aware, through its agent Evans, that the Agreement had been improperly notarized in May of 2007.[9]   (Doc. # 115 at 25).

When determining when a statute of limitations begins to run, the Court looks to when a reasonable person would have discovered the alleged fraud.   *See Smith v. Duff & Phelps, Inc.*, 5 F.3d 488, 492 (11th Cir. 1993) ("The question for this Court becomes, then, whether the receipt of those letters in February, 1984, announcing the planned acquisition would have led a reasonable person as a matter of law to the discovery of the alleged fraud.").   In other words, the "fraud is deemed to have been discovered when it

---

[9] First Community does not argue, and there is no evidence to suggest, that Guarantee had actual knowledge of the alleged breach of notary obligation and fraud in 2007.   First Community's argument is that Guarantee had constructive knowledge of the fraud, through the knowledge of its agent Evans, in 2007.

ought to have been discovered."  Michael L. Roberts, Gregory S. Cusimano, Alabama Tort Law § 20.21 (5th ed. 2010).

Additionally, any knowledge of the agent can be imputed to the principal if the knowledge was gained in the performance of duties related to the agency relationship. *Stone v. Mellon Mort. Co.*, 771 So. 2d 451, 457 (Ala. 2000).  The existence of an agency relationship is determined by the facts.  *Ragsdale v. Life Ins. Co. of N. Am.*, 632 So. 2d 465, 468 (Ala. 1994); *Semo Aviation, Inc. v. Se. Airways Corp.*, 360 So. 2d 936, 940 (Ala. 1978).  If the facts establish an agency relationship, the intention of the parties is immaterial.  *Id.*  The character of the relationship is not affected by an agreement of the parties that the agency does not exist or that some other relationship exists.  *Id.*  How the parties characterize an agreement does not affect how the law characterizes the relationship.  *Id.* When determining whether there is an agency relationship between two entities, the dispositive factor to consider is control.  *Tyson Foods, Inc. v. Stevens*, 783 So. 2d 804, 808 (Ala. 2000).

The existence of an agency relationship is generally a question of fact to be decided by the trier of fact.  *Tyson*, 783 So. 2d at 808.  The party asserting that an agency relationship exists has the burden of presenting substantial evidence of the alleged agency.  *Malmberg v. Am. Honda Motor Co., Inc.*, 644 So.2d 888, 890 (Ala. 1994).

Evans was the account executive at J. Smith Lanier insurance agency that sold Guarantee bonds to WDWS.  (Doc. # 96 Ex. 1).  Evans testified that, during a meeting in

16

his office with Steve, Steve signed the Agreement as an individual indemnitor.  *Id.*  Evans then signed as a witness to Steve's signature.  Evans testified that to the best of his recollection, the signatures of all other parties already appeared on the Agreement at the time he witnessed Steve's signature.  Evans did not know whether Poole's notarization already appeared on the Agreement.  Regardless of whether or not Poole had already notarized the Agreement, Evans now concedes that Poole did not witness Steve sign the Agreement before she notarized the Agreement.  Either her notarization appeared on the document before Steve signed it in Evans's office, or Steve signed it in Evans's office and Poole later notarized the Agreement without observing Steve sign it.  Evans conceded during his deposition that while he did not realize there was a problem with the signatures at the time, he agrees that if he had noticed, he would have alerted Guarantee to the potential problem with the signatures.

Evans may have had knowledge that Steve's signature was not properly notarized. However, there is no evidence to suggest that Evans had knowledge that the signatures of Jeff and Tracye may have been improperly notarized.  Evans could have reasonably assumed that if the signatures of the other individual indemnitors appeared on the Agreement, that those signatures had already been properly notarized as well. Additionally, the fact that Poole may have improperly notarized Steve's signature does not automatically mean that she improperly notarized Jeff and Tracye's signature. Therefore, the Court finds that Evans did not have knowledge of the facts giving rise to

17

Guarantee's constructive fraud claim.  Even if Evans was Guarantee's agent and his knowledge is imputed to Guarantee, the statute of limitations clock did not start running when Steve signed the Agreement in May 2007.  For these reasons, First Community's motion for summary judgment is due to be denied with respect to the statute of limitations grounds.

### 3.  First Community is not entitled to summary judgment on any element of Guarantee's fraud claim

Alabama Code (1975) § 6-5-101 provides that misrepresentations of material fact made willfully, recklessly, or innocently, and acted on by the opposite party constitute legal fraud.   "Fraud by one, accompanied with damage to the party defrauded, in all cases gives a right of action."  Ala. Code (1975) § 6-5-100.  First Community argues that Guarantee cannot prove (1) that it relied in fact upon the Agreement; (2) that it reasonably relied on the Agreement; (3) that the alleged fraud was the proximate cause of injury; and (4) that it suffered damages.  Each of these elements will be discussed independently.

#### a.  Reliance in fact

To support its argument that Guarantee did not rely on the notarization, First Community points out that bonds were issued before May 30, 2007, the date on which the Agreement was notarized.

In support of its contention, First Community points to the two bond detail sheets accompanying bonds # 40008020 and 40008021.  The detail sheets are dated May 16,

2007 and May 17, 2007, approximately two weeks before the Guarantee was signed and notarized.  This paperwork indicates that Guarantee had already agreed to issue bonds on behalf of WDWS before the final Agreement was in their possession.  According to First Agreement, this indicates that Guarantee did not rely on the Agreement, and therefore cannot establish a constructive fraud claim.

Guarantee argues, however, that there are several explanations for why the bond detail sheets may have been dated before the Agreement was signed.  First, Guarantee distinguishes between the date on which a bond is issued and the date on which a bond is released.  A bond does not become binding on the parties until it has been released.  (*See* Doc. # 96 Ex. 9 at 96–97, stating that the date on which Steve received the bonds is the date that matters, not the effective date listed on the bond detail sheets).  The effective date of the bond as reflected on the bond detail sheet may not correspond with the date on which the bond was released.  According to Befort, bonds are often back dated to correspond to the date on which the underlying construction contract was executed.  Therefore, the dated bond detail sheets are not conclusive evidence that Guarantee released bonds before receiving the signed Agreement.  In fact, according to Guarantee's Vice President of Surety National Underwriting Standards, Home Office Underwriter, and Regional Surety Manager, under no circumstances would Guarantee release any bonds on behalf of WDWS without first obtaining the signed Agreement.

Guarantee further explains that several aspects of the bonding and underwriting

19

process proceed simultaneously.  So bond paperwork could have been prepared and underwriting decisions made before Guarantee received the signed Agreement.[10] However, no bonds would be released to the party who had contracted with WDWS until Guarantee was in possession of the Agreement.  First Community counters this argument with the signed bond for the City of Gordo project, bond # 40008021.  (Doc. # 96 Ex. 13). The bond is dated May 24, 2007, a date later than the effective date listed on the bond detail sheet, but still earlier than the date on which the Agreement was notarized.  *Id.* Befort's affidavit states that the date that appears on the face of the bond may have been back dated, and accordingly may not accurately reflect the date on which the bonds were released.  (Doc. # 110 Ex. 1).

It appears that the testimony of the Guarantee employees is in conflict with the signed and dated bond paperwork relating to the City of Gordo project.  Accordingly, there is a genuine dispute of fact that remains to be resolved at trial with regard to whether Guarantee relied on the notarized Agreement.

---

[10] First Community also argues that because Guarantee had determined the individual bond and aggregate bond levels for the WDWS account, Guarantee did not rely on the signed agreement when making underwriting decisions.  However, Guarantee has explained that parts the underwriting process, including the decision about what the "line of authority" should be, happen simultaneous to other parts of the process, including the acquisition of the Agreement.  Additionally, First Community has presented no evidence that the Agreement was necessary for the calculation of the line of authority.  As several Guarantee employees have testified, Guarantee would not have released any bonds until it obtained the Agreement, but there is not evidence that Guarantee needed the Agreement in order to calculate the line of authority.

### b.  *Reasonable reliance*

In support of its argument that Guarantee could not have reasonably relied on the

Agreement, First Community renews its argument that Evans had notice that the

notarization of the Agreement was done improperly.  As the Court has explained above,

while Evans may have had knowledge that Steve's signature was not properly notarized,

Evans did not have knowledge that the signatures of Jeff and Tracye may have been

forged.  Therefore, First Community's argument is unpersuasive to the extent that it relies

on Evans supposed knowledge of improper notarization.

First Community also points to Guarantee's underwriting guidelines, which state

that notarization provides only "some assurance" that the notarized signatures are valid.

(Doc. # 96 Ex. 8 at GCNA 00023).  The guidelines go on to state that notarization is not

necessary for the creation of a valid agreement, but that it is "desirable and should be

obtained as a matter of standard operating procedure."  *Id.*  First Community argues that if

Guarantee didn't even require the notarization in order for there to be a binding

agreement between the parties, then Guarantee could not have reasonably relied on the

notarization when issuing bonds on behalf of WDWS.

While the notarization may not have been necessary, First Community has not

presented evidence to demonstrate why, after obtaining notarization, Guarantee would not

then be entitled to rely on the notarization.  Perhaps if the Agreement had been returned

without notarization, Guarantee would have taken further steps to corroborate the

21

signatures—steps that were not taken in this case because the notarization provided "some assurance" that the signatures were valid.

Because First Community has not carried its burden of establishing the absence of a genuine dispute of material fact as to Guarantee's reasonable reliance, First Community's motion is due to be denied in that regard.

### c. Proximate cause of damage

First Community argues that the allegedly improper notarization did not proximately cause Guarantee's damage in this case. Instead, First Community contends that Guarantee's failure to comply with its own guidelines was the proximate cause. The guidelines require that when a corporation is an indemnitor, the corporate officer's signature must be witnessed by the corporate secretary. (Doc. # 96 Ex. 8 at GCNA 00024). Jeff was the WDWS corporate secretary at the time the Agreement was signed, and therefore should have been the one to witness Steve's signature in his capacity as WDWS president. First Community argues that if Jeff had been required to sign at that time, he would have known about the indemnity agreement and either have signed it himself or made clear that he was not willing to indemnify WDWS. In other words, the bulk of this lawsuit would have been avoided if Jeff had been required to sign in his capacity as corporate secretary.

Alabama law defines proximate cause as "an act or omission that in a natural and

continuous sequence, unbroken by any new and independent causes, produces the injury and without which the injury would not have occurred." *Crowne Invs., Inc. v. Bryant*, 638 So. 2d 873, 877–78 (Ala. 1994).  The injury incurred must be a foreseeable consequence of the allegedly improper conduct.  *See Everett v. Brad Ragan, Inc.*, No. Civ. A. 99-663CBC, 2000 WL 360240, at *3 (S.D. Ala. 2000) (finding that "under no circumstances is it reasonably foreseeable that a plaintiff would fail to apprehend a fugitive as a result of the negligent installment of [a] fuel filter").  "The existence of proximate cause is 'almost always' a question of fact." *Hammonds v. U.S.*, No. 10-12927, 2011 WL 989605, at *4 (11th Cir. March 22, 2011) (quoting *Thompson v. Gaier*, 512 So. 2d 775 (Ala. 1987)).

This argument doesn't hold merit, however.  First, Poole's allegedly fraudulent notarization "produce[d] the injury." *Crowne Invs.*, 638 So. 2d at 878.  Assuming that Poole did in fact fraudulently notarize the document without having witnessed Jeff and Tracye sign the Agreement, her fraudulent conduct is an act "without which the injury would not have occurred." *Id.*  If Poole had required Jeff and Tracye to sign the Agreement in front of her, the forgery would have been exposed earlier, and Guarantee would never have issued bonds on behalf of WDWS.

Additionally, the Court does not find First Community's arguments about intervening cause to be persuasive.  First Community argues that Guarantee's failure to comply with its own underwriting guidelines interrupts the chain of causation and

23

therefore precludes a finding that Poole's actions were the proximate cause of Guarantee's alleged damage.  Had Guarantee required Jeff to attest Steve's signature in his capacity as corporate president, there is no evidence that Steve would have actually obtained a legitimate signature.  If Steve forged Jeff's signature in his individual capacity, there is no evidence to suggest that Steve would not also have forged Jeff's signature in his capacity as corporate president.

First Community argues that because notarization is not required to create a legally binding contract, that the allegedly improper notarization could not in and of itself make the agreement unenforceable, and therefore could not cause Guarantee's injury.  While it is true that notarization isn't necessary to create a binding contract, Guarantee has made it clear that they would not have accepted the Agreement, and therefore would not have issued any bonds on behalf of WDWS if the Agreement had not been notarized.  If Guarantee had not issued any bonds on behalf of WDWS, then Guarantee would not have incurred a loss by paying to complete the unfinished public works projects.  Therefore, Poole's notarization of the Agreement is an essential component of the transaction between Guarantee and WDWS, without which Guarantee's injury would not have occurred, and is therefore the proximate cause of the injury.[11]

---

[11] First Community may be arguing that if the Agreement is deemed enforceable against Jeff and Tracye , then Guarantee has not suffered an injury.  Since an agreement can be enforceable even without proper notarization, if Guarantee is able to recover for its losses against Jeff and Tracye through the Agreement, then Poole's improper notarization would not be the proximate cause of any harm.  Because this argument also touches on

First Community also argues that Guarantee's failure to follow its own underwriting requirements by neglecting to require a corporate seal and triplicate copies of the Agreement was either the proximate cause or an intervening cause that precludes their claim of constructive fraud. The underwriting guidelines are not mandatory, and in some cases do not reflect standard operating procedure in the industry. Additionally, First Community has presented no evidence that Guarantee's failure to require a corporate seal and triplicate execution caused Guarantee's injury. Whether or not a corporate seal was required has absolutely no bearing on whether or not the Agreement is enforceable against Jeff and Tracye. Additionally, there is no guarantee that had the Agreement been executed in triplicate that the problem with the allegedly forged signature would have been avoided. Steve could just have easily forged Jeff and Tracye's signatures three times, and Poole could just have easily improperly notarized three copies of the Agreement. Accordingly, First Community's arguments do not convince the Court of an absence of genuine dispute of material fact as to the existence of proximate cause.

### d. Damages

Last, First Community argues that Guarantee cannot succeed in its constructive fraud claim because there is no evidence that Guarantee has suffered present damage. If the Court finds that Jeff and Tracye cannot be bound by the Agreement, then Guarantee

---

whether Guarantee can establish any present damages, it will be discussed in more detail below.

cannot recover from them and Guaratnee will suffer damage as a proximate result of the constructive fraud.  If the Court finds that Jeff and Tracye are in fact bound by the terms, then Guarantee can hold Jeff and Tracye liable and no damage would be incurred as a result of the fraudulent notarization.  First Community goes so far as to argue that Guarantee's claims for relief are not ripe for review by this Court because there has not yet been a determination of whether Jeff and Tracye are liable for Guarantee's losses under the Agreement.  First Community requests that the Court dismiss the claims against it, but cites no case law which would allow this Court to dismiss Guarantee's breach of notary duty claim on the basis that the outcome of the claim is dependent on the outcome of another claim in the same litigation.

First Community suggests in the alternative that the Court stay the claim against it until Guarantee is able to resolve all other claims regarding the Agreement, both in this Court and in bankruptcy proceedings.  "The District Court has broad discretion to stay proceedings as an incident to its power to control its own docket."  *Clinton v. Jones*, 520 U.S. 681, 706–707 (1997).  As the Court is perfectly capable of resolving all factual issues regarding the allegedly forged signatures on the Agreement before determining whether First Community is liable on the breach of notary duty claim, First Community's request to stay the claim against it is due to be denied.

### 4.  *First Community can be held vicariously liable for Poole's actions*

Guarantee's claim against First Community is based solely on Poole's allegedly

26

improper notarization of the Agreement.  Accordingly, Guarantee's theory of liability against First Community is that First Community should be held vicariously liable for the tortious conduct of its employee.  In other words, Guarantee seeks to hold First Community liable through the doctrine of respondeat superior.  First Community argues that under Alabama law, an employer cannot be held vicariously liable for the tortious acts of its employee notary.  The parties cite three Alabama decisions in support of their respective positions.  For the reasons set out below, the Court finds that none of the cases provide an on-point holding.

In the only decision of the three to be rendered by the Alabama Supreme Court, *Constantine v. U.S. Fid. & Guar. Co., Inc.*, the court upheld the lower court's finding that the plaintiff was estopped from bringing claims against the defendant bank and notary. 545 So. 2d 750, 754 (Ala. 1989).  The trial court had found that because of a prior suit, the plaintiff was estopped from bringing a breach of notary obligations claim against the bank that had employed the notary.  *Id.*  Because the notary was the bank's agent, the trial court then found that the plaintiff was further precluded from proceeding against the agent after the principal had been absolved from liability for the acts of the agent.  *Id.* The Alabama Supreme Court agreed that the plaintiff was estopped from bringing suit against either the employer bank or the notary, but stated that "we cannot agree with the defendants' contention that a principal/agent relationship existed between the bank and the notary public or her surety." *Id.* at 755.  The court's ultimate decision, however, was

27

not at all based on the dicta about whether an agency relationship existed between the specific bank and the specific notary involved in the case.  *Id.*  Accordingly, *Constantine* cannot stand for the proposition that a bank is free from liability for the actions of its employee notary in all cases.

Next, the parties cite *First Bank of Childersburg v. Florey*, 676 So. 2d 324 (Ala. Civ. App. 1996).  In *Florey*, a jury returned a verdict in favor of the plaintiff and against both the notary and the employer bank on a fraudulent notarization claim.  *Id.* at 333.  The bank appealed the charge and special interrogatories submitted to the jury, and the sufficiency of the evidence as to the fraudulent notarization claim.  *Id.* at 331.  The bank did not, however, appeal on the grounds that Alabama law precluded a finding that the bank was liable for the notary's tortious acts.  *Id.*  Accordingly, the appellate court's opinion upholding the lower court's judgment was not based on the same questions facing this Court, and does not shed light on the parties' arguments.

Last, the parties cite *Higgens v. Pacesetter Corp.*, 694 So. 2d 1265 (Ala. Civ. App. 1996).  In Higgens, the court cites the Alabama Supreme Court's opinion in *Constantine* for the proposition that "no principal-agent relationship existed between the bank and the notary public."  *Id.* at 1267.  The *Higgens* case doesn't actually involve an employer bank, however, and therefore this quoted language is unnecessary dicta.

Because the parties have failed to demonstrate to this Court that Alabama law prohibits a finding that a bank is liable for the tortious conduct of its employee notary, the

28

Court will instead look to general principles of respondeat superior to determine whether, under the facts of this case, an agency relationship existed between First Community and Poole.

To recover against a defendant under the theory of respondeat superior, it is necessary for the plaintiff to establish the status of employer and employee, or master and servant. *Ware v. Timmons*, 954 So. 2d 545, 549 (Ala. 2006) (citing *Hendley v. Springhill Mem'l Hosp.*, 575 So.2d 547, 550 (Ala.1990)). Proof of a master and servant relationship is tested by the degree of control the alleged master retains over the alleged servant. *Id.* (citing *Gossett v. Twin Cnty. Cable T.V., Inc.*, 594 So.2d 635, 639 (Ala.1992)).

It is clear that First Community had control over Poole's use of her notary power. Poole testified that First Community asked her to become a notary, and that after she filled out the application form, the bank "did the rest." (Doc. # 96 Ex. 14 at 12–13). First Community obtained a notary bond from RLI on behalf of Poole. *Id.* at 17–18. Poole stated that she did not receive any training from First Community about her notary duties. However, she was told that it would be appropriate for her to notarize documents, even when she had not seen the client sign the document, if her supervisor instructed her to do so. *Id.* at 19–20. Poole testified that her supervisor Tracy Alexander ("Alexander") often brought her documents to notarize, even though she had not seen the clients sign the documents. *Id.* at 30–32. Alexander testified that Poole was expected to notarize documents in the ordinary course of First Community's business. Accordingly, this Court

29

finds that a genuine dispute of material fact exists as to whether or not Poole was acting as a servant of First Community.

In order for an employer to be liable for the tortious conduct of a servant, the servant must have committed the tortious conduct in the line and scope of her employment. *Askew v. R & L Transfer, Inc.*, 676 F. Supp. 2d 1298, 1301 (M.D. Ala. 2009) (Thompson, J.). First Community has not moved for summary judgment regarding whether Poole was acting in the line and scope of her employment when she allegedly fraudulently notarized the Agreement. Accordingly, the Court need not reach this issue.

As First Community has failed to demonstrate that there is an absence of genuine disputes of material fact as to any of the elements of Guarantee's claim, their motion for summary judgment is due to be denied.

### C. Poole's Motion

Poole raises several arguments in her motion for summary judgment that are identical to those raised by First Community.[12] As those arguments were taken up by the Court in the above analysis there is no need to re-analyze them here. None of Poole's arguments were persuasive to the Court, and accordingly, her motion is due to be denied as well.

_____

[12] Poole argues first that Guarantee did not rely on her allegedly fraudulent notarization because two bonds were issued in favor of WDWS before Guarantee received the Agreement. Second, she argues that Guarantee could have discovered the allegedly forged signatures earlier if it had followed its own underwriting guidelines by requiring the signature of the corporate secretary and delivering a copy of the agreement to each individual indemnitor. Third, Poole alleges that Evans had knowledge of the facts giving rise to Guarantee's fraud claim, and Evans knowledge as agent was imputed to Guarantee as principal. Accordingly, Poole argues that Guarantee's claims are barred by the statute of limitations.

## V.  CONCLUSION

It is hereby ORDERED that Jeff and Tracye Wainwright's Motion for Summary Judgment (Doc. # 66), First Community's motion for summary judgment (Doc. # 95), and Denise Poole's motion for summary judgment (Doc. # 97) are DENIED.

Done this the 11th day of May, 2011.

/s/ Mark E. Fuller
_____
CHIEF UNITED STATES DISTRICT JUDGE
